Harry J. Williby
P.O. Box 990755
Redding,CA 96099-0755
Phone: (000) 000-0000 (cell phone users can be tracked by defendants' Android OS)
E-mail: wilabee@protonmail.com
Attorney for: In Pro Se

**FILED**

FEB 28 2022

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO

| | |
|---|---|
| **Harry J. Williby,**<br><br>**Plaintiff,**<br>**vs.**<br><br>**Sergey Brin,**<br>**Larry Page,**<br>**Pichai Sundararajan, a.k.a.,**<br>**Sundar Pichai, his predecessor,**<br>**Eric Schmidt, dba, Alphabet, Inc.,**<br>**Google, LLC., and YouTube, LLC., dba, Blogger, dba, Google AdSense (Pay-Per-Click)**<br>**Mark Zuckerberg, dba, Facebook, Inc.,**<br>**Jeff Bezos, dba, Amazon.com, Inc., and Doe(s)/Roe(s) 1-10,**<br>**Defendant(s).** | Case No.<br>**C22-01271** VC<br><br>**COMPLAINT FOR DAMAGES**<br>**JURY TRIAL DEMANDED**<br><br>**ORIGINAL** |

## I.   INTRODUCTION

The Plaintiff, Harry J. Williby ("Williby" or "Plaintiff"), by and through its

attorneys, (In Pro Se), as and for its complaint against Defendants Sergey Brin, Larry

Page, Sundar Pichai, his predecessor, Eric Schmidt, dba, Alphabet, Inc., Google, LLC., and YouTube, LLC., dba, Blogger, dba, Google AdSense (Pay-Per-Click), Mark Zuckerberg, dba, Facebook, Inc., Jeff Bezos, dba, Amazon.com, Inc., and Doe(s)/Roe(s) 1-10, allege as follows:

## II.    NATURE OF THE ACTION

1.    This is an action under Sections 1 and 2 of the Sherman Act to restrain anticompetitive conduct by the defendants, the world's largest providers of the Android OS, Google Apps, Google Search browser, Internet advertising, online sales, and online news feed, and to remedy the effects of their past unlawful conduct. Defendants' actions, conduct and agreements are restraints of trade that are per se unlawful under Section 1 of the Sherman Act, 15 U.S.C. and § 2. This is also an action for damages and other relief arising out of the Defendants' unlawful and unfair decision to deprive Plaintiff of earned Internet Advertising Revenue. Defendants' actions, conduct and agreements are restraints of trade that are per se unlawful and constitute false advertising under the Lanham Act, 15 U.S. Code § 1125(a)(1)(A) and (B). The Plaintiff seeks an order prohibiting such actions, conduct and agreements.

2.    Since 2003, Defendants have tightly limited the supply and territorial markets of online advertisement in the United States and around the world, through its Google "AdSense (PPC)" program. Defendants have also collectively controlled and dictated under what terms and conditions, the website owners, or content creators, such as the Plaintiff, can have an online, digital advertising presence. This is achieved through a process commonly referred to by Defendants as "Demonetization," or "Shadow

Banning." This is not a fair process in a competitive marketplace. It is a horizontal price-fixing scheme-rigged process that, contrary to the law, promotes a monopoly in order to further line the pockets of the Alphabet Defendants (owners) jointly and severally, with billions of dollars paid by their billionaire competitors (Defendants Facebook and Amazon) to the sole detriment of the Plaintiff, website owners, content creators and consumers. The Google "AdSense (PPC)" program is, essentially, a leveraging of the Defendants Android operating system and Internet browser monopoly power, used to extract value from Plaintiff, website owners, content creators and consumers, through a scheme-rigged process.

3.      The costs of Defendants' collective scheme is enormous, particularly to the public who bear the brunt of Defendants' anti-competitive conduct. Due to the great demand for online advertisement, on the one hand, and Defendants' collective market power over the online, digital advertising industry, on the other, Defendants can demand supra-competitive terms to the detriment of Plaintiff and consumers. This is a case of leveraging monopoly power, resulting in an anticompetitive wealth transfer from consumers to private business, in violation of the antitrust laws.

4.      Not only does the Google "AdSense (PPC)" program violate the antitrust laws, the federal courts have previously determined the terms & conditions of the program to be procedurally and substantively unconscionable. *In Free Range Content, Inc. v. Google Inc., No. 5:14-cv-02329 (BLF) Plaintiffs challenged the "Terms and Conditions" of the Google AdSense Program as unconscionable. The court held: "Thus, the Court finds that Plaintiffs have sufficiently alleged at least a degree of procedural*

*unconscionability. See Bridge Fund, 622 F.3d at 1004. (At page 12) [¶] [...] the Court finds that Plaintiffs have sufficiently alleged substantive unconscionability." (At Page 14.)* Defendant Alphabet, dba, Google, LLC., dba, Youtube, LLC., dba, Google "AdSense (PPC)" <u>alone</u>, determines the terms & conditions of the Google "AdSense (PPC)."

5.     Specifically, the Defendants, jointly and severally, controls all browsers, operating systems, online sales and online digital advertising; collectively, they control the terms & conditions, which Plaintiff, as the host of multiple websites, is an intended beneficiary; Defendants control who can place online ads; the number of advertisements that can be placed online (or on a particular page); where the ads are located online; and the cost of these online ads, which gives them complete market control and power. Through this decidedly skewed process, Defendants concertedly refused to deal with Plaintiff. As a result of Defendants' anti-competitive conduct, jointly and severally, the Defendants (during the operative times of this complaint) have shared, or will share, in more than ***$1.4 Trillion*** in online, digital advertising revenue. Maximizing their cartel revenue – ultimately at the expense of the consuming public and Plaintiff – is what really matters to Defendants.

6.     The Defendants' unlawful conduct has caused Plaintiff significant injury and loss. Among other things, Plaintiff has lost the value of his significant ten year investment in the websites/pages set forth below in ¶ 52. Plaintiff is burdened with a brand (Wilabee, (derivative brand of Williby)) of significantly diminished value, and has lost the revenues generated by the ten year investment in the websites/pages set forth

below in ¶ 52. Defendants disregarded every objective factor in the destruction, shadow banning and demonetization of Plaintiff's websites/pages set forth below in ¶ 52. Thus, concertedly demonetizing, shadow banning and refusing to deal with Plaintiff on objective terms in an effort to maximize their ad revenue, as well as leveraging their multi-market monopoly power, was not grounded on, or based upon any objective criteria. Because Defendants' collective action was not grounded in objective criteria and violates the law, their collective action lacks any procompetitive justifications.

7.    The Defendants, jointly and severally, possesses (and for several years has possessed) monopoly power in the market for browsers, online sale of goods, payment systems, Internet advertising, online news feeds, PC/tablets/smartphones and mobile based operating systems. Defendants' "Android" operating systems are used on over 98% of cell phones, the dominant type of cell phones in the United States. More than 90% of new cell phones are shipped with a version of Android apps pre-installed. Cell Phone manufacturers (often referred to as Original Equipment Manufacturers, or "OEMs") have no commercially reasonable alternative to Android operating systems for the cell phones, tablets, or wearables that they distribute.

8.    There are high barriers to entry in the market for browsers, the online sale of goods, payment systems, Internet advertising, online news feeds, PC/tablets/smartphones and mobile based operating systems. One of the most important barriers to entry is the barrier created by the number of software applications that must run on an operating system in order to make the operating system attractive to end users. Because end users want a large number of applications available, because most applications today are

written to run on Android, and because it would be prohibitively difficult, time-consuming, and expensive to create an alternative operating system that would run the programs that run on Android, a potential new operating system entrant faces a high barrier to successful entry and thus cannot develop browsers, platforms for the online sale of goods, payment systems, Internet advertising, online news feeds, PC/tablets/smartphones, or mobile based operating systems.

9. Accordingly, the most significant potential threat to the Defendants' operating system monopoly is not from a direct, frontal assault by existing or new operating systems, but from new software products that may support, or themselves become, alternative "platforms" to which applications can be written, and which can be used in conjunction with multiple operating systems, including but not limited to Android.

10. To protect its valuable Android monopoly against such potential competitive threats, and to extend its operating system monopoly into other software markets, The Defendants, jointly and severally, have engaged in a series of anticompetitive activities. The Defendants' conduct includes agreements tying other software products to the Android operating system; exclusionary agreements precluding companies from distributing, promoting, buying, or using products of Android's software competitors or potential competitors; and exclusionary agreements restricting the right of companies to provide services or resources to Android's software competitors or potential competitors.

11. One important current source of potential competition for Android's operating system monopoly comes from the Internet. The development of competing

Internet browsers -- specialized software programs that allow PC users to locate, access, display, and manipulate content and applications located on the Internet's World Wide Web ("the web") -- posed a serious potential threat to Android's operating system monopoly.

12.     Internet browsers pose a competitive threat to Android's operating system monopoly in two basic ways. First, as discussed above, one of the most important barriers to the entry and expansion of potential competitors to the Defendants in supplying platforms for the online sale of goods, payment systems, Internet advertising, online news feeds, PC/tablets/smartphones, or mobile based operating systems, is the large number of software applications that will run on the Android operating system, but not on other operating systems. If application programs could be written to run on multiple operating systems, competition in the market for platforms for the online sale of goods, payment systems, Internet advertising, online news feeds, PC/tablets/smartphones, or mobile based operating systems could be revitalized. For example, a programming language can be designed in part to permit applications written in it to be run on different operating systems, other than Android. As such, it threatens to reduce or eliminate one of the key barriers to entry protecting Android's operating system monopoly.

13.     Internet browsers are perhaps the most significant vehicle for distribution of platforms for the online sale of goods, payment systems, Internet advertising, online news feeds, to end users. The Defendants have recognized that the widespread use of browsers, other than their own, threatens to increase the distribution of platforms for the online sale

of goods, payment systems, Internet advertising, online news feeds, and in so doing threatens Defendants' Android operating system monopoly. Second, the Defendants recognized that a browser was itself a "platform" to which many applications were being written -- and to which (if it thrived) more and more applications would be written. For example, since a java supported browser could be run on any PC operating system, the success of this alternative platform threatened to reduce or eliminate a key barrier protecting Defendants' Android operating system monopoly. Therefore, for example, when we load a website or a web service in which Java technology is used, it shows a message saying: "The [Google] Chrome browser does not support Java." The reason is that the [Google] Chrome browser no longer supports the NPAPI. NPAPI is a technology that supports Java applets.

14.     To respond to the competitive threat posed by browsers not owned, or controlled by the Defendants, Defendant Google embarked on an extensive campaign to acquire, market and distribute Defendants' own mobile based Internet browser, which is named "Android."

15.     Due to Defendants' vast resources and programming technology, Defendant Google was well positioned to develop and market a mobile based browser in competition with Internet OS platforms. Indeed, continued competition on the merits between Internet OS platforms and Defendant's Android OS would have resulted in greater innovation and the development of better products at lower prices. Moreover, in the absence of the Defendants anticompetitive conduct, the offsetting advantages of Facebook, Amazon and Google's size and dominant positions in OS software and the

Internet OS platform's position as the browser innovator and the leading distribution browser supplier, and the benefit to consumers of product differentiation, could have been expected to sustain competition on the merits between these companies, and perhaps others that have entered and might enter the OS market.

16.     However, the Defendants Facebook, Amazon and Google have not been willing simply to compete on the merits. The Defendants have concluded that it would be very hard to increase browser share on the merits of Android alone. It will be more important to leverage the OS asset to make people use Android instead of the Internet based platforms. Thus, the Defendants Facebook, Amazon and Google began, and continues today, a pattern of anticompetitive practices designed to thwart OS and browser competition on the merits, to deprive customers of a choice between alternative browsers, or operating systems, and to exclude the Defendants' Internet browser and/or OS competitors.

17.     The Defendants' conduct with respect to Internet browsers and operating systems is a prominent and immediate example of the pattern of anticompetitive practices undertaken by the Defendants, jointly and severally, with the purpose and effect of maintaining its Android operating system monopoly and extending that monopoly to other related markets.

18.     The Defendants have clearly adapted the anticompetitive mantra of the former monopolistic giant Microsoft. In a warning to competitive rivals in June 1996, the Microsoft CEO stated: "*We are going to cut off their air supply. Everything they're selling, we're going to give away for free. Our business model works even if all Internet*

*software is free. . . . We are still selling operating systems.*" First, Google has invested eighty ($80) billion dollars to develop, test, and promote the Android OS, a product which it distributes without separate charge. Second, the Defendants have set about to exclude non-Android and other Internet browser rivals from access to the distribution, promotion, and resources they need to offer their browser products to OEMs and PC/tablets/smartphones users. This prevents rival browsers from becoming an attractive programming platform in their own right. Third, the Defendants Facebook, Amazon and Google did not stop at free distribution. Rather, the Defendants purposefully set out to do whatever it took to make sure significant market participants distributed and used the Android OS instead of the Internet browser -- including paying some customers to take the Android OS and using its unique control over Facebook, Amazon and Google Apps (supported only by Android OS) to induce others to do so. For example, virtually every cell phone manufacturer (globally) has installed the Android OS on their phones, while every U.S. (Android) wireless phone retailer has agreed to pre-install Facebook, Amazon and Google (Android based) Apps on their phones.

19.    The Defendants unlawfully required PC/tablets/smartphones manufacturers, as a condition of obtaining licenses for the Android operating system, to agree to license, preinstall, and distribute Android on every phone and the Google browser on every PC/tablets/smartphones such manufacturers shipped. By virtue of the monopoly position Android enjoys, it was a commercial necessity for OEMs to preinstall the Android OS -- and, as a result of Google's illegal tie-in, the Google search browser -- on virtually all of the PC/tablets/smartphones they sold. Google thereby unlawfully tied its Internet

Browser software to the Android version of its monopoly operating system and unlawfully leveraged its operating system monopoly to require PC/tablet/smartphone manufacturers to license and distribute the Google search browser on every PC/tablet/smartphone those OEMs shipped with Google (Android based) applications. The Defendants, Facebook, Amazon and Google have made it clear, that unless restrained, they will continue to misuse their operating system monopoly to artificially exclude browser/OS competition and deprive customers of a free choice between browsers/OS.

20.    Internet browsers are separate products competing in a separate product market from PC/tablets/smartphones and operating systems, and it is efficient to supply the products separately. Indeed, Defendant Google itself has consistently offered, promoted, and distributed its Internet browser as a stand-alone product separate from, and not as a component of, Android, and intends to continue to do so. Defendant Google's tying of its Internet browser to its monopoly operating system reduces the ability of customers to choose among competing browser products because it forces OEMs and other purchasers to license or acquire the tied combination whether they want Google's Internet browser or not. Defendant Google's tying -- which it can accomplish because of its monopoly power in Android OS -- impairs the ability of its browser rivals to compete to have their browsers preinstalled by OEMs on new PC/tablets/smartphones and thus substantially forecloses those rivals from an important channel of browser, or PC/tablet/smartphone operating system distribution.

21.    Defendant Google's executives have repeatedly recognized the significant

advantage that Google (and the other Defendants) receives by tying its Internet browser to its operating system, rather than having to compete on the merits. Google has misused, and continues to misuse, its Android operating system monopoly by requiring PC/tablet/smartphone OEMs to agree, as a condition of acquiring a license to the Android operating system, to adopt the uniform "boot-up" sequence and "desktop" screen specified by Google. This sequence determines the screens that every user sees upon turning on a PC/tablet/smartphone. Google's exclusionary restrictions forbid, among other things, any changes by an OEM that would remove from the PC/tablet/smartphone any part of Google's Internet browser software (or any other Google-dictated software) or that would add to the PC/tablet/smartphone becoming a competing browser (or other competing software) in any more prominent or visible way (including by highlighting as part of the startup sequence or by more prominent placement on the desktop screen) than the way Google requires its Internet browser to be presented.

22.     Virtually every new PC/tablet/smartphone that comes with Android, no matter which OEM has built it, presents users with the same screens and software specified by Google. As a result of Google's restrictive boot-up and desktop screen agreements, OEMs are deprived of the freedom to make competitive choices about which browser or other software product should be offered to their customers, the ability to determine for themselves the design and configuration of the initial screens displayed on the phones, or computers they sell, and the ability to differentiate their products to serve their perceptions of consumers' needs.

23.     These restrictive agreements also maintain, and enhance the importance of,

Google's ability to provide preferential placement on the desktop (or in the boot-up sequence) to various Internet Service Providers ("ISPs") and Internet Content Providers ("ICPs"), in return for those firms' commitments to give preferential distribution and promotion to the Google Internet browser and to restrict their distribution and promotion of competing browsers. As a result, these restrictions further exclude competing Internet browsers from the most important channels of distribution, substantially reduce OEMs' incentives and abilities to innovate and differentiate their products in ways that could facilitate competition between Google products and competing software products, and enhance Google's ability to use the near-ubiquity of its Android operating system monopoly to gain dominance in both the Internet browser/OS, the online sale of goods, payment systems, Internet advertising, PC/tablet/smartphone and the online news feeds market as well as other software markets.

24.     The Defendants have entered into anticompetitive agreements with virtually all of the nation's largest and most popular ISPs, including particularly Online Service Providers ("OLSs"), firms which provide the communications link between a subscriber's PC, Cell Phone and the Internet and sometimes related services and content as well. Defendants Facebook, Amazon and Google provide PC/tablet/smartphone users with "folders" or lists including the names of certain of these ISPs that have entered into agreements with the Defendants and enable users readily to subscribe to their services. Because Google is preinstalled on nearly all PC/tablets/smartphones in the United States, inclusion in these folders and lists is of substantial value to ISPs. As a result, almost all of the largest and most significant ISPs in the United States have sought placement on the

Google desktop.

25.     Defendant Google's agreements with ISPs allow Google to leverage its Android operating system monopoly by conditioning these ISPs' inclusion in Googles' lists on such ISPs' agreement to offer Google's browser primarily or exclusively as the browser they distribute; not to promote or even mention to any of their subscribers the existence, availability, or compatibility of a competing Internet browser; and to use on their own Internet sites Google-specific programming extensions and tools that make those sites look better when viewed through Android, or the Google browser than when viewed through competing mobile operating systems, or Internet browsers. Defendant Google's anticompetitive agreements with ISPs have substantially foreclosed competing OS/browsers from this major channel of OS/browser distribution. Over ninety percent of Internet browser/OS users have obtained their browsers/OS from ISPs.

26.     Google has entered into anti competitive agreements with Internet Content Providers ("ICPs"). Prominent "channel buttons," advertising and providing direct Internet access to select ICPs appear on the "Active Desktop" feature that is shipped with the Android operating system. Defendant Google's agreements condition an ICP's placement on one of these buttons on the ICP's agreement to not pay or otherwise compensate Defendant Google's primary Internet browser/OS competitors (including by distributing their browsers/OS) for the distribution, marketing, or promotion of the ICP's content; to not promote any browser produced by any of Defendant Google's primary browser/OS competitors; to not allow any of Defendant Google's primary browser/OS competitors to promote and highlight the ICP's "channel" content on, or for their

OS/browsers; and to design its web sites using Google-specific, proprietary programming extensions so that those sites look better when viewed with Google's Internet browser/OS than when viewed through a competing browser/OS. These illegal agreements further inhibit competition on the merits between Google's Internet browser/OS and other OS/Internet browsers.

27.     Neither the antitrust laws nor this action seeks to inhibit Defendants Facebook, Amazon and Google from competing on the merits by innovation or otherwise. Rather, the Complaint challenges only Defendants Facebook, Amazon and Google concerted attempts to maintain its monopoly in operating systems, Internet search browsers and digital advertising to achieve dominance in other markets, not by innovation and other competition on the merits, but by tie-ins, exclusive dealing contracts, and other anti competitive agreements that deter innovation, exclude competition, and rob customers of their right to choose among competing alternatives.

28.     Facebook, Amazon and Google's conduct adversely affects innovation, including by:

> a.  impairing the incentive of Facebook, Amazon and Google's competitors and potential competitors to undertake research and development, because they know that one, or all of the Defendants will be able to limit the rewards from any resulting innovation;
>
> b.  impairing the ability of Facebook, Amazon and Google's competitors and potential competitors to obtain financing for research and development;
>
> c.  inhibiting Facebook, Amazon and Google's competitors that nevertheless

succeed in developing promising innovations from effectively marketing their improved products to customers;

d. reducing the incentive and ability of OEMs to innovate and differentiate their products in ways that would appeal to customers; and

e. reducing competition and the spur to innovation by Facebook, Amazon, Google and others that only competition can provide.

29.    The purpose and effect of Facebook, Amazon, Google's conduct with respect to Internet browsers, the Android OS, have been and, if not restrained, will be:

a. to preclude competition on the merits between Google's browser and other browsers;

b. to preclude potential competition with Google's Android operating system from competing browsers and from other companies and software whose use is facilitated by these browsers;

c. to extend Google's Android operating system monopoly to the Internet browser market; and

d. to maintain Google's Android operating system monopoly.

30.    Accordingly, Plaintiff now brings this action explicitly for preliminary and permanent injunctive relief, and demonstrates that Defendants' conduct constitutes clear violations of Sections 1 and 2 of the Sherman Act (breach of contract, breach of covenant & good faith and unfair competition, among other claims) and will cause irreparable injury in the absence of preliminary relief. As demonstrated in more detail below, because of this unlawful conduct, Plaintiff is entitled to, among other remedies, treble

damages from Defendants under 15 U.S.C. §§ 1 and 15; a disgorgement of the enormous supra-competitive profits that Defendants have received, and will receive, from their unlawful conduct; and damages for Defendants' breach of their own contract, to which Plaintiff, as the online web host of tens of thousands of Google "AdSense (PPC)" advertisements, was an intended beneficiary.

## III.   PARTIES

31.   Plaintiff, during the operative times of this complaint, was a resident of the City of Oakland and operated as a sole proprietorship, located in California. Oakland, as an content creator, website designer,  independent advertiser, ad server and owner of the websites/pages set forth below in ¶ 52, at which the Defendants, jointly and severally, currently serve and host Google "AdSense (PPC)" online advertisements.

32.   Defendant Alphabet Holding Corporation (hereafter "Alphabet") was created by Law as a private legal entity, for profit, and with "general corporate powers," under the Delaware General Corporation Law (where Alphabet is incorporated). Alphabet is an American multinational conglomerate headquartered in Mountain View, California 94043, at 1600 Amphitheatre Parkway (County of Santa Clara). Alphabet, Inc. was created through a corporate restructuring of Google on October 2, 2015. Alphabet, Inc. became the parent company of Google and several former Google subsidiaries. Alphabet Inc., is thus a legal entity doing business as (hereafter, "dba") Google, Inc., dba, Blogger, dba, Google AdSense (PPC) and dba, YouTube, LLC." Shares of Google's stock have been converted into Alphabet stock, which trades under Google's former ticker symbols of "GOOG" and "GOOGL". Google's core businesses are its search engine and

advertising sales through its global AdSense (PPC) program. Alphabet is essentially a holding company for Google, as well as all the projects, ideas, capital investments, and subsidiaries that Google has acquired over the years. The company consists of Google as well as other businesses including X Development, Calico, Nest, Verily, Fiber, Makani, CapitalG, and GV. As per its 2017 annual report, 86% of Alphabet's revenues came from performance advertising (through user clicks using AdSense and Google Ads) and brand advertising. Of these, 53% came from its international operations. This translated to a total revenue of US$110,855 million in 2017 and a net income of US$12,662 million. On January 16, 2020, Alphabet became the fourth US company to reach a **US$1 trillion dollar market value**, entering the trillion dollar companies club for the first time.

33.     Defendant Larry Page co-founded Google. Defendant Page was the CEO of Alphabet, Inc., for the period covering October 2, 2015 to 2018. From September 4, 1998 to October 2, 2015, Page served as CEO of Google. Defendant Page remains at Alphabet as co-founder, controlling shareholder, board member, and employee. As of November 2020, Defendant Page was the 13th-richest person in the world, with a net worth of **US$77.6 billion dollars**.

34.     Defendant Sergey Mikhaylovich Brin co-founded Google. Defendant Brin was the president of Google's parent company, Alphabet Inc., until stepping down from the role on December 3, 2019. Defendant Brin remains at Alphabet as co-founder, controlling shareholder, board member, and employee. As of September 2020, Defendant Brin is the 7th-richest person in the world, with an estimated net worth of **US$63.9 billion dollars**.

35.     Defendant Eric Emerson Schmidt was the Executive Chairman of Google from 2001 to 2015 and Alphabet Inc. from 2015 to 2017. From 2001 to 2011, Schmidt served as the CEO of Google. Defendant Schmidt served as a Technical Advisor for Alphabet, until February 2020.  As of November 13, 2020, Defendant Schmidt had an estimated net worth of **US$16.9 billion dollars**. Defendant Schmidt recently obtained citizenship in the European island, Cyprus, which could allow him to legally avoid paying U.S. taxes on his $17 billion fortune

36.     Defendant Sundar Pichai (his full name is Pichai Sundararajan) was the chief product officer of Google, Inc., for the period covering October 2, 2015 to 2018. Defendant Pichai, Product Chief, became the new CEO of Google, replacing Defendant Page, who transitioned to the role of running Alphabet, along with Google co-founder, Defendant Brin. Defendant Pichai's net worth in 2020 is estimated at between **US$600 million dollars and US$1.2 billion dollars**.

37.     Defendant Facebook, Inc. is a California corporation that was founded in 2004, by Defendant Mark Zuckerberg. Defendant Facebook's Headquarters is located at 1 Hacker Way, Menlo Park, California 94025. Facebook Inc. (FB) is the largest social networking site in the world with 2.5 billion monthly active users (MAUs) as of year-end 2019. Facebook also owns and operates the popular photo-sharing app Instagram as well as messaging apps Messenger and WhatsApp. The company provides virtual-reality hardware, software, and a developer ecosystem through its Oculus business. Facebook went public in 2012 and has become one of the world's largest companies with a market capitalization of **US$507.92 billion dollars** as of April 14, 2020. Facebook earned net

income of **US$18.5 billion dollars on US$70.7 billion dollars** of revenue during fiscal year 2019 (FY).

38.     Defendant Mark Zuckerberg is the co-founder, chairman and CEO of Facebook, Inc. Defendant Zuckerberg co-founded Facebook, Inc., in 2004, with three fellow classmates at Harvard University at the time. Defendant Zuckerberg is responsible for setting the overall direction and product strategy for the company. He leads the design of Defendant Facebook Inc.'s service and development of its core technology and infrastructure. As the Chief Executive Officer, Defendant Zuckerberg is responsible for enforcing the acts, policies, practices, and/or customs of Defendant Facebook, Inc. Defendant Zuckerberg is Facebook's largest shareholder by far. He currently holds over 400 million shares of Facebook, comprising a market value of around **US$82.2 billion**. Zuckerberg's holdings also give him a disproportionate share of voting rights. He controls 57.9% of the total voting shares, giving him effective control of the company.

39.     Defendant Amazon.com, Inc. engages in the retail sale of consumer products and subscriptions in North America and internationally. It operates through the North America, International, and Amazon Web Services (AWS) segments. The company sells merchandise and content purchased for resale from vendors, as well as those offered by third-party sellers through retail Websites, such as amazon.com, amazon.ca, amazon.com.mx, amazon.com.au, amazon.com.br, amazon.cn, amazon.fr, amazon.de, amazon.in, amazon.it, amazon.co.jp, amazon.nl, amazon.es, and amazon.co.uk. It also manufactures and sells electronic devices, including kindle e-readers, fire tablets, fire TVs, and echo; and provides Kindle Direct Publishing, an online service that allows

independent authors and publishers to make their books available in the Kindle Store. Defendant Amazon.Com, Inc., is currently the world's largest online sales company, the largest Internet company by revenue, and the world's largest provider of virtual assistants and cloud infrastructure services through its Amazon Web Services branch. Amazon's net worth as of November 11, 2020, is more **US$1.7 trillion dollars**, making it the second-most valuable company in the U.S., trailing only Apple.

40. Defendant Jeff Bezos founded Amazon in late 1994. Bezos founded the aerospace manufacturer and sub-orbital spaceflight services company Blue Origin in 2000. Defendant Bezos owns approximately 53 million shares of Amazon stock. Defendant Bezos purchased the major American newspaper The Washington Post, in 2013, for $250 million. Defendant Bezos was one of the first shareholders in Google. Defendant Bezos invested $250,000 in 1998. Defendant Bezos' $250,000 investment resulted in 3.3 million shares of Google stock, worth about $3.1 billion dollars in 2017. As of November 5, 2020, Defendant Bezos had a net worth of **US$194.0 billion dollars**.

41. The Board of Directors of the Defendant companies, and each of them, jointly and severally, since their creation, and up to the present, has served as a conduit for the fraudulent objectives, by which the interlocking directors of the Defendant companies and their subsidiary members, jointly with other individuals, knowingly, intentionally and unlawfully, have met, planned, devised, organized, and assisted in the adoption and implementation of part, or all, of the fraudulent artifices that form the basis of this complaint as defined herein after. As a direct and proximate result of the acts, omissions and policies described herein, Defendants, and each of them, jointly and

severally, have shared, or will share in **US$2 - $2.5 Trillion dollars** in online Ad revenue this fiscal year.

42.     Whenever it is alleged in the complaint that any Defendant did any act or thing, it is meant that its Directors, Officers, agents, employees, or the Directors, Officers, agents or employees of its subsidiaries or affiliates, performed or participated in such act or thing, and in each instance that such act or thing was authorized or ratified by, and done on behalf of, that Defendant. Plaintiff thereupon alleges, the true names and capacities of Defendants sued as Does/Roes 1 through 10 are unknown to Plaintiff, who therefore sues these Defendants by fictitious names. Doe/Roe Defendants include the employees, agents, servants of the Defendants, and each of them, jointly and severally, who directly approved the acts, omissions and policies described herein, as well as agents, officers and employees of the Defendants who are liable in connection with one or more of the claims sued upon here and are responsible in some manner for the wrongful acts and conduct alleged herein. Plaintiff will amend this Complaint to show Doe/Roe Defendants' true names and capacities when they have been ascertained.

## IV.     JURISDICTION AND VENUE

43.     This is an action for violations of federal antitrust law, including 15 U.S.C. §§ 1, 2. Accordingly, this Court has subject matter jurisdiction over this proceeding and all claims asserted herein pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction), 1337 (antitrust jurisdiction) and 1367(a) (supplemental jurisdiction). This Court has subject matter jurisdiction over this action pursuant to Section 39 of the Lanham Act, 15 U.S.C. § 1121 (actions arising under the Lanham Act), and 1338 (b) (any action asserting

claim of unfair competition joined with a substantial and related claims under the trademark law) for the claims arising out of the violations of Section 43(a) of the Lanham Act.

44. Venue is proper in this district under 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391 because: (i) each of the Defendants transact business, committed an unlawful or tortious act, and/or are found, in this district; and (ii) a substantial portion of the conduct detailed herein, which affected interstate trade and commerce, has been carried out in this district.

## V.   INTRADISTRICT ASSIGNMENT

45. Pursuant to the Northern District Civil Local Rule 3-2(d), the intradistrict assignment should be to the Oakland Division or the San Francisco Division. This action arises in Oakland and the County of Alameda because a substantial part of the events giving rise to these claims occurred in the City of Oakland and Alameda County.

## VI.   THE RELEVANT MARKET

46. Up until 2003, the relevant geographic advertising  market for Plaintiff's claim is worldwide, including the United States and other relevant submarkets thereof. The technology of the  21st Century, has for all practical purposes, caused the relevant market and relevant product market to become inextricably intertwined.

The relevant market for purposes of Plaintiff's claims consist of the following:

(a)     The Internet via website(s) as a relevant market to sell all products;

(1)     Mobile Networking (Android OS) Hardware Routers, Smartphones, Tablets; and

(2)    Mobile (Networking) Android OS Apps.

The relevant product market consists of the following:

(b)    Internet  based advertisement on Streamed Videos and Movies;

(c)    Internet  based advertisement on Streamed Music and Music videos;

(d)    Mobile Networking (Android OS) [Internet]  based advertisement on mobile devices;

(e)    Mobile Networking (Android OS) [Internet]   based advertisement on Android OS Apps;

(f)    The sale(s) of digital ad based Internet (cloud-based) music, videos, movies, and images; and

(g)    Digital ad based News Feeds.

## VII.  FACTUAL ALLEGATIONS

### A.    Background

### 1.    Plaintiff's Decade of Serving AdSpend/Adsense & Marketing YouTube!

47.    Between the time period October 15, 2008 and November 13, 2013, Plaintiff created two (2) YouTube channels: the "Harry Williby" channel (http://www.youtube.com/c/HarryWilliby021269, created November 13, 2013) and "The Attorney Depot™" channel (http://www.youtube.com/c/TheAttorneyDepotTM, created October 15, 2008). On October 8, 2008, Plaintiff also created "The Williby Blogs" ( https://willibys-corruptjustice.blogspot.com/) on Defendant Alphabet's Blogger Platform. Beginning in 2011, Defendant Alphabet, dba, Google, dba, Google+, dba, Google AdSense (PPC), dba, Blogger, dba, YouTube, LLC., mandated that YouTube channel

owners create Google+ accounts to access YouTube. As a direct and proximate result of this mandate by Defendant Alphabet, Plaintiff created two (2) Google+ accounts: "The Harry Williby" Google+ account (https://plus.google.com/+HarryWilliby021269) and "The Attorney Depot™" Google+ account. (https://plus.google.com/b/114610022579488515977/+TheAttorneyDepotTM).

48.    Between October 15, 2008 and August 1, 2018, The Attorney Depot™ channel published and hosted Daily, Weekly, Monthly and yearly News, legal news, political, election, trial coverage, documentaries and entertainment videos. Videos hosted on the The Attorney Depot™ YouTube channel were automatically and simultaneously published on The Attorney Depot™ Google+ account. The Plaintiff simultaneously hosted all The Attorney Depot™ videos on Williby Blogs, Twitter and Facebook. Between October 15, 2008 and August 1, 2018, The Attorney Depot™ YouTube channel garnered over twenty-one million (21,000,000+) global, public, video views; and twenty-one thousand (21,000+) return subscribers. Between October 15, 2008 and August 1, 2018, Plaintiff posted and published Daily, Weekly, Monthly and yearly News, legal news, political, election, trial coverage text and images posts on The Attorney Depot™ Google+. These text, image and video posts numbered approximately 10,000 posts. The Google+ account garnered well over two-million viewers and/or visitors as a direct and proximate result of these videos, text and image posts. Between October 15, 2008 and August 1, 2018, The Attorney Depot™ Channel and Google+ account produced, globally marketed and branded "trial court coverage" videos on YouTube. The Attorney Depot™ channel averaged 500,000 -to- 1,000,000 million viewers per month.

Between October 8, 2008 and August 1, 2018, Plaintiff's Blogger pages (Williby Blogs) netted 15k – 40,000 viewers per week, with over one-million global readers/viewers.

49.     The Harry Williby Channel's primary genre was real life interactions, including police interrogations and/or police interactions with civilians. Plaintiff branded raw videos on The Williby Channel as "Streat Beatz™" videos. This genre was so popular on YouTube, The Williby Channel, grossed approximately 1,000,000 (one-million) viewers per year. Between and November 13, 2018, and August 1, 2018, The Harry Williby Channel published and hosted Daily, Weekly, Monthly and yearly News, political, election, documentaries, entertainment and raw videos (or videos shot live on scene by the bystander). Between November 13, 2013 and August 1, 2018, "The Harry Williby Channel," publicly displayed approximately eight-hundred and eight-one (881) videos; garnered eighteen-hundred and forty-nine (1,849) return subscribers; and has (had) approximately four million, one Hundred and eighty-seven thousand (plus) viewers (4,187,000+) on the channel. Between November 13, 2013 and August 1, 2018, videos hosted on "The Harry Williby [YouTube] channel" were automatically and simultaneously published on the Harry Williby Google+ account. Between November 13, 2013 and August 1, 2018, The Harry Williby Google+ account generated approximately 20-25,000,000 million visitors. Between October 15, 2008 and August 1, 2018, The Attorney Depot™ YouTube channel, The Attorney Depot™ Google+ account, Williby Blogs and Plaintiff's Twitter (feed) and Facebook pages were viewed in every country with an Internet connection. As a direct and proximate result of ten (10) years (or a decade) of marketing YouTube and The Attorney Depot™ Channel by Plaintiff, virtually

every major U.S. media network, including the Defendants, and each of them, jointly and severally, has joined YouTube and now host "trial court coverage" videos.

50.     The Google AdSense, Pay-Per-Click, (PPC) is a program run by Defendant Alphabet, dba, Google. Defendant Google purchased the AdSense program on June 18, 2003, from "Applied Semantics." The AdSense program is a Pay-Per-Click advertising program. AdSense (PPC) allows publishers (website/page owners) in the Google Network of content sites to serve automatic text, image, video, or interactive media advertisements, that are targeted to site content and audience. Google Advertisement customers purchase an "ad spend account" with Defendants to have these automatic text, image, video, or interactive media advertisements placed on websites, or pages owned by the plaintiff. These advertisements are administered, sorted, and maintained by Defendant Google. While these advertisements are administered, sorted, and maintained by Defendant Google, Defendants, and each of them, jointly and severally, administer Google AdSense, Pay-Per-Click, (PPC) advertisement programs on their respective owned sites.

51.     In October 2008, Defendant Alphabet, dba, Google, LLC., dba, Youtube, LLC., by way of electronic advertisement, led Plaintiff to believe that if he created a Blogger™ website, or a YouTube channel, Plaintiff could serve Advertisements, under Defendant Google's "AdSense, PPC" program. Defendant Alphabet, dba, Google, LLC., dba, Youtube, LLC., led Plaintiff to believe that he would receive $0.25 (cents) each time a site visitor clicked on one of the Advertisements, hosted by Plaintiff and served by Defendant.

52. Plaintiff relied upon this electronic advertisement and In October of 2008, Plaintiff created "The Williby Blogs," (https://willibys-corruptjustice.blogspot.com/); and "The Attorney Depot™ Channel" (https://www.YouTube.com/channel/UCPBu0JFPj9R57SyjfCxHvmw). Acting upon this same information and belief, as provided by Defendant Alphabet, dba, Google, LLC., dba, Youtube, LLC., Plaintiff created The "Williby Channel" (https://www.YouTube.com/c/HarryWilliby021269) in November of 2013, in an attempt to increase Ad revenue by hosting automatic text, image, video, or interactive media advertisements, served by Defendants. Acting upon this same information and belief, as provided by Defendant Alphabet, dba, Google, LLC., dba, Youtube, LLC., Plaintiff intentionally hyperlinked directly to, and served videos and blog posts on the following websites (created, managed and operated by Plaintiff):

(I) Harry Williby Google+ profile (https://plus.google.com/+HarryWilliby021269);

(II) Harry Williby @ Twitter (https://twitter.com/wilabee);

(III) The Attorney Depot™ @ Twitter (https://twitter.com/AttorneyDepot);

(IV) The Attorney Depot™ Google+ profile (https://plus.google.com/+TheAttorneyDepotTM);

(V) Facebook (Harry Williby) (https://www.facebook.com/harry.williby);

(VI) Facebook (Harry J. Williby) (https://www.facebook.com/Harry.J.Williby); and

(VII) Facebook Pages (Corrupt Justice; The Attorney Depot; and Streat Beatz).

53. Defendant Alphabet, dba, Google, LLC., dba, Youtube, LLC., dba, Google Analytics tracking system demonstrates that between October 8, 2008 and August 1,

2018, Plaintiff's Blogger pages (Williby Blogs) netted 15,000 – 40,000 viewers per week, with over one-million global readers/viewers; Between October 15, 2008 and August 1, 2018, The Attorney Depot™ YouTube channel garnered over twenty-one million (21,000,000+) global, public, video views; twenty-one thousand (21,000+) return subscribers; Between November 13, 2013 and August 1, 2018, "The Harry Williby Channel," publicly displayed approximately eight-hundred and eight-one (881) videos; garnered eighteen-hundred and forty-nine (1,849) return subscribers; generated approximately four million, one Hundred and eighty-seven thousand (plus) viewers (4,187,000+) on the channel;   Between October 8, 2008 and August 1, 2018, The Attorney Depot™ Google+ page generated approximately 350,000 page visits; and between November 13, 2013 and August 1, 2018, The Harry Williby Google+ account generated approximately 20-25,000,000 million visitors/readers/viewers.

54.     Defendant Alphabet, dba, Google, LLC., dba, Youtube, LLC., effective August 1, 2018, terminated Plaintiff's YouTube channels, The "Williby Channel" and "The Attorney Depot™ Channel." Plaintiff was thus denied access to his Google+, "The Attorney Depot™ page," effective August 1, 2018. Plaintiff was granted access back to his Google+, "The Attorney Depot™ page," effective October 12, 2018, after Defendant Alphabet removed approximately 7,000-to-10,000 posts, placed there by Plaintiff.

55.     Despite over a decade (ten years) of publishing on Defendants' platform, under the Google "Adsense (PPC)" program, Plaintiff did not earn $0.25 per-ad-click. Plaintiff earned less than $2,500.00 (over 10 years) with the vast majority of this revenue being confiscated by Defendant Alphabet, dba, Google, LLC., dba, Youtube, LLC., dba,

Google "AdSense (PPC)." In fact, Defendant Alphabet, dba, Google, LLC., dba, Youtube, LLC., dba, Google "AdSense (PPC)," repeatedly, over a ten  (10) year time period, accused and adjudicated Plaintiff guilty of copyright infringement, as the basis for confiscating the nominal ad revenue plaintiff earned under the Google "AdSense (PPC)" program.

56.    Defendant Alphabet, dba, YouTube's site is a popular site for music and music videos. Defendant Alphabet, dba, Google, LLC., dba, Google, AdSense (PPC) serves AdSense advertisements on these music videos. Defendant Google replaced Google Play Music with YouTube Remix. YouTube Remix is a music service that's fully integrated with YouTube. Between the time period of October 15, 2008 and August 1, 2018, Defendant Alphabet, dba, Google, dba YouTube, informed plaintiff that music on the YouTube website could be downloaded for free and could be used by Plaintiff on videos uploaded by Plaintiff to The Williby Channel and The Attorney Depot™ Channel, without risk of copyright claims. Plaintiff relied upon these claims by Defendant YouTube and utilized numerous songs from Defendant's database on his videos. As a direct and proximate result of Plaintiff's use of the copyrighted music, a multitude of music copyright owners did in fact file music copyright claims against The Williby Channel and The Attorney Depot™ Channel for the use of this music as provided by Defendant YouTube.  As a direct and proximate result of these music copyright claims against The Williby Channel and The Attorney Depot™ Channel, Defendant Alphabet, dba, Google, dba YouTube, required Plaintiff to publicly acknowledge and/or admit the music copyright claim violations. Defendant Alphabet, dba, YouTube, LLC., then

allowed the music copyright owners to generate AdSense revenue from The Williby Channel and The Attorney Depot™ Channel. Simultaneously, Defendant Alphabet claimed The Attorney Depot™ Channel was now ineligible for monetization, "due to multiple claims of copyright infringement," thus, denying and preventing Plaintiff from earning, or generating AdSense revenue. The Williby Channel was then terminated "due to multiple claims of copyright infringement," and The Attorney Depot™ Channel was terminated for being hyper-linked to a channel with "multiple claims of copyright infringement." As a direct and proximate result of Plaintiff's reliance, upon the false advertisements of Defendant Alphabet, dba, Google, LLC., dba, YouTube, LLC., and Plaintiff's Channels were terminated and Plaintiff prevented from generating ad revenue on any of his sites.

57.    In the same year of 2008, Plaintiff, acting upon information and belief regarding Defendants' advertisement capabilities, Plaintiff initiated and advertised an independent advertisement program on Williby Blogs, and "The Attorney Depot™ Channel." In 2013, Plaintiff extended this independent advertisement campaign to "The Williby Channel." Between October 15, 2008 and August 1, 2018, The Attorney Depot™ generated $0.00 in Google AdSense (PPC) revenue; and Plaintiff's independent advertising programs netted $0.00 in advertisement revenue. Between November 11, 2013 and August 1, 2018 Defendant Alphabet paid "The Williby Channel" and "Williby Blogs" a combined amount of approximately $2,450.00 in AdSense (PPC) revenue. On multiple occasions between October 15, 2008 and August 1, 2018, Defendant Alphabet paid the plaintiff $0.01 for an entire month of Ad hosting, under the AdSense PPC

program. (See Attached Exhibit "A".)

58.     From the period between October 15, 2008 and August 1, 2018, Defendant Alphabet, dba, Google, LLC., dba, Youtube, LLC., dba, Google "AdSense (PPC)," required advertisement customers to purchase an "ad spend account" under Defendants' Google AdSense (PPC) program. Adsense customer advertisements, which included automatic text, image, video, or interactive media advertisements, were then hosted and served on Plaintiff's websites. Defendant Alphabet charged all advertising customers $0.10 - $0.30 for the placement of "bumper," or "non-skippable" advertisements on websites owned by Plaintiff. Defendant Alphabet, dba, Google, dba YouTube, also charged advertising fees per video view. Defendant charged fees on ads referred to as "bumper ads," "skippable video ads" and "non-skippable video ads. Defendant Alphabet charged its customers a fee amount unknown to Plaintiff, to place "ad units" on Plaintiff's videos. A typical video ad earned Defendants between $0.10 and $0.30 per click. Thus, an ad campaign (on YouTube) with a $0.10 video view would cost (the ad customer) $1,000 for every 10,000 people that watch the video ad. However, Defendant's Google Adsense customer does not have to pay the $0.10 - $0.30, unless a viewer/reader "clicks" on the "ad unit." The total Google AdSense revenue generated Defendant Alphabet, between 2008 and 2018 was in the aggregate amount of $680,246,000,000.00 (billion dollars) in on-line "AdSense" advertisement sales.

59.     Defendant Alphabet's Google "AdSense (PPC)" program requires the advertisement customer to pay for the advertisement, only if an advertisement consumer "clicks" on the advertisement. This constitutes free advertisement provided by the

Defendants, jointly and severally. Thus, other advertisers, such as Plaintiff, have virtually no chance of selling advertisements on the Internet. Defendant Alphabet owns all on-line advertising companies and web platforms, except Facebook and Amazon.com. Between June 18, 2003 and August 1, 2018, Defendant Alphabet, dba, Google, LLC., dba, Youtube, LLC., dba, Google "AdSense (PPC)," acquired all of the competitive online advertisers. The Google "AdSense (PPC)" program now constitutes the only online, digital advertising platform available to consumers. Thus, on June 18, 2003, Defendants embarked upon what is now an online advertisement monopoly, ... by acquisition. The Google "AdSense (PPC)" program violates not only the antitrust laws, the Google "AdSense (PPC)" program violates California State Statute, governing Unfair Competition.

## 2. The inextricably intertwined relevant market and relevant product

60. In the instant matter, there exists an inextricably intertwined relevant market and relevant product market. An example of this is the Expedia Group advertising program with Defendant Google. Expedia and its peer Booking Holdings typically spend heavily on Defendant Google's "AdSpend" program. Expedia Group Chairman Barry Diller said the travel company spends **$5 billion dollars annually** on online, digital advertising. Both Expedia and Booking Holdings have complained of Defendant Google's tactics. One tactic includes Defendant Google building its own travel search products that compete with the travel search products of Expedia and Booking Holdings. The only option available to Expedia and Booking Holdings in this case would be to shift advertising to Defendant Facebook, or Defendant Amazon. Both

the other defendants use Defendant Google's "AdSpend" and "Adsense" (PPC) program. <u>All three defendants function on the Android OS and exercise complete platform control</u>. There are no other relevant market substitutes available to Advertisers, Content Creators, Website owners, customers and end-users for products within the web based advertising market, the Internet streamed video and movie market, or the Internet streamed music, or music video market. There are barriers to entry into the web based advertising market, including the Internet streamed video; movie market; Internet streamed music; and music video market. These barriers include Defendants' unlawful anti-competitive activities to exclude competition. The defendants' anti-competitive conduct in the relevant market has excluded competitors and resulted in consumers paying higher prices than they would have paid in competitive markets. Consumers paying higher prices for the relevant product and the exclusion of competitors are indicia of Defendants' market power and unlawful anti-competitive conduct, which in itself constitutes an unlawful monopoly.

**3.    The Defendants Complete Market Power Over online, digital advertising**

61.    The Defendants, and each of them, jointly and severally, are a conglomerate of professional online, digital advertising franchises. The Defendants, and each of them, jointly and severally, places strict limits on the number of webpages, web page advertisements any person, or entity can place online. Through the Defendants' Android operating system and browser monopoly, they control where those pages and ads are located, and require that all content creators/website designers host and/or use Google

AdSense (PPC) to sell online advertisements. The defendants control the complete share of revenues and financial benefits of Google AdSense (PPC) participation. The entire online advertisement apparatus is made up of only 3 companies, ... Google, Facebook and Amazon, Inc., ... the across the entire globe. Any efforts by the Defendants to claim they are a single entity are strongly rebuffed by Courts, most notably the Supreme Court's 9-0 ruling against this view in <u>American Needle, Inc. v. National Football League</u>, 560 U.S. 183 (2010).

62.     Since 2003, Defendant Google has used "Applied Semantics" in a highly technical manner to improve its market dominating, anti-competitive conduct. "Applied Semantics" became "Google AdSense," "pay-per-click," (and "Google AdSpend," "pay-per-click") meaning that advertisers pay "only when" a person clicks on an ad. With AdSense, Google broke out of search and onto the wider Web with <u>contextual targeting technology that soon overwhelmed other players, such as Sprinks and IndustryBrains</u>. <u>Adsense uses targeted ads on general content pages, based upon the user, by matching them to text on the pages</u>. Defendant Google went on to become much more than an "upstart search engine." Defendant Google became the largest of "only" three advertising companies in the world (including Facebook and Amazon). By 2005, AdSense was about 15 percent of Google's revenue. Defendant Alphabet's search engine [Google] AdSense ad sales, are the second largest source of revenue for Alphabet. In 2016, <u>Defendant Alphabet earned nearly all of its revenue from Google advertising based on users' search requests</u>. "Google AdWords" is an advertising platform that allows businesses to show their product to relevant potential customers based on their search terms. <u>AdWords</u>

helped deliver 96% of the company's revenue in the first quarter of 2011. There exists no real alternative to AdSense for publication of ads on web properties" given AdSense's ability to target ads, leverage Google's search technology, set up accounts quickly and easily, and access the largest global advertiser pool on the web. As of 2018, Defendant Alphabet had an overall market capitalization that exceeded $500 billion dollars. Two years later in 2020, Defendant Google's parent company (Defendant Alphabet) has entered the $1 trillion market cap club for the first time.

63.     Defendant Amazon, Inc., began in 1994 as an online bookstore. The company has since expanded to a wide variety of other e-commerce products and services, including online digital advertising, video and audio streaming, cloud computing, and artificial intelligence. Defendant Bezos initially named his new company Cadabra. Defendant Bezos later changed the name to Amazon after the Amazon River in South America, in part because the name begins with the letter A, which is at the beginning of the alphabet. In November 2007, Bezos launched the Amazon Kindle, a device that allows a "flow state" in reading and advertisements that are similar to the experience of video games. In October of 2007, Defendant Amazon was recognized as the largest online shopping retailer in the world. On February 1, 2018, Defendant Amazon reported its highest ever profit with quarterly earnings of $2 billion. In 2020, Defendant Amazon's online digital ad revenues in the United States are projected to amount to **$12.75 billion U.S. dollars** with growth declining to a still impressive 23.5 percent year-over-year. In 2019, Amazon's annual online digital ad revenue grew by 39.4 percent. Defendant Amazon is currently the world's largest online sales company and the

largest Internet company by revenue.

64.    Facebook currently makes 98.5% of its money from digital advertising, mostly ads on Facebook and Instagram. Facebook (FB) makes most of its money by serving ads on the social media and messaging platforms it owns — Facebook, Messenger, Instagram, and WhatsApp. Advertisers pay Facebook to make their ads visible to people. Advertisers can choose to "target" the ads by only showing them to people who fit certain characteristics. These include age, gender, country, interests, etc. Advertisers choose the targeting options, and Facebook then shows the ads to the right people based on automated computer algorithms. Facebook has 2.89 billion monthly active users across its "family" of products. Of these, 2.26 billion people use at least one of their products each day. This means that Facebook reaches about 3/4 of the world's internet population. Due to its massive user base, Defendant Facebook makes a lot of money from serving online, digital ads. Most of the ads are "pay-per-click," meaning that advertisers pay Facebook each time a person clicks on an ad. Even though each click may not cost that much, it quickly adds up to billions of clicks and billions of dollars. According to Defendant Facebook, "there are now 8 million businesses globally that use their advertising platform." There are 90 million business pages on Facebook. 140 million businesses use Facebook every month to communicate with prospective customers and employees, or to engage with their communities (this stat refers, however, to Facebook products, not just Facebook itself). According to Defendant's "eMarketer Facebook" marketing statistics, more than 85% of US marketers have used Facebook as a marketing platform since 2016 – a figure that has increased to 87% in 2020.

65.     Defendant Alphabet, dba, Google and Defendant Facebook remain the dominant digital advertising companies. They controlled a combined 58 percent of the $111 billion market, in 2018. This is down from 59 percent in 2017 (Google 38.6% and Facebook 19.9%). Defendant Amazon, Inc., generated $4.61 billion in U.S. digital ad sales in 2018. This represents 4.2 percent of the total digital ad market. Advertising is quickly becoming one of Defendant Amazon's most lucrative businesses. This is in addition to its e-commerce engine and cloud computing arm. Advertising doesn't have its own category in Defendant Amazon's earnings reports and is listed under a category called "Other." The category "Other." brought in $2.7 billion in revenue in the first quarter (of 2019), up 34 percent over a year ago. As of October 26, 2020, the total of desktop and mobile banner advertising was $38.1 billion in FY 2019, a 13.8% increase on 2018's $33.5 billion. Desktop Banner Advertising dropped from a 22.5% share to 20.3% in 2019. The Banner share on mobile decreased from 35.8% to 35.1%; **however, revenue increased by 21.5% to $30.4 billion**. However, without any reasonable hope of a "competitive company," that can compete with the Defendants, Facebook, Alphabet, or Amazon, Inc., the market for owning or hosting such a "competitive company," is significantly constrained. The Defendants' complete control over online, digital advertising in the United States, combined with its ability to artificially limit the supply of websites and digital ads and who can host ads, enables it to hold Plaintiff and consumers hostage by imposing anti competitive conditions on being an Advertiser, Content Creator, Website owner, or consumer. As the Ninth Circuit recognized in American Needle, Inc. v. National Football League, 560 U.S. 183 (2010), the Defendants

herein, acts as a cartel, limiting the supply of websites and digital ads, as well as, who can host ads to create anti competitive pressures on website owners, content creators and ad consumers.

66.     Recently, the Defendants have increasingly used Google AdSense (PPC)'s complete market power and the Digital Millennium Copyright Act (hereafter "DMCA") to exert this anticompetitive pressure on Plaintiff. Through Google's AdSense for Content program ("AdSense"), Google contracts with website operators who publish ads on their websites in exchange for a percentage of the money advertisers pay to place the ads. Google terminated each of Plaintiff's Google's AdSense accounts without cause and withheld the entirety of the earnings Plaintiff had accrued, but had not yet been paid upon termination. The Payment Terms of Google's AdSense allows Google, in its sole discretion, to withhold earnings from Plaintiff, or a publisher for "invalid activity." Plaintiff's websites and YouTube channels were viewed by tens of millions of viewers and readers, while simultaneously serving Google Adsense ads. After a decade of serving Google's AdSense ads on multiple webpages for defendants, the defendants, acting in concert, and jointly, aiding, abetting, and conspiring with each other, accused Plaintiff of "invalid activity," to wit: "Due to multiple claims of copyright infringement[,]" [from multiple sources,] resulting in the termination of Plaintiff's Google Adsense accounts and confiscation of all revenue earned. In addition to termination of the Adsense account and revenue confiscation, Defendant Alphabet, dba, Google, dba, YouTube, terminated Plaintiff's YouTube channels and blocked Plaintiff's access to the counter-notification process under 17 U.S.C. § 512, Subsection (g) (1). In retrospect, Defendant  Google

asserted misuse of the DMCA in a filing concerning New Zealand's copyright act. Defendant Google argued that "takedown notices" targeting a competing business made up over half (57%) of the notices Google has received; and that more than one-third (37%), "were not valid copyright claims." However, it is the Defendant Alphabet who uses the DMCA to target and intimidate competitors of Alphabet, Defendant Facebook and Defendant Amazon.

67.     The Defendants Alphabet, and on behalf of the other Defendants, jointly and severally, and through the Google Adsense, (PPC) program, have entered into online digital advertising contracts with the following companies:

- Viacom, dba Paramount Pictures Corporation;

- Apple Corps Ltd.;

- Sony Corporation;

- Hearst Corporation;

- Walt Disney Company;

- Tele München Fernseh GmbH + Co. Produktionsgesellschaft (VOD);

- Icon Film Distribution Pty Ltd (Australia VOD);

- Mel Gibson and long-time producing partner Bruce Davey (co-owners of Icon Film Distribution Pty Ltd (Australia VOD); and

- Fintage House, dba, Lasso Group.

68.     These are brand name, global movie, video, music and advertising companies with major internet presences. Due to the fact the Defendants, jointly and severally, have multi-billion dollar "AdSpend" accounts with these individuals

companies, each company has been allowed by Defendant Alphabet and Defendant Facebook (and on behalf of Defendant Amazon) to file frivolous copyright claims against the Plaintiff under the DMCA, causing Plaintiff to lose significant online, digital advertising revenue.

## B.    The Monopolistic horizontal price fixing scheme

69.    Under the traditional forms of advertising, an <u>advertising customer pays to place an advertisement</u>, regardless of the size of the ad, the placement, or length of time the ad runs. Under this tradition, the advertisers pay to place the ad, regardless of what the consumer does. On March 25, 2004, United States Patent Application No. 20040059708, was filed by Jeffrey A. Dean for Adsense. This patent application has been assigned to Google, Inc. The patent is titled: "<u>Methods and apparatus for serving relevant advertisements</u>." The Adsense methodology states: "*The relevance of advertisements to a user's interests is improved. In one implementation, the content of a web page is analyzed to determine a list of one or more topics associated with that web page. <u>An advertisement is considered to be relevant to that web page if it is associated with keywords belonging to the list of one or more topics</u>. One or more of these relevant advertisements may be provided for rendering in conjunction with the web page or related web pages.*" This "<u>Methods and apparatus for serving relevant advertisements</u>[,]" is actually an "apparatus" and foundation of Defendants' market power and unlawful anti-competitive conduct. After the 2003 launch of Google Adsense, "Pay-Per-Click," companies like Plaintiff's found themselves at a disadvantage when Defendant Google and the others began offering productivity software for free.

70.     Defendant Alphabet markets Google Adsense, "Pay-Per-Click," under two different stratagems: An "AdSpend," or an "AdSense" account. The difference between a Google "AdSense" account and an "AdSpend" account is,  the "AdSpend" account is used when an advertiser buys advertising space from Google. The "AdSpend," average cost-per-click (CPC) on Google Ads is $1 to $2 for the Google Search Network and less than $1 for the Google Display Network. Generally, small-to-midsize companies will spend $9000 to $10,000 per month on Google Ads. Larger companies, such as those listed in paragraph 43, will spend $1,000,000 to $10,000,000 per month on Google Ads. Thus, as long as a website visitor does not click on the digital ad, the ad is virtually viewable by the consumer for free, thereby eliminating competitors, such as Plaintiff. These "AdSpend," costs do not include additional costs paid to Defendants for things such as software and technical support. On the other hand, the Google "AdSense" account is the revenue sharing account where Defendant Alphabet pays the website owner, or content creator for serving advertisements on the web page. However, the Google "AdSense" account and the "AdSpend" account are the methodologies in which the Defendants used unlawful anti-competitive conduct to obtain complete market power, thus obtaining a monopoly by acquisition. The "AdSpend" (pay-per-click) account provides free, online, digital advertising to advertisers, thus eliminating all competition. The Google "AdSense" (pay-per-click) account is used to limit the number of advertisements, a website owner, or content creator can post and the amount of revenue a website owner, or content creator can generate. In furtherance of this unlawful anti-competitive conduct, Defendant Alphabet and Defendant Facebook (and on behalf of

Defendant Amazon) simply assert "invalid activity," or a "violation of the DMCA" and confiscate (for their own benefit) revenue generated through the Google "AdSense" (pay-per-click) account of Plaintiff (and other website owners, or content creator.) As of today, over 10 million websites are using Google "AdSense" accounts. Facebook users are clicking on an average of 12 adverts per month (14 for women, 10 for men). Hence, the Google "AdSense" (pay-per-click) is merely a "horizontal price fixing scheme." See *Free Range Content, Inc. v. Google Inc.*, No. 5:14-cv-02329 (BLF).

**4.    The Defendants have acquired An Advertising "Monopoly by Acquisition(s)."**

**A. The Defendants have divisely purchased all of competitive online digital advertising companies under a Horizontal Market Agreement**

71.    Defendant Zuckerberg stated in 2010: "We [Facebook] have not once bought a company for the company. We buy companies to get excellent people... In order to have a really entrepreneurial culture one of the key things is to make sure we're recruiting the best people. One of the ways to do this is to focus on acquiring great companies with great founders." Acquisitions have been key to growing these businesses and Defendant Facebook's revenue in general. Defendant Facebook's strategy has been to buy potential rivals before they can get too big. In the process, the Defendant sometimes has paid exceptionally high prices for some deals. Defendant Facebook tried to buy Twitter in 2008 for $500 Million. The big impact for Defendant Facebook would have been a massive data merger of the databases of both companies (Twitter/Facebook). In an email, Defendant Zuckerberg implicitly threatened to create a clone of Twitter if Twitter

didn't sell. Defendant Facebook later deployed this tactic against the likes of Snapchat and Twitch. In late 2013, "SnapChat" CEO, Evan Spiegel rebuffed a $3 billion takeover offer from Defendant Zuckerberg. The vast majority of Defendant Facebook's acquisitions have been shut-down.

72.     Defendant Facebook has acquired 82 other companies, including WhatsApp. The WhatsApp acquisition closed at $19 billion. Defendant Facebook would later merge the databases of both the WhatsApp acquisition and Facebook. The Instagram acquisition, announced on April 9, 2012, appears to have been the first exception to this pattern. Defendant Facebook makes money from ads on Instagram. In the time since Spiegel spurned Defendant Zuckerberg, Defendant Facebook has turned Instagram into a key growth driver and a "Snapchat" killer. Instagram mimics Snapchat features. Instagram has been combined with Facebook's own service. Instagram now offers advertisers access to more than 2 billion users, as well as detailed data about their online "likes" and habits. According to the investment bank Morgan Stanley, "Some Instagram advertisers are now getting for free a type of sponsorship that they have to pay for on Snapchat." Defendant's Facebook Marketplace platform has hundreds of millions of users. Many brands and influencers also rely heavily on Instagram to market their products. Defendant Facebook launched Instagram Checkout in the US. This makes it possible for some businesses to sell products directly through the platform. The Israeli company Onavo was Founded in 2010. Defendant Facebook acquired Onavo in October 2013 for an undisclosed amount some analysts estimated to be between $100 million and $200 million. At the time of the acquisition, Onavo was an independent company. Onavo

performs web analytics on other mobile apps to determine customer usage. Onavo's technology allowed Defendant Facebook to make crucial early determinations about other companies and apps to acquire. Facebook was the second most-used mobile app in the world over Q3 2019 and the second most downloaded. In addition, Most of Defendant Facebook's revenue now comes from ads on their mobile apps. The Messaging app service Beluga was acquired by Facebook in 2011. Defendant Facebook acquired Beluga and the technology that eventually became the social media company's highly successful Messenger platform. In the process, Defendant Facebook again expanded its offerings and eliminated a potential rival. Now, Almost all of their revenue comes from serving targeted advertising on their internet platforms (Facebook platform, Instagram, Instagram Stories Facebook Messenger, Facebook Marketplace, and WhatsApp.). Defendant Facebook claimed no less than 40% of US digital ad revenue in 2018. Defendant Facebook's unlawful anti-competitive conduct has helped it become one of the world's leading marketing and advertising platforms.

73.     Google purchased the "Google AdSense" program from "Applied Semantics" in 2003. Applied Semantics was an obscure Santa Monica, Calif., company that made "software applications for the online, digital advertising, domain name and enterprise information management markets." The acquisition of "Applied Semantics" was for $102 million in cash and stock. The Android operating system was acquired by Google in 2005. In 2006, Defendant Google paid $102 million for another Web advertisement business, "dMarc Broadcasting."   In the same year (2006) Defendant Google announced that it would pay $900 million over three and a half years for the right

to sell ads on "MySpace.com." Defendant Google then purchased Defendant YouTube for $1.65 billion dollars in 2006. In 2007, Defendant Google made its largest acquisition to date by purchasing online, digital advertising firm "DoubleClick" for $3.1 billion. The "DoubleClick" acquisition transferred to Defendant Google, valuable relationships that "DoubleClick" had with Web publishers and advertising agencies. In 2009, Defendant Google purchased the mobile advertising network "AdMob," for $750 million. In 2011, Defendant Google acquired the survey site Zagat for $125 million. Defendant Google acquired the Israel-based startup Waze in June 2013. Defendant Google submitted a 10-Q filing with the Securities Exchange Commission (SEC) that revealed Google spent $1.3 billion on acquisitions during the first half of 2013. The 10-Q filing showed that $966 million of the total $1.3B was paid to Waze. As of March 31, 2019 Defendant Google acquired Night corn, a Video sharing service. As of December 2020, Alphabet has acquired over 238 companies. The largest acquisition being the purchase of Motorola Mobility, a mobile (phone) device manufacturing company, for $12.5 billion. As of January 14, 2020, Defendant Google acquired AppSheet, a Mobile app development and Pointy, a Local retail inventory feed software app.

74.    Omid Kordestani was senior advisor to the Office of the CEO and Founders at Google. On October 14, 2015 Kordestani left Google. Twitter announced Omid Kordestani as its Executive Chairman. In 2017, Defendant Google and Twitter agreed to an acquisition deal. Google acquired Twitter's suite of developer products, including its developer suite Fabric. Fabric includes the crash reporting service Crashlytics. Twitter acquired Crashlytics back in 2013. "Fabric" is a collection of products that Twitter rolled

out in 2016 to try and encourage mobile app developers to integrate more closely with Twitter's core app. Defendant Google acquired "Fabric" and integrated it with its own developer team, "Firebase." "Firebase," is a backend-as-a-service startup. The company was acquired by Google in 2014. The developer platform has since expanded. "Firebase" quadrupled its number of users to 450,000 by mid-2016 and added analytics capabilities and mobile development tools. By 2019, Defendant ended support for "Fabric." "Firebase," Defendant Google's mobile and web application development platform, swallowed "Fabric" and all its features. Incidentally, both Fabric and Firebase were once separate companies.

75.     In 1997, Defendant Bezos used $54 million dollars raised through Amazon's initial public offering (IPO) to finance aggressive acquisition of smaller competitors. In 1998, Defendant Bezos diversified into the online sale of music and video. In 2002, Bezos led Amazon to launch Amazon Web Services, which compiled data from weather channels and website traffic. In 2013, Bezos secured a $600 million contract with the Central Intelligence Agency (CIA) on behalf of Amazon Web Services. Defendant Amazon, Inc., returned to making multiple acquisitions per year in 2005. Defendant Bezos focused on acquiring digital retailers and media websites. Amazon acquired the video streaming site Twitch. Starting in 2011, Defendant Amazon began shifting its focus to buying technology startups to develop and improve Amazon Echo and grow its Amazon Web Services division.  In 2019, Amazon acquired parts of a global ad tech company to bolster its rapidly growing advertising business. Defendant Amazon acquired Sizmek's Ad Server and its Dynamic Creative Optimization tool, which helps personalize

ads using data. Defendant Amazon, Inc  said in a press release the two companies have a lot of customers in common, "so we know how valued these proven solutions are to their customer base." On August 5, 2013, Defendant Bezos announced his purchase of The Washington Post for $250 million in cash. The sale closed on October 1, 2013. In March 2014, Defendant Bezos made his first significant change at The Washington Post. Defendant Bezos removed the online paywall (making news content and advertising free) for subscribers of a number of U.S. local newspapers in Texas, Hawaii, and Minnesota. In January 2016, Defendant Bezos reinvented the newspaper as a media and technology company by reconstructing its digital media, mobile platforms, and analytics software. After a surge in online readership in 2016, the paper was profitable for the first time since Defendant Bezos made the purchase in 2013. Defendant Amazon's advertising includes sponsored products in search and display ads to reach audiences based on their likely purchase intentions, while the e-commerce retailer's trove of first-party data about millions of customers helps with ad targeting.

76.     Advertising drives a majority of revenue for Defendant Google  (dba Twitter) and Defendant Facebook, which charge advertisers to have their marketing content appear on search results and news feeds. Defendant Amazon employs a similar strategy. Defendant Amazon uses its online marketplace and other platforms, giving vendors, authors, and other advertisers ways to reach potential customers. One of Defendant Amazon's main competitive advantages as it gears up to share in a larger portion of advertising revenue with dominant digital advertising players Google and Facebook, is the data Defendant Amazon has on customer purchasing habits. Defendant

Bezos developed the mantra "Get Big Fast", establishing the company's need to scale its operations to produce market dominance. eMarketer forecasts e-commerce channel advertising to represent 12.2% of all U.S. digital ad spending by the end of this year (2020). Defendant Amazon is the dominant player by far. As a consequence of the Horizontal Market Agreement, competition between Defendants has been entirely eliminated in the three markets. to wit: Digital Advertising, Android OS and Online sales of goods. Accordingly, Defendants Amazon, Facebook and Google are now the only three digital advertisers in the United States and the only three beneficiaries of Defendant Google's AdSpend/Adsense.

**B.     The Google "AdSense" (pay-per-click) "horizontal price fixing scheme" And the Acquired Advertising Monopoly has and Continues to Net the Defendants Trillions of Dollars.**

77.     In early 2020, Defendant Alphabet, dba, Defendant Google, disclosed that on an annual basis, Defendant YouTube generated $15 billion last year and contributed roughly 10 percent to all Google revenue. These figures make Defendant YouTube's ad business nearly one fifth the size of Defendant Facebook's, and more than six times larger than all of Defendant Amazon-owned Twitch. Defendant Alphabet, dba Google, LLC., dba, YouTube, LLC., will earn $39.58 billion dollars in U.S. advertising revenue this year (2020), compared with $41.80 billion dollars in 2019. Despite the decline, Google's ad revenues will still exceed the $36.48 billion earned in 2018. Defendant Alphabet, dba Google, LLC., dba, YouTube, LLC., and its former or current subsidiaries, generated Google AdSense revenue, in the following amounts, for the following quarters:

- For the quarter ending June 30, 2018, Defendant Alphabet generated AdSense revenue in the amount of $32.657B, a 25.56% increase year-over-year;

- Defendant Alphabet's AdSense revenue for the twelve months ending June 30, 2018 was $123.898B, a 24.8% increase year-over-year;

- Defendant Alphabet's annual AdSense revenue for 2017 was $110.855B, a 22.8% increase from 2016;

- Defendant Alphabet's annual AdSense revenue for 2016 was $90.272B, a 20.38% increase from 2015;

- Defendant Alphabet's annual AdSense revenue for 2015 was $74.989B, a 13.62% increase from 2014;

- Defendant Alphabet's AdSense revenue for the twelve months ending December 31, 2014 was $66.001B, a 15.25% increase year-over-year;

- Defendant Alphabet's AdSense revenue for the twelve months ending December 31, 2013 was $55.519B, a 52.75% increase year-over-year;

- Defendant Alphabet's AdSense revenue for the twelve months ending December 31, 2012 was $46.039B, a -2.84% decrease year-over-year;

- Defendant Alphabet's AdSense revenue for the twelve months ending December 31, 2011 was $37.905B, a 25.40% increase year-over-year;

- Defendant Alphabet's AdSense revenue for the twelve months ending December 31, 2010 was $29.321B, a 26.46% increase year-over-year;

- Defendant Alphabet's AdSense revenue for the twelve months ending

December 31, 2009 was $23.651B, a 17.07% increase year-over-year; and

- Defendant Alphabet's AdSense revenue for the twelve months ending December 31, 2008 was $21.796B, a 18.11% increase year-over-year.

78.     The total AdSense revenue for Defendant Alphabet, between 2008 and 2018 was in the aggregate amount of $680,246,000,000.00 (billion dollars) in on-line digital "AdSense" advertisement revenue. As of 2020, and a direct and proximate result of Defendant's unlawful, anti-competitive conduct, Defendant Google massively beat Wall Street expectations on profit margins. Defendant Google's hardware businesses are lumped together with subscription services like YouTube Premium and YouTube Music Premium in Defendant Google's "Other" category, all of which added up to a total of $17 billion of revenue in 2019. This suggests that Defendant Google's hardware business (motorola mobility, Pixel phones and laptops; Nest doorbells, cameras, speakers, thermostats, Chromecast dongle and the Google Wifi router) rakes in at least $2 billion, but theoretically a bit more. The defendants expect revenue to rebound by more than 20% in 2021 and to see 11.8% growth in 2022.

79.     Defendant Facebook's annual/quarterly revenue history and growth rate from 2009 to 2020 has been abnormally astronomical. Revenue is the top line item on an income statement from which all costs and expenses are subtracted to arrive at net income. Approximately 42.8% of Defendant Facebook's global revenue in 2019 came from the United States. Facebook revenue for Q3 2019 came to a stately $17.65 billion. This compares to $16.89 billion in Q2 2019 (a 5% increase), and $13,727 in Q3 2018 (a 29% increase). Indeed, it is the highest single quarterly Facebook revenue figure ever

generated, beating the previous record of $16.91 billion in Q4 2018. Defendant Facebook's revenue from Canada region was **$1.98 billion during 2019**. Defendant Facebook's revenue from the International markets such as Europe, India, Canada, etc. clocked $15.06 million in 2016. Facebook fiscal year starts from January 1st. Interestingly, the fiscal 2016 was the first time when the company reported over $10 billion in advertising revenue from the United States. This represented 45.5% of the total annual revenue in 2016. In 2019,  Europe contributed $4.12 billion (23%); Asia $3.27 billion (19%); and the rest of the world $1.77 billion (10%). Of all major global digital ad sellers, only Defendant Google's business is worth more than Defendant Facebook's. eMarketer stats forecasting total net ad revenue over 2019 (published in March 2019) estimated Facebook's total for the year would come to $67.37 billion, with Google at $103.73 billion. Facebook total net ad revenue is over twice the figure of third-place Alibaba ($29.2 billion).

- Facebook revenue for the quarter ending September 30, 2020 was $21.470B, a 21.63% increase year-over-year.

- Facebook revenue for the twelve months ending September 30, 2020 was $78.976B, a 18.71% increase year-over-year.

- Facebook annual revenue for 2019 was $70.697B, a 26.61% increase from 2018 (In 2019, the social media company reported its highest-ever annual revenue of $30.23 billion from the United States, with 25.4% YoY growth.).

- Facebook annual revenue for 2018 was $55.838B, a 37.35% increase from 2017 (Of that $55.83 billion, a tidy $21.11 billion was profit ).

- Facebook annual revenue for 2017 was $40.653B, a 47.09% increase from 2016.

- Facebook annual revenue for 2016 was $27.6B, a 54.2% increase from 2015.

- Facebook annual revenue for 2015 $17.93B, an increase of 44% year-over-year.

- Facebook annual revenue for 2014 $12.47B, an increase of 58% year-over-year.

- Facebook annual revenue for 2013 $7.87B, an increase of 55% year-over-year.

- Facebook annual revenue for 2012 $1.585B, an increase of 40% year-over-year.

- Facebook annual revenue for 2011 $$3.71B, an increase of 88% year-over-year.

80.    Defendant Facebook, Inc. held its initial public offering (IPO) on Friday, May 18, 2012. The IPO was the biggest in technology and one of the biggest in Internet history, with a peak market capitalization of over $104 billion. Prior to 2011, Defendant Facebook was tight-lipped about its revenue numbers, which is typical of private companies. Market experts estimate Defendant Facebook made between $700M - $1.1 billion in total revenue between the years 2008 through 2010. Even in the earlier days, Defendant Facebook's growth was explosive. 2013's figure of $7.87 billion represents a tenfold increase over 2009's $777 million. Five years on from that, in 2018, the figure had increased sevenfold once more. Defendant Facebook's market valuation is now approximately $607 billion dollars. The total AdSense revenue for Defendant Facebook, between 2008 and 2018 was in the (approximate) aggregate amount of $365,250,000,000.00 (billion dollars) in on-line digital "AdSense" advertisement revenue. As of January 8, 2019, Facebook (FB) had a market capitalization of $409.6 billion dollars.

81.    As of October 2020, Amazon's advertising revenue rose 51% to $5.4 billion

dollars in Q3 from a year earlier. The growth in online, digital ad sales was greater than Amazon's total revenue gain of 37% to a record $96.1 billion dollars. Subscription revenue, which includes the fees that people pay for Amazon Prime memberships, audiobooks, digital video, digital music and e-books, rose 33% to $6.57 billion dollars. Amazon's ad revenue growth was stronger in Q3 than in the prior quarter, when it reported a 41% yearly gain. The company anticipates total revenue will grow anywhere from 28% to 38% in Q4 (2020) as consumers continue to show a greater preference for online shopping. Defendant Amazon's ad business accounted for $10.32 billion in revenue last year (2019) and is expected to grow to $12.75 billion dollars in 2020. Defendant Amazon's ad revenue growth this year (2020) helps to solidify its place as the third-biggest digital ad platform in the U.S. behind Defendant Alphabet's Google and Defendant Facebook.

82.     As of October 2019, Ad spend through Amazon's DSP was up 30% in Q3, compared with a 27% increase in Q2, as advertising brands increasingly leveraged the ability to target ads on Defendant Amazon's web properties as well as on those web properties Defendant Amazon doesn't own. In Q3, 32% of the Ad spend through Amazon's DSP went to properties not owned by the e-commerce giant. The cost of digital ads on Amazon in Q3 accelerated as cost-per-thousand impressions (CPM) rose 15%, up from the 5% increase seen in Q2. Ad spend on Defendant Amazon's Sponsored Products increased 30% year-over-year in the U.S. and 50% for international campaigns. Revenue generated by Defendant Amazon's Sponsored Products jumped 30% while clicks climbed 18% and the cost-per-click rose 10%. The portion of ad spend allocated to brand

awareness was 42% in Q3, a significant lift over the 26% measured in Q1. The majority of Defendant Amazon's DSP ad spend still goes to purchase-focused campaigns. In furtherance of this unlawful anti-competitive conduct, Last year in 2019, Defendant Google held 31.6% of total digital advertising spending with Defendant Facebook and Defendant Amazon holding 22.7% and 7.8% respectively. This year, market analysts expect Defendant Google to claim 29.4% of digital ad spending with Defendant Facebook and Defendant Amazon clawing 23.4% and 9.5%, respectively.

**5.     The Defendants have jointly conspired to engage in unlawful anti-competitive conduct from 1998 -to - Present.**

**A.     The "Obama Phone" (UMX U686CL).**

83.     The Barack Obama administration, well into the internet and wireless age, agreed that broadband and cellular services are essential services. Citizens of various federal programs now qualify for a free-service cell phone. The UMX U686CL is a cell phone subsidized by the US government for low-income users. The UMX U686CL is provided by (the Sprint owned) Virgin Mobile's Assurance Wireless program at $35 per phone. Assurance Wireless is an offshoot of the Lifeline Assistance program (LAP). The LAP is a Federal Communications Commission free phone plan.     The LAP is often referred to as the Obama Phone because it was expanded in 2008, when President Barack Obama took office. The UMX U686CL runs on the Android OS. The Android operating system was acquired by Google in 2005. Between 2005 and 2020, Defendant Alphabet has paid a total of **$80 billion dollars** out to Android developers.     The UMX device comes with hidden apps installed. The first app, "Android/Trojan.Dropper.Agent.UMX,"

is heavily obfuscated <u>malware that installs adware and other unwanted apps without the knowledge or permission of the user</u>. The "<u>Android/Trojan.Dropper.Agent.UMX</u>," contains striking similarities to two other trojan droppers. For one, <u>it uses identical text strings and almost identical code</u>. Secondly, the app contains an encoded string. When this string is decoded, it contains a hidden library named: "<u>com.android.google.bridge.Libgmp</u>" <u>that aggressively displays ads</u>. Once the library is loaded into memory, it installs software Malwarebytes calls "<u>Android/Trojan.HiddenAds</u>." <u>The malware that installs these programs is hidden in the phone's settings app</u>. This makes it virtually impossible to uninstall. The phone can't operate properly without the Settings app. Market experts agree on one thing: "If you Uninstall the Settings app, you've just made yourself a pricey paper weight." This conduct represents the brain of Defendants Alphabet, Amazon and Facebook's unlawful, anti-competitive conduct.

### B. The Anti-Competitive Android Operating System

84. The Android operating system was first developed by Android, Inc., a software company located in Silicon Valley. After <u>Defendant Google acquired Android in 2005</u>, the Android operating system was developed by Google for use in all of its touchscreen devices, tablets, and cell phones. <u>The vast majority of phones on Earth run Android</u>. As a result, and in furtherance of the conspiracy to engage in unlawful, anti-competitive conduct, Android and Google Mobile Services (GMS) are now synonymous with each other, even though they are actually quite different, ... <u>Defendant Alphabet provides both Android and Google Mobile Services for free</u>. The Android Open

Source Project (AOSP) is an open-source software stack for any device, from smartphones to tablets to wearables, created by Google. Defendant Google believes giving Android away for free increases the size of the world's Web-connected population. The company believes that increasing the Web-connected population will inevitably lead to more Google searches — which Google can monetize with search ads. GMS, on the other hand, are different. GMS are a range of Google-branded services that Google wants you to use for daily interaction. These services include Gmail, Google Maps, Google+, Google Play, Chrome and YouTube, and while these run on Android OS to a large extent, many of them are also available on iOS. Google doesn't charge a fee for GMS, it places stringent approval processes on all device OEMs that want to offer GMS, and has moved some of the key Android core functionality and APIs into GMS in order to better control and monetize them. Android increasingly dominates as it becomes fragmented, leading to the balance of power to swing from GMS to AOSP. An Android device without Google Play is an Android device without access to more than a million apps.

85.    Defendant Amazon's Kindle Fire and the Fire smartphone are completely Android-based, but devoid of any Google Mobile Services. Defendant Amazon has had to create its own app store, API stack and developer program. OEMs that are not as big as Amazon, but want to build their own branded ecosystems on Android, will reach out to providers to deliver white labeled app stores, and API and app management platforms in order to create a third party developer portal. Facebook for Android refers to the official mobile app developed by Defendant Facebook for Android cell phones and tablets. The app is free to download and install from the Google Play store. Defendant Facebook's

official suite of apps include Facebook Messenger, Facebook Groups, Facebook at Work, and Facebook Mentions. Defendant Facebook's Instagram added 10 million users in just ten days, after making its service available on Android.

86.    Defendant Google created the underlying value of the Android OS. Defendant Amazon and Defendant Facebook, as well as Alibaba, Baidu, Microsoft, Tencent and Xiaomi are all using the Android OS. Defendant Google announced Android Pay almost directly after Apple announced Apple Pay. Google's most notable payments acquisition was Softcard, a contactless NFC based mobile payments solution. AT&T, Verizon, and T-Mobile wireless service carriers have agreed to pre-install Google payment apps on their android phones. Defendant Google's Android is used daily by 1.17 billion people worldwide, while 1.35 billion people use Defendant Facebook's Apps daily. On Thanksgiving Day 2020, online, web-based sales shattered previously recorded profits. Consumers spent $5.1 billion online on Thanksgiving Day 2020 alone. Spending is up 21.5% from last year (2019). Nearly 50% of the web-based purchases were made on an android smartphone. These numbers and profits are a direct and proximate result of Defendants Alphabet, Amazon and Facebook's unlawful, anti-competitive conduct.

**C.    Twitter and the Unlawful Conspiracy to Engage in Unlawful, Anti-Competitive Conduct**

87.    Defendant Bezos was one of the first shareholders in Google in 1998. Defendant Bezos was also an early investor in the current Twitter. Defendant Bezos invested about $15 million in Twitter (TWTR) just over a decade ago in 2008, through his investment firm Bezos Expeditions. Twitter founder Jack Dorsey was an early angel

investor in Instagram. Dorsey previously supported Instagram financially and allegedly expressed interest in buying Instagram prior to Defendant Facebook's acquisition of the company. In fact, Twitter had a deal in place to buy Instagram for $525 million back in March 2012. However, Defendant Zuckerberg prevailed with a $1 Billion dollar offer. Dorsey (@jack) unfollowed Defendant Zuckerberg (@finkd) on Twitter in December of 2019, after Zukerberg purchased Instagram. Dorsey now, the CEO of Twitter and Square, receives a monster financial return he made on his angel investment in Instagram, which he gets back many times over in cash and pre-IPO Facebook stock.

88.     Defendant Facebook's Mark Zuckerberg tried to acquire Twitter not once, but twice through official channels and via co-founder Dorsey. In 2008, Facebook executive Chris Cox had been meeting in coffee shops with Dorsey, who had just been exiled from Twitter. Cox wanted to hire Dorsey. A Facebook owned Twitter would have reaped bigger profits, making ads on Facebook a little better, but really supercharging the ads on Twitter. The combined information would have allowed for precision targeting of sponsored tweets. The 330 million or so users on Twitter now are chicken feed for Facebook. Dorsey's exile from Twitter ended in March 2011, when then-CEO Dick Costolo brought him back.

89.     Defendant Google having acquired Android OS in 2005, now owns all Twitter Development tools as of 2019. The Twitter advertising page reads: "This page and certain other Twitter sites place and read third party cookies on your browser that are used for non-essential purposes including targeting of ads. Through these cookies, Google, LinkedIn, NewsCred and Logicad collect personal data about you for their own

purposes."

90.    The <u>video live-streaming app</u> Periscope was acquired by Twitter in 2015. Periscope is being shut down. <u>On December 15, 2020, Defendant Google (the owner of Twitter) announced: "We have made the difficult decision to discontinue Periscope as a separate mobile app by March 2021." This isn't the first video service Twitter has acquired and subsequently discontinued.</u> The company also bought Vine, a short video app in 2012 before shutting it down in 2017. Thus, Defendant Bezos, (on behalf of Amazon) Twitter CEO Dorsey, Defendants Facebook/Zuckerberg and Defendant Alphabet, dba Google are working together as apparent beneficiaries of this unlawful, anti-competitive conduct.

**D.    The Obama Administration, the UMX U686CL (Android OS) and the "Cloud-based" Conspiracy to Engage in Unlawful, Anti-Competitive Conduct**

91.    Former Pres. Obama (while campaigning for President in the 2008 election) told Google employees during a 2007 visit to Google's headquarters in Mountain View, California: "What we shared is a belief in changing the world from the bottom up, not from the top down." Between October 15, 2008 August 1, 2018, Defendant Alphabet, dba, Google, dba, YouTube, invited, allowed and supported (now) Former President Barack Obama to campaign, raise funds and secure votes and voters, via Obama's YouTube channel(s) Obama Dotcom (pre-election channel); The Obama White House (President's Channel); and The Obama Foundation (Presidency & PostPresidential Channel). Defendant Google employees emerged as the No. 2 donors to the Democratic National Committee in the 2008 election. <u>Defendant Google employees and the</u>

company's political action committee gave $1.6 million to Democrats in the 2008 presidential election. Google hosted multiple fundraising events for former President Barack Obama. Google's fund-raising executives for Obama's Presidential campaign included Susan Wojcicki and Marissa Mayer. Defendant Schmidt and other Google executives forked over $25,000 apiece to help pay for the inaugural celebration. Then-Google Chief executive, Page, also wrote a check to help pay for Obama's inauguration. Defendant Schmidt also served as an informal economic adviser during the Obama campaign.

92.    In 2008, multiple "ex-Google employees" joined the Obama administration in various roles. Defendant Schmidt became a member of Obama's Council of Science and Technology Advisers. Google's former head of global public policy, Andrew McLaughlin, was named deputy chief technology officer in Obama's administration. President Obama's appointment of McLaughlin to a position in his administration, resulted in McLaughlin being in a position that shaped policy, ... that affected Google's rivals. Defendant Google's, Vice President Marissa Mayer, acting as co-chairwoman of a report commissioned by the Knight Foundation and the Aspen Institute, called for greater broadband deployments and "open-access policies." Defendant Google's, Vice President Mayer was the sole author of the report. Obama's FCC chairman Julius Genachowski and Obama's Chief Technology Officer, Aneesh Chopra, praised the report. Genachowski and Chopra both said the paper would guide Obama's Internet policy. Obama and his tech regulators, including Genachowski, had long supported one of Google's top policy priorities: codifying "Net neutrality," or rules that prohibit network providers like AT&T,

Verizon, and the cable operators from prioritizing traffic and content that run on their networks. While working for Defendant Google, Obama's deputy chief technology officer McLaughlin, championed Google's policy goals.

93.     Immediately   upon   taking   office   in   2008,   Obama   made   the government-subsidized cell phone, the UMX U686CL, which runs the Android OS, available to millions of low-income families. UMX U686CL disbursements ballooned to $2.2 billion during President Barack Obama's first term. Over the years since Obama's election as President, preinstalled (advertising) malware has been found on a raft of low-cost Android phones from a variety of providers and manufacturers.

94.     Washington, D.C. Mayor Adrian Fenty appointed Vivek Kundra to the cabinet post of Chief Technology Officer (CTO) for the District of Columbia, on March 27, 2007. Kundra used Defendant Google's cloud-based web applications while employed in the D.C. (City) government. The District of Columbia paid $479,560.00 for the "Enterprise Google Apps" license. Since its deployment in July 2008 Google Apps has been available to over 38,000 D.C. city employees. In 2008, Kundra served as technology adviser on President Barack Obama's transition team. Kundra was officially named to the post of Federal Chief Information Officer by President Obama on March 5, 2009. The Federal Chief Information Officer is responsible for directing the policy and strategic planning of federal information technology investments as well as for oversight of federal technology spending. Kundra oversaw the government's tech spending. On September 15, 2009, during an event at NASA's Ames Research Center in Mountain View, California, Kundra announced a new site that lets federal agencies buy Google

"cloud computing" Apps that run on the Internet, instead of installing software on their computers. Kundra also announced the launching of the federal government strategy and the (Google) cloud computing portal Apps.gov. Defendant Brin attended this event and said Defendant Google was launching a "government cloud" data center specifically designed for government agencies.

95.     In late 2010, hoping to spur use of Gmail, the D.C. (City) government ran a pilot program. The City selected about 300 users and had them use the Defendant Google's product (Gmail) for three months. Google participated closely in the project. The first major cloud project during Kundra's tenure was GSA's migration of email/Lotus Notes to Defendant Google's Gmail and Salesforce.com's platform. GSA awarded a contract for email to Defendant Google in December 2010. In July 2011, the General Services Administration (GSA) became the first federal agency to migrate its email services for 17,000 employees and contractors to the cloud-based Google Apps for Government.

96.     GSA awarded a five-year contract to Salesforce.com in August 2011. In January 2012, Kundra joined Salesforce.com as Executive Vice President of Emerging Markets (*Most notably, Salesforce.com made an official announcement on Tuesday, December 1, 2020, of their plans to buy SLACK TECHNOLOGIES INC., for $27.7 billion.*). In February, 2017 Kundra joined Outcome Health as EVP of Provider Solutions. He was then promoted to Chief Operating Officer in July. Vivek left Outcome in Nov 2017 after major investors filed a lawsuit alleging improper practices against its founders for misleading advertisers and investors.

97.   In 2007, Facebook Co-Founder Chris Hughes met with Jim Brayton (then) Senator Obama's Internet director, via phone. A couple of weeks before Obama's official announcement that he was running for President, Brayton and Hughes met in person over coffee at Union Station in D.C. Brayton decided to hire Hughes on the spot. Hughes created the on-line campaign apparatus that got Barack Obama elected as President of the United States. Hughes helped develop the most robust set of Web-based social-networking tools ever used in a political campaign. Obama's campaign manager David Plouffe said (on April 1, 2009): "Technology has always been used as a net to capture people in a campaign or cause, but not to organize." Chris saw what was possible before anyone else." Hughes' key tool was My.BarackObama.com, or MyBO for short. The website "Obama for America" (https://www.ofa.us/) was originally created as My.BarackObama.com by Hughes. The networking Web site, interfaced with Facebook and allowed Obama supporters to create groups, plan events, raise funds, download tools and connect with one another. By the time the campaign was over, volunteers had created more than 2 million profiles on Facebook, planned 200,000 offline events, formed 35,000 Facebook groups, posted 400,000 blogs, and raised $30 million on 70,000 personal Facebook fund-raising pages.

98.   Sheryl Sandberg is Chief Operating Officer for Defendant Facebook, Inc. Sandberg has been COO at Facebook since March of 2008. Prior to working for Defendant Facebook, Inc., Sandberg was vice president of Global Online Sales and Operations at Google. Prior to this, Sandberg was Chief of Staff for the United States Treasury Department under President Clinton. Sandberg also sat on President Obama's

Council on Jobs and Competitiveness. In 2016, Google executives and Sandberg, on behalf of Facebook, met with President Obama to discuss strategies including counter speech initiatives and efforts to identify potential terrorists online. Facebook provided ad credits worth up to $1,000 to those who post counter-extremist messages, and together with the State Department, launched competitions in 45 college classes around the world. Those who participated in the competition were provided a budget of $2,000 and $200 in ad credits.

99.     On April 20, 2011, President Barack Obama made a campaign-style visit to the nexus of social communications, Facebook, Inc.'s headquarters, in Menlo Park, California,  at the invitation of Defendants Zuckerberg and COO Sandberg. President Barack Obama, Defendant Zuckerberg, and Facebook COO Sheryl Sandberg answered questions from users as part of a Facebook Live town hall meeting. By visiting Facebook headquarters in Silicon Valley, Obama sought to connect to tens of millions of people who have adopted social media as a prime method of communications.

100 .   Defendant Facebook's hosting President Obama in April 2011 at Facebook's headquarters was choreographed and timed to Defendant Facebook's much-expected initial public offering (IPO). President Obama got to talk directly to potential voters. Facebook got incredible validation. In July 2011, Facebook was the most popular third-party app on Google's Android platform. Facebook came in third place on Google's first-party apps. In August 2011, Facebook introduced Facebook Messenger, a new mobile app. It became available August 11th in the US and Canada for Android on Google's Android Market and for the iPhone on Apple's App Store. This app is the result

of Facebook's acquisition of Beluga. In December of 2011, Facebook became the most popular Android app among adult smartphone owners in the US.

101.    Facebook filed its $5 billion IPO in February of 2012, stating: "*We had 432 million MAUs who used Facebook mobile products in December 2011. While most of our mobile users also access Facebook through personal computers, we anticipate that the rate of growth in mobile usage will exceed the growth in usage through personal computers for the foreseeable future, in part due to our focus on developing mobile products to encourage mobile usage of Facebook.*"

102.    In 2012, Defendants Facebook, Inc., Defendant Zuckerberg and COO Sandberg integrated political campaign data with Defendant Facebook's data. This integrated data change was critical to President Barack Obama's 2012 re-election.

103.    Carol Davidsen is the former director of integration and media analytics at Obama for America. Davidsen is a data expert. She worked on the Obama campaign from November 2011 to November 2012. On Twitter, Davidsen explained how the 2012 Obama campaign harnessed Defendant Facebook's Application Programming Interface (API) to access the company's "social graph." Defendant Facebook's "social graph" maps the Facebook users connections. This enabled the Obama campaign to access information on Defendant Facebook users' friends when they used the Facebook log-in button to access the campaign's website.

104.    On March 18, 2018, Davidsen tweeted: "I worked on all of the data integration projects at O[bama] F[or] A[merica]. In a subsequent tweet on March 18, 2018, Davidsen added: "They came to office in the days following election recruiting &

were very candid that they allowed us to do things they wouldn't have allowed someone else to do because they were on our side."

105.   Defendant Facebook has denied that there was any favoritism toward the Obama campaign in the 2012 election. However Barack Obama's re-election team built a vast digital data operation that for the first time combined a unified database on hundreds of millions of American voters  with the power of Facebook to target individual voters to a degree never achieved before. "The [Obama 2012] campaign's exhaustive use of Facebook was so intense, it triggered the site's internal safeguards."

106.   Defendant Facebook had over 432 million monthly active mobile users as of December 2011. This represents 51.1 percent (up from 50.3 percent) of Facebook's total user base of 845 million monthly active users. Thirteen point four (13.4) percent accessed Facebook strictly through mobile, while the rest accessed Facebook from desktop and mobile. Thus, by allowing Obama to harness Facebook API's, Defendant Facebook, in furtherance of the unlawful conspiracy to engage in anti-competitive conduct, generated billions of dollars in online ad revenue. Facebook's mobile user must access Facebook using the Android OS, which is preloaded with malware that installs adware and other unwanted apps without the knowledge or permission of the user.

107.   Federal law "bans corporations from making 'direct or indirect' contributions to federal candidates." This ban doesn't just include cash, but anything of value. "In other words, corporations cannot provide federal candidates with free services of any kind." Defendant Facebook gave the Obama campaign free access to this type of data when it normally does not do so for other entities, or usually charges for such access to this data.

Defendant Facebook appears to have violated the federal ban on in-kind contributions by a corporation. The Obama campaign appears to have violated the law by accepting such a corporate contribution. U.S. Election officials all agree on one point: "Carol Davidsen's admissions should provide a sufficient basis for opening a federal investigation into what appears to be a clear and serious violation of the law."

108.    In 2008, it was Google and Facebook that went to Barack Obama and met him at San Francisco airport and told him all about the power of this personal data. In 2010, Defendant Facebook divulged unique user IDs to advertisers, which were used to track consumers. In the same year, the "Silicon Valley Insider" published old instant messages in which Zuckerberg makes incendiary remarks such as calling the earliest Facebook members "dumb fucks" for trusting him with their information.

109.    In 2016, Defendant Zuckerberg said live video was the future of Facebook, and he had a big get to help it grow: President Barack Obama. The plan was for Obama and Zuckerberg to talk together in some manner on Facebook Live, potentially allowing many thousands of people around the globe to tune in. In May 2016, viewers tried to watch a BuzzFeed interview with Obama on "Facebook Live," but the stream failed. C-SPAN resorted to showing streams from Facebook Live and Periscope (Twitter's live video product) in order to broadcast the sit-in by members of the House of Representatives.

110.    Defendant Facebook then paid news outlets like The New York Times, CNN, and BuzzFeed more than $50 million to encourage them to produce more Facebook live video content.

111.    The Facebook data mining  in 2012 was a win-win situation for Obama, and allowed by Defendant Facebook, in furtherance of Defendant Facebook's conspiracy to engage in unlawful, anti-competitive conduct. Facebook's D.C. office established ties to the Obama administrations. Defendant Facebook hired Marne Levine, former chief of staff of Obama's National Economics Council, as its new vice president of global public policy. Thus, the Defendants, Facebook and Zuckerberg, and each of them, jointly and severally, have engaged the highest Office(s) of the United States, in furtherance of their conspiracy to engage in unlawful, anti-competitive conduct.

112.    On October 8, 2009, Defendant Amazon.com CEO Jeff Bezos sat down for a lunch meeting with President Obama. Defendant Amazon was ramping up its efforts to sell cloud-computing services to federal government agencies. "Cloud Computing" represented a potentially huge new market for the company.

113.    With its Kindle tablet, Defendant Amazon had a product it wanted to sell. Defendant Amazon launched Kindle Singles Corner in June of 2013. A Kindle single is a type of e-book which is published through Amazon's Kindle Store. Kindle Singles Corner was made available to both Kindle device and Android OS App users, and priced between $0.99 and $4.99.

114.    In July of 2013, the Defendant Amazon conducted a sit-down interview with President Obama. The interview was  featured on Defendant's new Kindle Singles Corner. In July of 2013 President Obama praised Defendant Amazon for the firm's job creation, which notably put independent bookstores out of business.

115.    In 2019, Defendant Amazon's federal corporate income tax bill was zero.

The Obama administration vocally supported several of the tax credits and deductions used by Amazon. The research and development (R&D) credit allows companies to quickly recover the cost of expenditures for research and experimentation. President Obama in several of his budget proposals, not only supported the R&D credit, Obama advocated for making it permanent and expanding it. Defendant Amazon also utilized full business expensing, which allows companies to deduct the cost of new equipment purchased. In 2019, Defendant Amazon also deducted losses from previous years and for stock compensation granted to employees.

116.    Jay Carney is a top advisor to Defendant Jeff Bezos and architect of Defendant Amazon's HQ2. Carney is Senior Vice-President of Worldwide Corporate Affairs at Amazon. Carney is essentially Amazon's public policy and communications chief. Carney was President Barack Obama's press secretary from 2011 to 2014. For the first two years of Obama's presidency, Carney was director of communications for Vice President Joe Biden.

117.    Defendant Bezos hired Carney as Defendant Amazon was entering a tougher regulatory environment. Carney had all the important connections. Carney is a unique presence in the company's highest ranks. He's one of only two remote members of Bezos' exclusive S-team, the 18 most senior executives who work closely with the CEO, along with Amit Agarwal, the head of Amazon India.

118.    Every policy team member's performance is tracked through a rigorous internal program called "Watering the flowers." The flowers represent elected officials, and the goal is to create a well-tended "garden" of pro-Amazon policymakers, from state

governors and senators down to local officials and economic development teams, according to current and former employees. Based on sales management software from Salesforce.com, the program measures employees on things like how many meetings and events they attend with power players.

119.    In 2017, Carney hired Michael Punke, a former U.S. ambassador to the World Trade Organization, to lead Defendant Amazon's public policy two years ago. Carney hired Susan Pointer from Google in 2018 to lead international public policy. Thus, it is clear that the ingratiation with Obama and hiring of ex-Obama and Google executives was done in furtherance of Defendant Bezos and Defendant Amazon's conspiracy to engage in unlawful, anti-competitive conduct.

120.    In 2007, Obama became the seventh presidential candidate to visit Google's main campus in Mountain View. After an introduction by Google's Senior VP David Drummond, Obama unveiled his new policy agenda on technology and innovation. He reaffirmed his support for network neutrality, saying: "The Internet is perhaps the most open network in history. We have to keep it that way."

121.    Obama was interviewed by Defendant and then-Google CEO Eric Schmidt. Defendant Schmidt says, during the Q&A, that he thinks of the job of running for president much like trying to get a job at Google — it's difficult. Obama laid out a detailed package of technology policies designed to [...], put high-speed broadband within reach of all Americans, [...] and, drive America's competitiveness. As part of his plan, (then) Sen. Obama said he would use the Internet to give citizens better visibility into, and greater participation in, the workings of their government, stating: *"I'll put*

*government data online in universally accessible formats. I'll let citizens track federal grants, contracts, earmarks, and lobbyist contacts. I'll let you participate in government forums, ask questions in real time, offer suggestions that will be reviewed before decisions are made, and let you comment on legislation before it is signed. And to ensure that every government agency is meeting 21st century standards, I'll appoint the nation's first Chief Technology Officer.*"

122.   [Obama] talked about his "Google for Government" bill (which is now law) to create a searchable database for every dollar of federal spending. [Obama] said, "If you give people good information, they will make good decisions." In the first presidential debate, (then) Senator Barack Obama mentioned he worked with Senator Tom Coburn "to set up what we call a Google for Government, which says that we are going to list every dollar of federal spending to make sure that the taxpayer can take a look and see." The actual name of this law is the Federal Funding Accountability and Transparency Act of 2006 (S. 2590) (FFATA), and it mandates the Office of Management Budget to ensure the existence and operation of a single searchable website, accessible by the public at no cost to access information on federal grants, contracts, earmarks and loans. This "single searchable website" is the same "cloud-based" website Defendant Brin stated Defendant Google would build when he attended the NASA event with Vivek Kundra.

123.   On July 1, 2010, Obama called "Sergey Brin's Google" one of the "great ventures" that was made "possible because of immigrants." On May 10, 2011, Obama referred to [Defendant] Google as a "great American company" that "created countless jobs" and was founded by an immigrant. However, Defendant Google may well be one of

the "great ventures" and a "great American company" that "created countless jobs."

However, Defendant Brin and Google's meeting(s) and working for Barack Obama's administration(s) were done in furtherance of Defendant's conspiracy to engage in unlawful, anti-competitive conduct.

**E.     The   Obama   and   the   Biden     Administrations  Are  "Unnamed Conspirators"  in  the  Defendants'  Conspiracy  to  Engage  in  Unlawful, Anti-Competitive Conduct**

124.    In 2019-2020, Defendant Amazon contributed $8.9 million dollars through individual and PAC donors to federal candidates. Defendant Amazon's top recipient was Joe Biden, who received $1.7 million dollars. Defendant Amazon's PAC contributed just over $1 million to the total spending, including a $5,000 donation from Defendant Bezos. As with the Obama campaign(s) and administration(s) in 2008 and 2012, certain confirmed names on (President-elect) Joe Biden's transition team are intrinsically associated with the Defendants' unlawful, anti-competitive conduct. Biden has publicly confirmed the following persons to his transition team:

- Tom Sullivan, international tax director at Amazon - State Department;

- Mark Schwartz, enterprise strategist at Amazon Web Services: Executive Office of Management and Budget team (White House);

- Michael Hornsby, director of customer success at Salesforce.com: General Services Administration (GSA) team;

- Phillip Carter, senior corporate counsel at Tableau Software (owned by Salesforce.com): Department of Veterans Affairs; and

- Will Fields, senior associate at Sidewalk Labs (<u>owned by Defendant Alphabet</u>): Treasury review panel.

125.    President Biden is also reportedly considering former Alphabet, dba, Google CEO [and Defendant] Eric Schmidt for <u>a leading role in a tech industry task force in the Biden administration</u>. Alphabet contributed $21 million dollars to the 2020 Presidential election. <u>The top recipients were Joe Biden</u> and Democrat super PACs. Defendant Alphabet's employees and PACs <u>contributed a whopping $3.66 million dollars to the Joe Biden campaign since 2019</u>. Defendant Pichai contributed a total of $10,000 through six donations to Google's PAC. Defendant Larry Page made a $5,000 one-time donation in late 2019.

126.    Employees and PACs affiliated with <u>Defendant Facebook donated a total of $6 million dollars during the 2020 election cycle. The Joe Biden campaign alone received $1.3 million dollars from the Defendant Facebook PAC</u>. Defendant Zuckerberg made direct political donations to the Facebook PAC. However, <u>Defendant Zuckerberg and his wife, Priscilla Chan, gave $400 million dollars to local governments in order to foot the bill for 2020 election-related costs</u>. Thus,  the Defendants, jointly and severally, and in furtherance of the conspiracy to engage in unlawful, anti competitive conduct, <u>have donated approximately $432 million dollars to the Democrat Party and the Biden campaign in the 2020 election cycle</u>.

127.    On December 9, 2020, Defendant YouTube stated (on their official blog): "Yesterday was the safe harbor deadline for the U.S. Presidential election and enough states have certified their election results to determine a President-elect. Given that, <u>we</u>

will start removing any piece of content uploaded today (or anytime after) that misleads people by alleging that widespread fraud or errors changed the outcome of the 2020 U.S. Presidential election, in line with our approach towards historical U.S. Presidential elections. For example, we will remove videos claiming that a Presidential candidate won the election due to widespread software glitches or counting errors. We will begin enforcing this policy today, and will ramp up in the weeks to come."

128.    The Representatives of the Defendants dominate the entire Biden transition team. The Defendants regarded the eight years from 2009 to 2016 as a golden age in which Obama-Biden chose to revert to traditional laissez-faire policies. The Obama-Biden policies allowed the Defendants to grow into a monopoly and do as they liked without the heavy hand of federal regulation. It was Twitter (owned by Defendant Google) that led the way when it came to shutting down news coverage of the revelations about Hunter Biden's influence-peddling reported by the New York Post. It was Twitter (owned by Defendant Google) who also shut down the subsequent revelations pointing toward the former Vice President Biden's direct involvement in his son's schemes to profit from his father's role as Obama administration point man on policy toward Ukraine and China. The agenda of all of the Defendants' technology executives now helping Biden fill the thousands of administration posts, will be to ensure that reforms aimed at punishing Defendants for their monopoly exploitation of the public information highway, ... will never materialize. Given the Defendants place at the table in Biden's incoming administration, there's no reason to think this monopoly will diminish, rather than grow, over the next four years.

**6.      The Defendants have jointly conspired with mainstream media and movie outlets to engage in unlawful anti-competitive conduct on the YouTube Website.**

**A.      YouTube's Background**

129.      YouTube was founded by Chad Hurley, Steve Chen, and Jawed Karim. The domain name "YouTube.com" was activated on February 14, 2005 with video upload options being integrated on April 23, 2005. The three creators realized they couldn't find any videos of it on the internet, after noticing that this type of platform did not exist they made the changes to become the first major video sharing platform.

130.      The idea of the new company was for non-computer experts to be able to use a simple interface that allowed the user to publish, upload and view streaming videos through standard web browsers and modern internet speeds. Thus, YouTube was created as an easy to use video streaming platform that wouldn't stress out the new internet users of the early 2000s.

131.      YouTube allows users to upload videos, view them, rate them with likes and dislikes, share them, add videos to playlists, report, make comments on videos, and subscribe to other users. The site has a wide variety of user-generated and corporate media videos. Utilizing the YouTube slogan "Broadcast Yourself," YouTube was marketed as an alternative to (mainstream) Major Media and Movie outlets.

132.      Before being purchased by Google, YouTube declared that its business model was advertisement-based, making 15 million dollars per month. This kickstarted YouTube's rise to becoming a global media dominator, creating a $15-billion dollar

annual advertising, video and music sales business that has surpassed most television stations and other media markets.

133.   Defendant YouTube now operates as one of Defendant Google's subsidiaries. Advertising is YouTube's central mechanism for gaining revenue. Advertisements were launched on the site beginning in March 2006. In April 2006, YouTube started using Google AdSense. Defendant Google bought the site in November 2006 for US$1.65 billion. At the time YouTube was Defendant Google's second-largest acquisition.

134.   On March 31, 2010, YouTube launched a new design with the aim of simplifying the interface and increasing the time users spend on the site. In May 2010, it was reported that YouTube was serving more than two billion videos a day, which was "nearly double the prime-time audience of all three major US television networks combined." According to May 2010 data published by market researchers, YouTube is the dominant provider of online video in the United States, with a market share of roughly 43 percent and more than 14 billion videos viewed during May.

135.   In May 2011, YouTube reported on the company blog that the site was receiving more than three billion views per day. In January 2012, YouTube stated that the figure had increased to four billion videos streamed per day.

136.   On October 25, 2012, The YouTube slogan (Broadcast Yourself) was taken down due to the live stream of the U.S. presidential debate. Defendant YouTube relaunched its design and layout on December 4, 2012 to be very similar to the mobile and tablet app version of the site. In 2012, the site had eight hundred million unique users

a month. In March 2013, the number of unique users visiting YouTube every month reached 1 billion.

137.    As of October 2020, YouTube is the second-most popular website in the world, behind Google, according to Alexa Internet. Alexa Internet, Inc. is an American web traffic analysis company based in San Francisco and a wholly owned subsidiary of Defendant Amazon. Starting from 2010 and continuing to the present, Alexa ranked Defendant YouTube as the third most visited website on the Internet after Defendants Google and Facebook.

**B.      The YouTube AdSpend/Adsense Conspiracy To Mislead Plaintiff As A Content Creator/Website Designer.**

138.    In October 2008, Plaintiff joined Defendant's Blogger™ and YouTube websites, based strictly upon Defendants marketing the sites as alternatives to (mainstream) Major Media and Movie outlets. However, nothing was further from the truth. The agreement between Google to purchase YouTube in 2006 came after YouTube presented three agreements with major media companies in an attempt to avoid copyright-infringement lawsuits.

139.    On June 4, 2007, Hearst-Argyle Television Inc. (now Hearst, Inc.) one of the nation's largest operators of local TV stations, began distributing news, weather and entertainment video to Google Inc.'s YouTube in a revenue-sharing agreement. The deal between Defendant YouTube and Hearst/Walt Disney marked the first time a TV station got paid when people viewed their content on the YouTube site. Hearst is partnered with the Walt Disney Company. Effective June 4, 2007, five of Hearst-Argyle's biggest

stations began posting local video content to channels on YouTube. The stations included WCVB in Boston and KCRA in Sacramento, Calif.

140.    Most notably, In Williby v. Hearst, Case No. [5:15-cv-02538-EJD] (a case regarding a video posted on YouTube) Counsel for the Defendants, Hearst., Inc., successfully argued that the California federal court lacked jurisdiction to hear a case in which they were named defendants. However, nothing was, or remains further from the truth. Hearst, Inc., in partnership with the Walt Disney Company had YouTube AdSpend/Adsense PPC Revenue sharing accounts as early as June 2007. Defendants and their counsel withheld this information during the proceedings. Williby v. Hearst proceeded before the U.S. District Court for the Northern District of California in 2015-2016. At all times mentioned herein (2008 -thru- present) Defendant YouTube was owned, operated and conducted all business within the State of California.

141.    Hearst received an undisclosed portion of the revenue generated from advertising sold against the video clips it made available to YouTube. Jordan Hoffner, (then) head of premium-content partnerships for YouTube, said both companies would likely [continue to] sell ad inventory, and the ads would take various forms. Newspaper sales of local online video ads totaled $81 million in 2006, compared with $32 million for TV stations. Thus,.

142.    Defendant Google continued to market YouTube as an alternative to mainstream, major media. Again, nothing is further from the truth. Hearst, Inc., owns newspapers, magazines, television channels, and television stations, including the San Francisco Chronicle. Hearst, Inc., owns 50% of the A&E Networks cable network group

and 20% of the sports cable network group ESPN, both in partnership with The Walt Disney Company. Hearst is the largest affiliate of Walt Disney Company's "ABC" Media Company. In 2006, Hearst reached about 18% of U.S. households. In the same year, Hearsts' 26 television stations streamed 38 million videos on their Web sites in 2006, up 29% from a year earlier.

143.   In addition to Hearst, Inc. and the Walt Disney Company, and as early as 2007, Defendants had in fact established AdSpend/Adsense accounts on YouTube for "Icon Film Distribution Pty Ltd (Australia VOD)," "Tele München Fernseh GmbH + Co. Produktionsgesellschaft VOD (TMG)," "Viacom, dba, Paramount Pictures," "Zefr SonyPictures," "Live Storms Media," "Lasso Entertainment," "Apple Corps Ltd.," "cocheusadoooo," "VideoVigilanteOKC," "Content Media Corporation International Limited," "Remove Your Media LLC," Brian M. Heiss, Jean-Xavier de Lestrade, Robert Schmidt and John Nicholas Broomfield, a documentary producer.

144.   Defendant Alphabet, dba, Google, dba, YouTube, knowing since June 2007, that YouTube would not be operated as an alternative to mainstream media, allowed each of the competing parties listed above, to file copyright claims against plaintiff, … resulting in the termination of both Plaintiff's YouTube channels. Plaintiff not only served Adsense advertisements for a decade (2008-2018) for Defendant Alphabet, dba, Google, dba, YouTube, Plaintiff now knows he was serving ads and generating revenue for parties who Plaintiff believed were his competitors, … for a period of ten years. [Emphasis added.]

145.   Plaintiff was intentionally misled by the Defendant Alphabet, dba, Google,

dba, YouTube for a period of ten years. The Defendants, jointly and severally, and through the Adsense program, or horizontal price fixing scheme, misled Plaintiff into designing websites and creating content, ... all for the benefit of the Defendants (Facebook, Google, Amazon) and mainstream media and movie studios.

146.    The specific acts as set forth below clearly demonstrate Defendants had no intentions of operating YouTube as an alternative to mainstream, major media, or movie studios. Specifically:

- YouTube entered into a marketing and advertising partnership with NBC (owned by Hearst, Inc.) in June 2007;

- On July 23, 2007 and November 28, 2007, CNN and YouTube produced televised presidential debates in which Democratic and Republican US presidential hopefuls fielded questions submitted through YouTube;

- On June 19, 2007, (then) Google CEO Eric Schmidt went to Paris to launch the new localization system. The interface of the YouTube website is available with localized versions in 89 countries, one territory (Hong Kong) and a worldwide version;

- In November 2008, YouTube reached an agreement with MGM, Lions Gate Entertainment, and CBS, allowing the companies to post full-length films and television episodes on the site, accompanied by advertisements in a section for US viewers called "Shows". The move was intended to eliminate competition with websites such as Hulu, which features material from NBC, Fox, and Disney;

- In early 2009, <u>YouTube registered the domain www.youtube-nocookie.com for videos embedded on United States federal government websites</u>;

- In January 2010, YouTube introduced an online film rentals service which is currently available only to users in the US, Canada and the UK;

- In March 2010 YouTube began free streaming of certain content, including 60 cricket matches of the Indian Premier League;

- According to YouTube, the 60 cricket matches were <u>the first worldwide free online</u> broadcast of a major sporting event;

- During November 2011, the Google+ social networking site was integrated directly with YouTube and the Chrome web browser, allowing YouTube videos to be viewed from within the Google+ interface;

- In October 2012, for the first-time ever, YouTube offered a live stream of the U.S. presidential debate and partnered with ABC News to do so;

- On April 4, 2012, YouTube and Paramount Pictures reached a deal to make nearly 500 films available to rent online;

- In May 2013, YouTube launched a pilot program to begin offering some content providers the ability to charge $0.99 per month or more for certain channels, <u>but the vast majority of its videos would remain free to view</u>;

- Defendant Google launched YouTube TV in April 2016, initially in just five markets. It's now available in the top 100 U.S. markets, with YouTube TV expanding to more than a dozen additional markets. This gives Defendant Google coverage of the top 100 U.S. markets, reaching over 85% of U.S.

households;

- In early March of 2018, YouTube TV became available on Roku players and Apple TV devices. This is in addition to Xbox One consoles, Android TVs, Samsung and LG 2016 and 2017 smart TVs, Chromecast, and Chromecast built-in TVs;

- On March 13, 2018, Under a deal with Turner Networks, YouTube TV added the programmer's suite of eight networks, including CNN, TBS and TNT. With the addition of Turner, YouTube TV now offers more than 50 networks in the base package, including local ABC, CBS, Fox, and NBC stations, plus cable networks like ESPN, AMC, and FX, and local sports networks from NBC Sports, Fox Sports, and NESN in select markets;

- In 2019, YouTube TV offers a 7-day free trial to subscribers

- In 2019, Verizon Wireless offers new & existing Android phone customers a 30-day free trial of YouTube TV; and

- On December 1, 2020, YouTube TV begins offering new subscribers a 21-day free trial.

147.   The new markets where YouTube TV is now available are: Honolulu; Lexington, Ky.; Dayton, Ohio; El Paso, Texas; Burlington, Vt.; Plattsburgh, N.Y.; Richmond, Va.; Petersburg, Va.; Mobile, Ala.; Syracuse, N.Y.; Champaign, Ill.; Springfield, Ill.; Columbia, S.C.; Charleston, S.C.; Harlingen, Texas; Wichita, Kan.; Wilkes-Barre, Pa.; and Scranton, Pa.

148.   In 2012, Defendant YouTube's employee, Malik Ducard, (then) director of

content partnerships at YouTube is quoted as saying: "Paramount Pictures is one of the biggest movie studios on the planet. We're thrilled to bring nearly 500 of their films to movie fans in the U.S. and Canada on YouTube and Google Play."

149.   In 2012, YouTube's online video store was a growing rental library that typically charged $2 to $4 per viewing. Prior to 2012, NBC Universal, Sony Pictures, Warner Bros., the Walt Disney Co. and many independent studios made deals to rent their latest releases through YouTube.

150.   Thus, it is clear Defendants had no intentions of operating YouTube as an alternative to mainstream, major media, or movie studios.

151.   20th Century Fox was the only major studio that had not signed with YouTube in 2012. Walt Disney acquired 21st Century Fox (successor) Company on March 20, 2019 for $71.3 billion dollars. Disney at the time was the world's largest media company and under contract with Defendant YouTube. This was the largest and perhaps most complicated acquisition of one media company to another in history.

152.   21st Century Fox, which was owned by media mogul Rupert Murdoch, included the 20th Century Fox, Fox Searchlight, Fox 2000, Blue Sky Animation film studios, The Fox News, Fox Sports Stations, FX Cable Stations, and National Geographic TV holdings along with a 30% share of Hulu (video) streaming and other international holdings. Disney already owned a 30% stake in Hulu. The deal made Disney, already the largest media conglomerate in the world, even larger making up nearly a third of the entertainment media landscape.

153.   In May of 2019, Sinclair Broadcast Group and the Walt Disney Company

closed a $9.6 billion dollar deal for Sinclair to buy 21 Fox Regional Sports Networks and Fox College Sports. The deal was announced in May after Disney bought the networks as part of its acquisition of Twenty-First Century Fox. Disney was required to divest the 21 regional sports networks as part of its acquisition of 21st Century Fox's film and TV assets in order to obtain clearance from the U.S. Department of Justice.

154.   On March 5, 2020, YouTube TV and Sinclair Broadcast Group reached a deal covering most of the Fox regional sports networks (RSNs). The deal between Google and Sinclair will keep 19 of the 21 Sinclair-owned Fox RSNs on YouTube TV through the end of the 2020 Major League Baseball season.

155.   Under the deal with Sinclair, YouTube TV will carry the following Fox-branded RSNs: Fox Sports Arizona, Fox Sports Carolinas, Fox Sports Detroit, Fox Sports Florida, Fox Sports Indiana, Fox Sports Kansas City, Fox Sports Midwest, Fox Sports New Orleans, Fox Sports North, Fox Sports Ohio, Fox Sportstime Ohio, Fox Sports Oklahoma, Fox Sports Prime Ticket (L.A.), Fox Sports San Diego, Fox Sports South, Fox Sports Southeast, Fox Sports Southwest, Fox Sports Sun, Fox Sports Tennessee, and Fox Sports Wisconsin.

156.   YouTube TV had over 2 million subscribers at the end of 2019, according to Defendant Google. YouTube TV doesn't bring YouTube videos to the TV. That's the duty of the free YouTube app. Instead, YouTube TV offers live TV, video-on-demand and a cloud-based DVR. YouTube TV just added improved integration with Android TV. Defendant Google owns YouTube and Android TV.

157.   The YouTube TV streaming service now includes 85-live TV channels

including: <u>ABC, CBS, Fox and NBC (with all four in 98% of U.S. markets), plus cable nets including ESPN, HGTV, TNT, AMC, Food Network, CNN and Fox News</u>, as well as content from the YouTube Originals channel.

158.    YouTube TV had one big competitive gap: the channels from ViacomCBS. That changed: Eight (8) ViacomCBS channels (BET, CMT, Comedy Central, MTV, Nickelodeon, Paramount Network, TV Land and VH1) were added to YouTube TV, with more mainstream channels being added soon.

159.    Thus, <u>Walt Disney buys 21st (successor to 20th) Century Fox for multi-billions, sells 21 Station affiliates to Sinclair Group,  only for (Defendant) YouTube TV to host 19 of the 21 channels sold by Disney, ...  under another multi-billion dollar ad and pay-per-view structured price scheme</u>.

160.    Defendant YouTube TV also touts its no-limits cloud DVR, which lets customers record an unlimited amount of programming that is available for nine months. YouTube TV allows up to six accounts per household, each with its own content recommendations and personal DVR. Customers can access the service on up to three devices simultaneously.

161.    As of 2020, <u>every major media outlet and major movie studio is now under contract with Defendant YouTube, or YouTube TV</u>, to either sell digital ads, movies, music, apps, news stories, and/or television shows.  Thus, it is clear <u>Defendants had no intentions of operating YouTube as an alternative to mainstream, major media, or movie studios</u>.

162.    This   unlawful, anti competitive conduct has and continues to net the

Defendants, and each of them, jointly and severally, multi-billion dollars in direct revenue and Adsense/AdSpend revenue. The facts as set forth above clearly demonstrate the <u>Defendants had no intentions of operating YouTube as an alternative to mainstream, major media, or movie studios</u>. In fact, it is clear Defendants had every intention of engaging in a unlawful conspiracy to engage in unlawful, anti-competitive conduct, as early as June 2007.

163.    Despite all this backdoor dealings and public maneuvering, the U.S. and multiple State Governments have failed to act, ... <u>or simply accepted campaign donations from the defendants and looked the other way</u>. The Defendants are  indeed more than a business: They are an unlawful cartel violating antitrust laws and abusing their complete market control and power. Further, Plaintiff negotiated in good faith and went to incredible lengths to keep all of his websites and YouTube channels. The Defendant's Google Adsense/AdSpend horizontal price-fixing scheme (standing alone, or in combination with Android OS, Google Search, etc..) is a classic act of a cartel misusing market power to achieve monopolistic cartel payments and generating anti competitive profits and complete control of the relevant market in the pursuit of anticompetitive payments. By forcing consumers to choose between paying those monopolistic cartel payments – which far exceed the marginal costs of operating an ad service, or lose the ability to reach the desired market, the Defendants place consumers in a Hobson's choice that all consumers of monopolistic goods and services face: pay up, way up, or lose.

164.    Oprah Winfrey's OWN network was added to YouTube TV in December 2020. The YouTube TV streaming service added 10 new channels, including: Discovery

Channel; HGTV; Food Network; TLC; Investigation Discovery; Animal Planet; Travel Channel; and MotorTrend on April 10, 2019, ... along with a $10.00 price hike.

165.    YouTube TV presently costs $65 per month, which reflects a $15 price hike that started on July 30, 2020. It was formerly $50 per month, after the April 10, 2019 price hike moved it up from $40.

166.    Hulu with 60% ownership by Walt Disney and with its Hulu Live TV just upped its price to $65 per month, but still offers 20 fewer channels than YouTube TV (though it's got its own exclusive original shows).

167.    Past price hikes were timed with content additions. When YouTube TV got Turner channels in 2018, it went up by $5, and the 2019 addition of local channels and Discovery channels saw a price jump of $10.

168.    Defendants' conduct in creating, supporting and approving the Google Adsense PPC horizontal price fixing scheme is also premised upon a fluctuating policy on the types of content that is eligible to be monetized with advertising, or who can monetize content, or websites. The Defendants have collectively acted to increase the prices paid by advertisers for the ability to host an online news feed, digital ads to sums that far exceed the prices any advertiser would have to pay in a competitive online news, or digital ad market, or online marketplace.

169.    Specifically, the Defendants met and agreed collusively to impose the Google AdSpend/Adsense PPC fees in meetings dating back to 2003. As a collective, the Defendants, and each of them, jointly and severally, leveraged their monopoly position as the sole major Internet (Search) browser,  online news feed providers, digital ad, App

providers and online sales businesses in the United States, … and all tied in with their Android OS. The antitrust laws, and the laws regarding contracts, were adopted to prevent this exact kind of economic bullying and ensure a competitive marketing system.

170.    In a competitive marketplace, Defendants could not command, nor demand multi-billion dollar annual ad revenues; instead, they could only seek the market rates consistent with the market brand and relevant market. However, the Defendants are anything but a competitive market. Once again, in a country with over 325 million citizens, the Defendants, jointly and severally currently control 98% of the U.S. Internet market(s). The Internet is its own market. For an App developer, online content creator, website designer, advertiser, or consumer, the Defendants, Facebook, Google and Amazon are the only businesses in town.

171.    Because of the complete control that the Defendants have over the Internet market, demand for online products are effectively inelastic: i.e., the value of higher online prices far exceeds any reduction in demand caused by the higher prices, in part because demand is generally well above the "brick market," so even if some existing consumers choose not to purchase Defendants' online products, others are eager to buy. In short, digital advertisers have to pay anti competitive prices if they want to advertise online and, if they cannot, they simply cannot advertise. No one business could demand these anti competitive prices alone; indeed, 98% control of the vast Internet Market requires the collective effort of all the Defendants. As the United States Court of Appeals for the Second Circuit has recognized, such industry-wide agreements tend to "stiffen the spines" of otherwise competing interests. U.S. v. Apple, 791 F.3d 290, 305 (2d Cir.

2015). By acting in concert – in an agreement in violation of Section 1 of the Sherman Act – Facebook, Google and Amazon "stiffen" their "spines" to ensure that each of the Defendants demand the same of the online consumer and use the same platforms (Facebook, Instagram, Twitter, Amazon, AdSpend/Adsense, Android OS, Google Play, Google Search, YouTube, etc.).

### C.   The Relevant Market Applicable To Defendants' Misconduct

172.   The relevant market in this action is the Internet market, which spans the United States and all consumers, advertisers, website designers, content creators, cities and communities that are willing to utilize the Internet for online news feeds and to purchase goods (music, news, videos, movies, electronic accessories, software) and services in the geographic United States. There are multiple barriers that prohibit entry into this market.

173.   With respect to the product market, as alleged above, there is no substitute for Internet marketing, online news feeds, digital advertising, online movies, videos, music, global news feeds, or Apps. There is no other competitive search engine (key word) Internet market in the United States. The Yahoo search engine is no substitute for the Google, Amazon, or Facebook cartel. Even to the extent Yahoo has made limited attempts to enter the United States search engine  (key word) Internet market as a competitor, those efforts failed.

174.   Marissa Mayer joined Defendant Google in 1999 as employee number 20. She started out writing code and overseeing small teams of engineers, developing and designing Defendant Google's search offerings. She became known for her attention to

detail, which helped land her a promotion to product manager, and later she became director of consumer web products. She oversaw the layout of Defendant Google's well-known, unadorned search homepage. She was also on the three-person team responsible for Google AdWords, which is an advertising platform that allows businesses to show their product to relevant potential customers based on their search terms. AdWords helped deliver 96% of the company's revenue in the first quarter of 2011. Mayer was the vice president of Google Search Products and User Experience until the end of 2010, when she was asked by then-CEO Eric Schmidt to head the Local, Maps, and Location Services. In 2011, she secured Google's acquisition of survey site Zagat for $125 million. On July 16, 2012, Mayer was appointed president and CEO of Yahoo!, effective the following day.

175.   In 2015, Verizon expanded into content ownership by acquiring AOL. AOL and Yahoo were amalgamated into a new division formerly named Oath Inc., currently known as Verizon Media. In 2017, Verizon acquired Yahoo!.   It was announced in January 2017 that Mayer would step down from the company's board upon the sale of Yahoo!'s operating business to Verizon Communications for $4.8 billion dollars. Mayer announced her resignation on June 13, 2017.

176.   Yahoo! owns a 20% stake in the Chinese e-commerce company Alibaba Group (after selling 20%). Alibaba was set up in 1999 and operates retail, business-to-business and consumer-to-consumer platforms. It has expanded at a breakneck pace into digital advertising, financial services, film production and other fields. Alibaba's founder, Jack Ma, is China's richest entrepreneur and one of its most

prominent business people worldwide with a net worth of $59 billion. China has the world's biggest population of internet users at 940 million. Alibaba said revenue rose 30% over a year earlier in the three months ending in September to 155.1 billion yuan ($23.4 billion dollars). Alibaba said shoppers spent 498.2 billion yuan ($75.1 billion dollars) on its online platforms from Nov. 1, 2020 to November 11, 2020, during the Singles Day shopping festival. The informal holiday begun in the 1990s has become the world's biggest retail spending period. Alibaba Group is the 4th largest digital (PPC) advertiser after Defendants Google, Facebook and Amazon.

177.    Mayer essentially structured the Yahoo! Search engine, or browser, as a market host for Defendant Google's products, including: Apps, digital ads, movies, music, apps, online news feeds, and/or television shows.

178.    In 2019, Defendant Google, dba, YouTube TV and Verizon Media partnered up to make YouTube TV available on Verizon Wireless Android Phones (with a 30-day free trial of YouTube TV).

179.    The Internet market is a unique market. The Defendants wholly control the process of establishing websites, operating systems, search engines, App development advertising protocols, their locations, and monetization of the foregoing, if allowed by Defendants. If an App developer, website designer, content creator, advertiser, or a potential website designer, content creator, advertiser, does not abide by the process controlled by Defendants, then they stand to lose their online website, franchise or not get selected as a business capable of monetization. These website designers, content creators, and advertisers cannot go elsewhere. Defendants Google, Facebook and Amazon own all

advertising platforms, … as well as the Android OS that is required to participate in App development, online news feeds, digital advertising, or online sales. Traditional advertising is not a substitute for an online news feed, online sales franchise, or a digital advertising platform.

180.   With respect to the geographic market, the vast majority of demand for Internet Advertising, sales and online news feeds is in the United States, and the Defendant companies are located in the United States. Despite some Internet Advertising and online sales abroad, no Defendant has based itself in a foreign city, and at the time of the anti-competitive conduct alleged herein, the United States market dominated Internet Advertising and online sales, and there was no substitute outside of the United States.

181.   Thus, the Defendants have leveraged their Internet Search Browser and Android OS monopoly, to obtain a monopoly in the U.S. market for website designers, content creators, and advertisers, news feeds, as well as for Internet Advertising and online sales.

### D.   Defendants' Conduct Has Injured Competition

182.   In a competitive market, actual and potential app developers, website designers, content creators, and advertisers (often with investing private interests) could build or renovate webpages, or platforms for the purposes of hosting online news feeds, Internet Advertising and online sales, and they would be able to compete to host an online enterprise on a level playing field. However, the Defendants have complete control over the Internet, the Android OS, online news feeds, Internet Advertising and online sales; and the Defendants have agreed to strictly limit the number and location of online

companies to maintain that power. Thus, even if a website designers, content creators, and advertisers and/or private investors built a new Internet platform and had the capital and infrastructure to operate an online news feed, digital advertising franchise, they could not do so without Defendant's permission and the requisite cartel payments to Defendants through the AdSpend/Adsense horizontal price fixing scheme.

183.   As a result of the artificially restricted supply in the market of Internet Advertising and online sales, Defendants have caused excess demand among actual and potential website designers, content creators, and advertisers and/or private investors for an online news feed, digital advertising or Internet sales franchise. Defendants then capitalize on their complete market power by charging supra-competitive prices to participate in the market. Those who will not pay are shadow banned, banned through termination of websites, or have their websites and channels demonetized.

184.   As a result of Defendants' conduct, many actual or potential participants cannot realistically participate in the online news feed, digital advertising or Internet sales franchise market even though there is, or would be, considerable interest in their communities in hosting an online franchise. The market has been limited to Facebook, Google and Amazon and to the small number of affiliate companies willing to meet Defendants' supra-competitive demands.

### E.   Defendants' Anticompetitive Conduct Has Injured Plaintiff

185.   The Defendants consciously joined and participated in the conspiracy by violating the antitrust laws, supporting and approving the AdSpend/Adsense horizontal price fixing scheme (including but not limited to software support and collecting support

fees), demonetizing, shadow banning and terminating Plaintiff's websites and YouTube channels as a competitor for an online news feed, digital advertising and/or sales franchise. Such collusive conduct has been enormously injurious to Plaintiff.

186.   Among other damages, Plaintiff has invested ten (10) years labor, the marketing of YouTube, Facebook, Twitter and Blogger over 10 years and  significant sums of money, totaling over $1 million, in reliance on the Defendants Advertising and Online sales Policies; and on the Plaintiff's Brand presence within the Google, Facebook, YouTube portfolio of platforms. Further, Plaintiff has lost significant income, in the minimum amount of $1 billion dollars a year (2008-2018) that he derived from Plaintiff's Brand presence within the Google, Facebook, YouTube portfolio of platforms as well as the economic activity Plaintiff's brand presence generates. In addition, Plaintiff now owns a Facebook, YouTube, Google blogspot and Twitter account that has been shadow banned, demonetized and terminated by the Defendants and, thus, has incurred the significant diminution in property value caused by that shadow ban, demonetization and termination.

187.   All of these losses and injuries are directly related to, and caused by, the anticompetitive conduct of Defendants, including their contract, combination, or conspiracy in the restraint of trade and interstate commerce, and their resulting breach of the AdSpend/Adsense contract as outlined and formulated by the Defendants.

## VIII.  THE NEED FOR PRELIMINARY RELIEF

188.   In the absence of preliminary relief, consumers will be deprived of their choice of Apps, browsers, operating systems, online news feeds, digital advertising, sales

franchises and consumers and the public will be deprived of the benefits of competition during the pendency of this action. Relief at the conclusion of this case cannot remedy the damage done to consumers and the public during the interim.

189.    In addition, the damage to competitors and competition during the pendency of this case that would occur in the absence of preliminary relief cannot practically be reversed later.

190.    Aided by Defendants' anticompetitive conduct, Google's share of the relevant market and product market has increased dramatically in the top 100 U.S. markets, reaching over 85% of U.S. consumers, an increase from 18% in 2006; Consumers spent $5.1 billion online (on Facebook, Google and Amazon products) on Thanksgiving Day 2020 alone. Spending is up 21.5% from last year (2019). Nearly 50% of the web-based purchases were made on an android smartphone. In the absence of interim relief, Defendants' share of the browsers, operating systems, online news feeds, digital advertising, and sales franchises market will grow substantially as a result, among other things, of Google's tying of its Internet browser to the Android OS and other anti competitive practices.

191.    Defendants' App, browser, operating systems, online news feeds, digital advertising, and sales franchise market competitors will be effectively foreclosed from important opportunities to supply alternative browsers, operating systems, online news feeds, digital advertising, and sales franchise markets to customers so long as the tie-in and Defendants' other exclusionary practices continue. In particular, due to the market's network effects, the significant increase in Defendants' share of the App, browser,

operating system, online news feeds, digital advertising, and sales franchise markets that will result in the absence of preliminary relief will tip the market in favor of the Defendants and accelerate its dominance and competition's demise.

192.   In addition, the barriers that exist to the entry of new competitors, or the expansion of smaller existing competitors, including network effects, mean that dominance once achieved cannot readily be reversed.

193.   In the absence of preliminary relief, the increase in each Defendant's position that will result from its continuing illegal conduct will so entrench it (and so weaken its competitors) that the cost of reversing the Defendants' imminent domination of the Internet browser, operating system, online news feeds, digital advertising, and sales franchise markets "could be prohibitive." See United States v. Microsoft Corporation, 980 F. Supp. 537, 544 (D.D.C. 1997).

## IX.   CAUSES OF ACTION

### COUNT I:  Violation of the Sherman Act (15 U.S.C. § 1)

### Shadow Banning: Damages/Disgorgement

194.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

195.   The Defendants, jointly and severally have violated Section 1 of the Sherman Act (15 U.S.C. § 1), by engaging in a contract, combination or conspiracy in restraint of trade and interstate commerce, the nature and effect of which is to restrict the ability of Plaintiff and other website designers, content creators, and advertisers and/or private investors to maintain and sponsor an online news feed, digital advertising, or

online sales franchise at competitive prices.

196.    Through their unlawful contract, combination or conspiracy to restrain trade and interstate commerce, Defendants have imposed anti competitive prices and complete control for hosting of online news feeds, digital advertising, or online sales franchise by offering Plaintiff and other website designers, content creators, and advertisers and/or private investors a Hobson's choice: pay the enormous demands associated with online news feeds, digital advertising, or online sales franchise, or lose your website, or ability to advertise online. These demands have forced website designers, content creators, and advertisers –   like Plaintiff, that will not pay the supra-competitive price of the Defendants demands for hosting online news feeds, online sales franchises, or digital advertising – out of the market for online news feeds, digital advertising, or online sales franchise, as evidenced by the Defendants' shadow banning of Plaintiff's websites and YouTube channels. Indeed, as a result of Defendants' shadow ban of Plaintiff's websites and YouTube channels, Plaintiff lost not only the revenue, the channels and websites, but also any chance to host online news feeds, digital advertising, or online sales franchises in the future. In a competitive marketplace, Defendants could not have successfully demanded these monopolistic terms, conditions, or payments; and the Plaintiff would still be online hosting advertising, music, movies and news feeds.

197.    Defendants' unlawful contract, combination or conspiracy in restraint of trade and interstate commerce operates as a shadow ban.

198.    Defendants' shadow ban constitutes an unreasonable restraint of trade. First, Defendants have complete control over the Internet and their platforms. Second, the clear

objective of Defendants' misconduct is to limit the number of competitive online news feeds, digital advertising, or online sales franchises and to increase Defendants' profits, by providing shadow banning competitive websites and platforms to collect exorbitant advertising fees, and monopolistic fees paid by wealthier media corporations. Third, Defendants' shadow ban is not necessary for the production of online news feeds, digital advertising, online sales franchises, or the achievement of any pro-competitive business objective.

199. Each of the Defendants is a participant in this unlawful contract, combination or conspiracy.

200. As a result of Defendants' violations of the Sherman Act, Plaintiff has suffered injury from the loss of his websites and YouTube channels and the economic activity generated by Plaintiff's brand presence within the Google, Facebook, YouTube portfolio of platforms. These losses, current and future, are significant and were directly caused by Defendants' unlawful restraint of trade.

201. Further, Defendants' unlawful shadow ban has resulted in enormous profits for each of the Defendants, including monetary concessions from media corporations and inflated advertising revenue enjoyed by the Defendants, and all other media corporations sharing in the Adsense PPC advertising fees assessed on the Plaintiff. The policies underlying the Sherman Act, and the federal proscription of anticompetitive behavior (including shadow banning, or group boycotts), demands that these illicit profits be disgorged.

202. Accordingly, Plaintiff is entitled to a judgment of damages against the

Defendants, jointly and severally, in a minimum amount of $10 Billion Dollars ($1BN for each year 2008-2018) or in an amount to be determined at trial. Further, under Section 15 of the Sherman Act, Plaintiff seeks a trebling of his damages.

203.    In addition, or alternatively, Plaintiff is entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.

### COUNT II: Violation of the Sherman Act (15 U.S.C. § 1)

### Demonetization: Damages/Disgorgement

204.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

205.    There is a relevant market for the hosting of online news feeds, digital advertising, or online sales franchises in the United States, as alleged above.

206.    Within this relevant geographic market, Defendants have violated Section 1 of the Sherman Act (15 U.S.C. § 1), by engaging in a contract, combination or conspiracy in restraint of trade and interstate commerce, the nature and effect of which is to restrict the ability of Plaintiff and other website designers, content creators, and advertisers to maintain and/own an online news feeds, digital advertising, or online sales franchises at competitive prices.

207.    Through their unlawful contract, combination or conspiracy to restrain trade and interstate commerce, Defendants have imposed anti competitive prices and complete control for hosting of online news feeds, digital advertising, or online sales franchise by offering Plaintiff and other website designers, content creators, and advertisers and/or private investors a Hobson's choice: pay the enormous demands associated with online

news feeds, digital advertising, or online sales franchise, or lose your website, or ability to advertise online. These demands have forced website designers, content creators, and advertisers –  like Plaintiff, that will not pay the supra-competitive price of the Defendants demands for hosting online franchises, or digital advertising – out of the market for online news feeds, digital advertising, or online sales franchise, as evidenced by the Defendants' demonetization of Plaintiff's websites and YouTube channels. Indeed, as a result of Defendants' demonetization of Plaintiff's websites and YouTube channels, Plaintiff lost not only the revenue, the channels and websites, but also any chance to host online news feeds, digital advertising, or online sales franchises in the future. In a competitive marketplace, Defendants could not have successfully demonetized Plaintiff's websites and YouTube channels, or demanded monopolistic terms, conditions, or payments; and the Plaintiff would still be online hosting advertising, music, movies and news feeds.

208.  Defendants' unlawful contract, combination or conspiracy in restraint of trade and interstate commerce operates as a concerted demonetization of Plaintiff's YouTube channels and websites (or a refusal to deal).

209.  Defendants' concerted demonetization of Plaintiff's YouTube channels and websites constitutes an unreasonable restraint of trade. First, Defendants have complete control over the Internet and their platforms. Second, the clear objective of Defendants' misconduct is to limit the number of competitive online news feeds, digital advertising, or online sales franchises and to increase Defendants' profits, by demonetizing competitive platforms to collect exorbitant advertising fees, and monopolistic fees paid

by wealthier media corporations. Third, Defendants' concerted demonetization of Plaintiff's YouTube channels and websites is not necessary for the production of online news feeds, digital advertising, online sales franchises, or the achievement of any pro-competitive business objective.

210.   As a result of Defendants' violations of the Sherman Act, Plaintiff has suffered injury from the loss of his websites and YouTube channels and the economic activity generated by Plaintiff's brand presence within the Google, Facebook, YouTube portfolio of platforms. These losses, current and future, are significant and were directly caused by Defendants' unlawful restraint of trade.

211.   Further, Defendants' unlawful concerted demonetization of Plaintiff's YouTube channels and websites has resulted in enormous profits for each of the Defendants, including monetary concessions from media corporations and inflated advertising revenue enjoyed by the Defendants, and all other media corporations sharing in the Adsense PPC advertising fees assessed on the Plaintiff. The policies underlying the Sherman Act, and the federal proscription of anticompetitive behavior (including concerted demonetization), demands that these illicit profits be disgorged.

212.   Accordingly, Plaintiff is entitled to a judgment of damages against the Defendants, jointly and severally, in a minimum amount of $10 Billion Dollars ($1BN for each year 2008-2018) or in an amount to be determined at trial. Further, under Section 15 of the Sherman Act, Plaintiff seeks a trebling of his damages.

213.   In addition, or alternatively, Plaintiff is entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.

## COUNT III: Violation of the Sherman Act (15 U.S.C. § 1)

## Termination of Websites/Channels: Damages/Disgorgement

214.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

215.    There is a relevant market for the hosting of online news feeds, digital advertising, or online sales franchises in the United States, as alleged above.

216.    Within this relevant geographic market, Defendants have violated Section 1 of the Sherman Act (15 U.S.C. § 1), by engaging in a contract, combination or conspiracy in restraint of trade and interstate commerce, the nature and effect of which is to restrict the ability of Plaintiff and other website designers, content creators, and advertisers to maintain and/own an online news feeds, digital advertising, or online sales franchises at competitive prices.

217.    Through their unlawful contract, combination or conspiracy to restrain trade and interstate commerce, Defendants have imposed anti competitive prices and complete control for hosting of online news feeds, digital advertising, or online sales franchise by offering Plaintiff and other website designers, content creators, and advertisers and/or private investors a Hobson's choice: pay the enormous demands associated with online news feeds, digital advertising, or online sales franchise, or lose your website, or ability to advertise online. These demands have forced website designers, content creators, and advertisers –   like Plaintiff, that will not pay the supra-competitive price of the Defendants demands for hosting online news feeds, online franchises, or digital advertising – out of the market for online news feeds, digital advertising, or online sales

franchise, as evidenced by the Defendants' termination of Plaintiff's websites and YouTube channels. Indeed, as a result of Defendants' termination of Plaintiff's websites and YouTube channels, Plaintiff lost not only the revenue, the channels and websites, but also any chance to host an online news feed, digital advertising, or online sales franchises in the future. In a competitive marketplace, Defendants could not have successfully terminated Plaintiff's websites and YouTube channels, or demanded monopolistic terms, conditions, or payments; and the Plaintiff would still be online hosting advertising, music, movies and news feeds.

218. Defendants' unlawful contract, combination or conspiracy in restraint of trade and interstate commerce operates as a termination of Plaintiff's YouTube channels and websites.

219. Defendants' termination of Plaintiff's YouTube channels and websites constitutes an unreasonable restraint of trade. First, Defendants have complete control over the Internet and their platforms. Second, the clear objective of Defendants' misconduct is to limit the number of competitive online news feeds, digital advertising, or online sales franchises and to increase Defendants' profits, by terminating competitive platforms to collect exorbitant advertising fees, and monopolistic fees paid by wealthier media corporations. Third, Defendants' termination of Plaintiff's YouTube channels and websites is not necessary for the production of online news feeds, online sales franchises, online digital advertising, or the achievement of any pro-competitive business objective.

220. Each of the Defendants is a participant in this unlawful contract, combination or conspiracy.

221.    As a result of Defendants' violations of the Sherman Act, Plaintiff has suffered injury from the loss of his websites and YouTube channels and the economic activity generated by Plaintiff's brand presence within the Google, Facebook, YouTube portfolio of platforms. These losses, current and future, are significant and were directly caused by Defendants' unlawful restraint of trade.

222.    Further, Defendants' unlawful termination of Plaintiff's YouTube channels and websites has resulted in enormous profits for each of the Defendants, including monetary concessions from media corporations and inflated advertising revenue enjoyed by the Defendants, and all other media corporations sharing in the Adsense PPC advertising fees assessed on the Plaintiff. The policies underlying the Sherman Act, and the federal proscription of anticompetitive behavior (including termination of YouTube channels and websites), demands that these illicit profits be disgorged.

223.    Accordingly, Plaintiff is entitled to a judgment of damages against the Defendants, jointly and severally, in a minimum amount of $10 Billion Dollars ($1BN for each year 2008-2018) or in an amount to be determined at trial. Further, under Section 15 of the Sherman Act, Plaintiff seeks a trebling of his damages.

224.    In addition, or alternatively, Plaintiff is entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.

### COUNT IV: Violation of the Sherman Act (15 U.S.C. § 1)

### Price Fixing: Damages/Disgorgement

225.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

226.   There is a relevant market for the hosting of online news feeds, digital advertising, or online sales franchises in the United States, as alleged above.

227.   Within this relevant geographic market, Defendants have violated Section 1 of the Sherman Act (15 U.S.C. § 1), by engaging in a contract, combination or conspiracy in restraint of trade and interstate commerce, the nature and effect of which is to restrict the ability of Plaintiff and other website designers, content creators, and advertisers to maintain and/own an online news feeds, digital advertising, or online sales franchises at competitive prices.

228.   Through their unlawful contract, combination or conspiracy to restrain trade and interstate commerce, Defendants have imposed anti competitive prices and complete control for hosting of online news feeds, digital advertising, or online sales franchise by offering Plaintiff and other website designers, content creators, and advertisers and/or private investors a Hobson's choice: pay the enormous demands associated with online news feeds, digital advertising, or online sales franchise, or lose your website, or ability to advertise online. These demands have forced website designers, content creators, and advertisers –   like Plaintiff, that will not pay the supra-competitive price of the Defendants demands for hosting online news feeds, sales franchises, or digital advertising – out of the market for online news feeds, digital advertising, or online sales franchise, as evidenced by the Defendants' termination of Plaintiff's websites and YouTube channels. Indeed, as a result of Defendants' termination of Plaintiff's websites and YouTube channels, Plaintiff lost not only the revenue, the channels and websites, but also any chance to host online news feeds, digital advertising, or online sales franchises in the

future. In a competitive marketplace, Defendants could not have successfully terminated Plaintiff's websites and YouTube channels, or demanded monopolistic terms, conditions, or payments; and the Plaintiff would still be online hosting advertising, music, movies and news feeds.

229.   Defendants' unlawful contract, combination or conspiracy in restraint of trade and interstate commerce operates as a horizontal price fixing scheme.

230.   Defendants' horizontal price fixing scheme constitutes an unreasonable restraint of trade. First, Defendants have complete control over the Internet and their platforms. Second, the clear objective of Defendants' misconduct is to limit the number of competitive App developers, online news feeds, digital advertising, or online sales franchises and to increase Defendants' profits through the artificially inflated and monopolistic fees paid by wealthier media corporations. Third, Defendants' horizontal price fixing scheme is not necessary for the production of Apps, online news feeds, digital advertising, online sales franchises, or the achievement of any pro-competitive business objective.

231.   Each of the Defendants is a participant in this unlawful contract, combination or conspiracy.

232.   As a result of Defendants' violations of the Sherman Act, Plaintiff has suffered injury from the loss of his websites and YouTube channels and the economic activity generated by Plaintiff's brand presence within the Google, Facebook, YouTube portfolio of platforms. These losses, current and future, are significant and were directly caused by Defendants' unlawful restraint of trade.

Original Complaint

233.   Further, Defendants' unlawful horizontal price fixing scheme has resulted in enormous profits for each of the Defendants, including monetary concessions from media corporations and inflated advertising revenue enjoyed by the Defendants, and all other media corporations sharing in the Adsense PPC advertising fees assessed on the Plaintiff. The policies underlying the Sherman Act, and the federal proscription of anticompetitive behavior (including horizontal price fixing schemes), demands that these illicit profits be disgorged.

234.   Accordingly, Plaintiff is entitled to a judgment of damages against the Defendants, jointly and severally, in a minimum amount of $10 Billion Dollars ($1BN for each year 2008-2018) or in an amount to be determined at trial. Further, under Section 15 of the Sherman Act, Plaintiff seeks a trebling of his damages.

235.   In addition, or alternatively, Plaintiff is entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.

## COUNT V:  Violation of the Sherman Act (15 U.S.C. § 1)

## Exclusive Dealing and Other Exclusionary Agreements

236.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

237.   Google's agreements with ISPs, ICPs, and others pursuant to which such companies agree not to license, distribute, or promote non-Google, Facebook, or Amazon products (or to do so only on terms that materially disadvantage such products), and its agreements with OEMs restricting modification or customization of the Android OS, Apps and the PC/tablet/Android Smartphone boot-up sequence and screens, unreasonably

restrict competition and thus violate Section 1 of the Sherman Act. These agreements unreasonably restrain trade and restrict the access of Defendants' competitors to significant channels of distribution, thereby restraining competition in the Internet browser market, among other markets.

238.    The purpose and effect of these agreements are to restrain trade and competition in the Internet browser, operating system, online news feeds, digital advertising, Apps and sales franchise markets. These agreements violate Section 1of the Sherman Act, 15 U.S.C. § 1.

239.    After the commencement of the United States' Congressional investigation of Defendants' exclusionary agreements, the Defendants modified certain of those agreements. However, the continuing anticompetitive effects of the agreements are substantial; the modified agreements are themselves anticompetitive and there is a serious threat that, unless enjoined, the Defendants will reimpose the unlawful terms that they have only recently expressed an intention not to enforce.

### COUNT VI: Violation of the Sherman Act (15 U.S.C. § 1, & 2)

### Unlawful Tying

240.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

241.    The Android operating systems, Apps and Google's, Amazon's and Facebook's Internet browser software are separate products. They are sold in different markets; their functions are different; there is separate demand for them; and they are treated by the Defendants and by other industry participants as separate products. It is

efficient for Defendants not to tie them and/or to permit OEMs to distribute Android without Google, Amazon's and Facebook's Internet browser software, or Apps.

242.   Defendant Google, for the benefit of each Defendant, jointly and severally, has tied and plans again to tie its Internet browser to its separate Android operating system, which has monopoly power, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, & 2.

243.   The purpose and the effect of this tying are to prevent customers from choosing among Internet browsers, Apps, or operating systems on their merits and to foreclose competing browsers, Apps, or operating systems from an important channel of distribution, thereby restraining competition in the Internet browser market.

## COUNT VII: Violation of the Sherman Act (15 U.S.C. § 1)

### Horizontal Market-Division Agreements: Equitable Relief

244.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

245.   The Defendants' Horizontal Market Agreement consists of Defendants' agreement to use the Google AdSpend/Adsense, pay-per-click, advertising protocol and the Android OS. The Defendants' Horizontal Market Agreement constitutes a per se illegal market allocation and price-fixing agreement designed to eliminate competition between the Defendants for operating systems, digital advertising, the sale of online goods and services, the nature and effect of which is to is to allocate the markets to the Defendants, to give the Defendants the ability to fix the prices of operating systems, digital advertising, the sale of online goods and services, and to permit the Defendants to

control the future of online markets, and enable the elimination of, competitor products.

246. Through their unlawful contract, combination or conspiracy to restrain trade and interstate commerce, Defendants' products are the principal competitive products to each other's own dynamic control system design software (Android OS), the overall effect of the Horizontal Market Agreement is to eliminate the competition between Defendants in the three relevant markets (online sales, digital advertising and Operating Systems). Consumers are harmed both by the elimination of the Defendants' products as a competitive alternative to each other's products. The competition between the Defendants' products provided Defendants an incentive to facilitate interoperation with third-party products, as an unwillingness by one to do so would likely advantage the other.

247. Each of the Defendants cooperated with a small number of companies to facilitate interfaces between Defendants' products and those companies' products that compete with Defendants' products in the individual markets.

248. Defendants' Horizontal Market Agreement was not designed to, nor had the effect of, increasing economic efficiency or rendering the markets more competitive. As a consequence of the elimination of competition resulting from the Horizontal Market Agreement, the Defendants will have less incentive to provide such technical cooperation to competitors selling only individual products, thus further reducing competition for consumers who value integrated products.

249. In the alternative, the Horizontal Market Agreement has resulted in anticompetitive effects in the online sales, digital advertising and Operating Systems

markets by depriving customers of the benefits of competition between the Defendants' products, including competition based on price, service, functionality, and interfaces with other firms' products. The Horizontal Market Agreement constitutes an unreasonable restraint of trade in the markets for online sales, digital advertising and Operating Systems, and adversely affects interstate commerce.

250.   The Horizontal Market Agreement and Defendants' actions in implementing it violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

## COUNT VIII: Violation of the Sherman Act (15 U.S.C. § 1)

## Declaratory Judgment

251.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

252.   There is a relevant market for the hosting of browsers, operating systems, online news feeds, digital advertising, Apps and online sales franchises in the United States, as alleged above.

253.   Within this relevant geographic market, Defendants have violated Section 1 of the Sherman Act (15 U.S.C. § 1), by engaging in a contract, combination or conspiracy in restraint of trade and interstate commerce, the nature and effect of which is to restrict the ability of Plaintiff and other website designers, content creators, and advertisers to maintain and/own an online news feeds, digital advertising, develop Apps, or online sales franchises at competitive prices.

254.   Through their unlawful contract, combination or conspiracy to restrain trade and interstate commerce, Defendants have imposed in part, through governmental

agency, anti competitive prices and complete control of operating systems, hosting of Apps, online news feeds, digital advertising, and online sales franchises by offering Plaintiff and other website designers, content creators, and advertisers and/or private investors a Hobson's choice: pay the enormous demands associated with operating systems, Apps, online news feeds, digital advertising, or online sales franchise, or lose your website, or ability to advertise online. These demands have forced website designers, content creators, and advertisers – like Plaintiff, that will not pay the supra-competitive price of the Defendants demands for hosting, Apps, online news feeds, sales franchises, or digital advertising – out of the market for Apps, online news feeds, digital advertising, or online sales franchise, as evidenced by the Defendants' governmental agency, horizontal price fixing scheme, shadow banning, demonetization and termination of Plaintiff's websites and YouTube channels. Indeed, as a result of Defendants' shadow banning, demonetization and termination of Plaintiff's websites and YouTube channels, Plaintiff lost not only the revenue, the channels and websites, but also any chance to host online news feeds, digital advertising, or online sales franchises in the future. In a competitive marketplace, Defendants could not have successfully implemented a horizontal price fixing scheme, shadow banned, demonetized, or terminated Plaintiff's websites and YouTube channels, or demanded monopolistic terms, conditions, or payments without governmental agency; and the Plaintiff would still be online hosting advertising, music, movies and news feeds.

255.   Defendants' unlawful contract, combination or conspiracy in restraint of trade and interstate commerce operates as a governmental agency, horizontal group

shadow ban, concerted demonetization and termination of Plaintiff's websites and YouTube channels. Defendants' conduct also operates as a horizontal price fixing scheme.

256. Defendants' unlawful conduct constitutes an unreasonable restraint of trade. First, Defendants have complete market power in the relevant market. Second, the clear objective of Defendants' misconduct is to limit the number of competitive online news feeds, digital advertising, or online sales franchises and to increase Defendants' profits, through governmental agency, a horizontal price fixing scheme, by a horizontal group shadow ban, a concerted demonetization and termination of Plaintiff's YouTube channels, competitive websites and platforms to collect exorbitant advertising fees, and monopolistic fees paid by wealthier media corporations. Third, Defendants' governmental agency, horizontal price fixing scheme, horizontal group shadow ban, concerted demonetization and termination of Plaintiff's YouTube channels, competitive websites and platforms is not necessary for the production of online news feeds, digital advertising, online sales franchises, or the achievement of any pro-competitive business objective.

257. Each of the Defendants is a participant in this unlawful contract, combination or conspiracy.

258. Accordingly, Plaintiff, as a shadow banned, demonetized and terminated online franchise owner, is entitled to an Order of this Court declaring that:

(a) Defendants jointly and severally, at all times mentioned herein, were acting in governmental agency;

**(b)** Defendants' group shadow ban, concerted demonetization and termination of Plaintiff's YouTube channels, competitive websites and platforms; and their refusal to comply with their own contract, amount to an unreasonable restraint on trade and interstate commerce and a violation of the antitrust laws; and

**(c)** redistribution of a fair portion the resulting ill-gotten supra-competitive gains obtained by Defendants through artificially set advertising/hosting fees to Plaintiff as a quid pro quo for breaching the terms of those contracts,

**COUNT IX: Violation of the Sherman Act (15 U.S.C. § 2)**

**Conspiracy to Monopolize (browsers, operating systems, online news feeds, digital advertising, Apps and online sales franchise platforms): Injunctive Relief**

259.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

260.   There is a relevant market for the browsers, operating systems, online news feeds, digital advertising, Apps and online sales franchises in the United States, as alleged above.

261.   Beginning in, or about September 1998 and continuing until the filing of this Complaint, the exact dates being unknown to the plaintiff, the defendants, and each of them, jointly and severally, have engaged in a continuing agreement, combination and conspiracy to suppress and eliminate competition in the production and sale of browsers, operating systems, online news feeds, digital advertising, Apps and online sales franchises in the United States, as alleged above, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 2 (conspiracy to monopolize through concerted action directed at the

acquisition of monopoly power).

262.    In furtherance of this agreement, combination and conspiracy, the defendants did the following things, among others:

a.  Defendants Facebook, Zuckerberg, Bezos, Amazon, Alphabet, dba, Google, dba, YouTube, Brin, Page, Sundai and Schmidt met and agreed (with multiple unnamed parties) between themselves to limit the number of browsers, operating systems, online news feeds, digital advertising, Apps and online sales franchise platforms in the United States, by agreement that each Defendant would acquire competing companies in the relevant markets; and by agreement the acquired competing companies were to be closed, dismantled, or with rare exception, were absorbed into Defendants' companies, thereby conspiring to suppress, eliminate competition and divide the revenue and profits from the supply of the sale of browsers, operating systems, online news feeds, digital advertising, Apps and online sales franchise platforms in the United States, between each Defendant as nearly equally as possible;

b.  Defendants, and each of them, jointly and severally, met and further agreed (with multiple unnamed parties) to unlawfully secure the acquisitions of competitive websites, businesses, and advertising platforms including: Social/Photos, Search engines, Enterprise Tools/Productivity, Advertising, Commerce, Maps/Automobiles, Mobile, Dev Tools/Cloud Platform, Media and Entertainment, Cybersecurity, stealth semiconductor firm, Payments,

Multimedia & Graphics, Software, Wearables, Robotics, Energy, Consumer Products & Services, Smart Home, Telecommunications, Computer Software & Services, Aerospace & Defenses, Music, Business Intelligence, Analytics & Performance Mgmt, Healthcare, Internet Software & Services, Software/Gaming, Software/AI, Consumer electronics, Mobile Software & Services and Scientific & Engineering companies, thereby conspiring to suppress, eliminate competition and divide the revenue and profits from the supply of the sale of browsers, operating systems, online news feeds, digital advertising, Apps and online sales franchise platforms in the United States, between each Defendant as nearly equally as possible;

c. The Defendants met and further agreed between themselves to utilize "Applied Semantic," or Google AdSpend/Adsense as the primary and exclusive point-of-sale and payment software for the purchase of online, digital advertising systems and payment for hosting online news feeds and digital advertising systems, thereby conspiring to suppress, eliminate competition and divide the revenue and profits from the supply of the sale of online news feeds, digital advertising systems and online goods between each Defendant as nearly equally as possible;

d. The Defendants met and further agreed between themselves and AT&T, Verizon, and T-Mobile wireless service carriers to pre-install Google payment apps on their phones, thereby conspiring to suppress, eliminate competition and divide the revenue and profits from the supply of the sale of

browsers, operating systems, online news feeds, digital advertising, Apps and online sales franchise platforms in the United States, between each Defendant as nearly equally as possible;

e. Defendants Alphabet, Amazon, Facebook, met and further agreed between themselves and corporate leaders of <u>Alibaba</u>, Baidu, Microsoft, Tencent and Xiaomi to acquire and utilize  the Android OS as the primary and exclusive online operating system, thereby conspiring to suppress, eliminate competition and divide the revenue and profits from the supply of the sale of browsers, operating systems, online news feeds, digital advertising, Apps and online sales franchise platforms in the United States, between each Defendant as nearly equally as possible;

f. Defendants Facebook, Zuckerberg, Bezos, Amazon, Alphabet, dba, Google, dba, YouTube, Brin, Page, Sundai and Schmidt met and further agreed with the Chief Executive Officers of every movie and media company in the United States to exclusively buy, sell and host, videos, music, movies, news feeds and serve advertisements on videos, music, movies, news feeds and social media sites owned, or operated by the Defendants, jointly and severally, thereby conspiring to suppress, eliminate competition and divide the revenue and profits from the supply of the sale of browsers, operating systems, online news feeds, digital advertising, Apps and online sales franchise platforms in the United States, between each Defendant as nearly equally as possible;

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

    g.  The Defendants further met, conspired and agreed between themselves to allow the 2012 Obama Presidential campaign to harness Defendant Facebook's Application Programming Interface (API) to access the company's "social graph," which mapped the Facebook users connections and enabled the Obama campaign to access information on millions of Defendant Facebook users' friends when they used the Facebook log-in button to access the campaign's website; and

    h.  The Defendants further agreed between themselves to allow political campaigning and fundraising on their respective platforms, and to fund the Democrat party and the political campaigns of Barack Obama, Hillary Clinton and Joe Biden in 2008, 2012, 2016, and 2020, in order to escape governmental antitrust scrutiny.

263.  The aforesaid agreement, combination and conspiracy had the following effects, among others:

    f.  it suppressed, restrained, and eliminated competition in the development of Apps, the sale of online news feeds, digital advertising systems and online goods in the United States;

    g.  it reduced the number of operating systems to one; reduced independent advertisers, news feed providers, online (music, movie, videos) sales platforms on the Internet from over two-hundred (420) to three (3) (Four (4) including Chinese-owned Alibaba);

    h.  it substantially raised the price of advertising and goods sold on the Internet;

i. it caused the U.S. purchase contract officer(s), to nevertheless award technological procurement contracts to Defendants as an undefinitized contract action, obligating the United States to pay Defendants unfair and unreasonable prices, that exceed billions of dollars, with the exact amount to be determined later; and

j. It increased the costs and profits proposed by Defendants as fair and reasonable for the price of browsers, operating systems, online news feeds, digital advertising, Apps and online sales franchise platforms in the United States to levels significantly in excess of historical costs and profits.

264. Each of the Defendants is a participant in this unlawful agreement, combination or conspiracy.

265. As a result of the illegal agreement, combination and conspiracy alleged in this Complaint, the plaintiff, Harry J. Williby, has been injured and financially harmed by the defendants.

**COUNT X: Violation of the Sherman Act (15 U.S.C. § 2)**

**Monopolization (of browsers, operating systems, online news feeds, digital advertising, Apps and online sales franchise platforms): Injunctive Relief**

266. Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

267. The Defendants, and each of them, jointly and severally, possesses monopoly power in the market for browsers, operating systems, online news feeds, digital advertising, Apps, PC/tablet/smartphones and online sales franchise platforms.

Through the anticompetitive conduct described herein and above, the Defendants, and each of them, jointly and severally, have willfully maintained, and unless restrained by the Court will continue to willfully maintain, that power by anticompetitive and unreasonably exclusionary conduct. The Defendants, and each of them, jointly and severally, have acted with an intent illegally to maintain its monopoly power in the browsers, operating systems, online news feeds, digital advertising, Apps and online sales franchise platforms market, and its illegal conduct has enabled it to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**COUNT XI: Violation of the Lanham Act (Sections 43(a) 15 U.S.C. § 1125(a)(1)(A))**

**False designations of origin, false descriptions: Damages/Disgorgement**

268. Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

269. Defendants' unauthorized use in commerce of spurious copies of the Corrupt Justice™/The Attorney Depot™/Wilabee™ Trademark in connection with the distribution, advertising, promotion, offering for sale, and/or sale of the YouTube/Blogger/Facebook/Amazon corporations constitutes use of a symbol or device that is likely to cause confusion, mistake, or deception as to the affiliation or connection of Defendants with Corrupt Justice™/The Attorney Depot™/Wilabee™ and as to the origin, sponsorship, association, or approval of Defendants' anti competitive Products in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

270. Defendants' actions as alleged herein, including but not limited to their unauthorized use in commerce of spurious copies of the Corrupt Justice™/The Attorney

Depot™/Wilabee™ Trademark, constitutes use of a false designation of origin and misleading description and representation of fact that is likely to cause confusion, mistake, or deception as to the affiliation or connection of Defendants with Corrupt Justice™/The Attorney Depot™/Wilabee™ and as to the origin, sponsorship, association, or approval of Defendants' anti competitive Products in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

271.   At all relevant times, Defendants had actual and direct knowledge of Plaintiff's prior use and ownership of the Corrupt Justice™/The Attorney Depot™/Wilabee™ Trademark. Defendants' conduct is therefore willful and reflects Defendants' intent to exploit the goodwill and strong brand recognition associated with the Corrupt Justice™/The Attorney Depot™/Wilabee™ Trademark.

272.   Defendants' wrongful acts will continue unless enjoined by this Court.

273.   Defendants' acts have caused, and will continue to cause, irreparable injury to Plaintiff. Plaintiff has no adequate remedy at law and is thus damaged in an amount not yet determined.

274.   In addition, or alternatively, Plaintiff is entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.

**COUNT XII: LANHAM ACT FALSE ADVERTISING UNDER 15 U.S.C. § 1125(a)**

**Damages/Disgorgement**

275.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

276.   Beginning in, or about June 2003 and continuing until the filing of this

Complaint, the exact dates being unknown to the plaintiff, the defendants, and each of them, jointly and severally, have published, distributed and disseminated electronic advertising brochures and other advertising statements which include false and/or misleading representations and disparaging accusations regarding Plaintiff's product.

277.   Defendants' association of its AdSpend/Adsense products with the phrase "pay-per-click," or with statements indicating Plaintiff would receive $0.25 per-click for hosting digital advertising on his websites and/or YouTube channels, constitutes a false or misleading representation of fact regarding the actual amounts paid to plaintiff for hosting digital advertising on his websites and/or YouTube channels.

278.   Defendants' use of false or misleading representations of fact in commercial advertising or promotion misrepresents the nature, characteristics, or qualities of Defendants' goods.

279.   Defendants' use of false or misleading representations of fact has the tendency to deceive a substantial portion of the target consumer audience, or actually deceives the target consumers.

280.   Defendants' false or misleading representations of fact are material because they are likely to influence the operating and/or purchasing decision of the target consumers.

281.   The Defendants, and each of them, jointly and severally, falsely or misleadingly represented products that are advertised, promoted, sold and distributed in interstate commerce.

282.   Plaintiff has been and continues to be injured by Defendants' false or

misleading representations of fact through the diversion of sales or loss of goodwill.

283.   The Defendants, and each of them, jointly and severally, knows that its representations of fact are false or misleading.

284.   Defendants' false or misleading representations of fact were done with bad faith and malice or reckless indifference to Plaintiff's and consumers' interests.

285.   Defendants' bad faith false or misleading representations of fact regarding the payment amount and methodology of its product makes this an exceptional case within the meaning of 15 U.S.C. § 1117.

286.   The Defendants, and each of them, jointly and severally, continues to make false or misleading representations of fact regarding the payment amount and methodology of its product and will continue to do so unless enjoined by this Court as provided by 15 U.S.C. § 1116.

287.   Plaintiff is entitled to an award of Defendants' profits due to sales of the falsely or misleadingly represented product, any damages sustained by Plaintiff, and the costs of the action, pursuant to 15 U.S.C. § 1117.

288.   In addition, or alternatively, Plaintiff is entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.

**COUNT XIII: LANHAM ACT FALSE ADVERTISING UNDER 15 U.S.C. §**

**1125(a) (as to Defendants Bezos, Amazon, Brin, Schmidt, Page, Pichai and**

**Defendants Alphabet, dba, Google, dba, YouTube/YouTube TV):**

**Damages/Disgorgement**

289.   Plaintiff incorporates by reference the preceding paragraphs of this

Complaint as if fully restated herein.

290.    Beginning in, or about June 2003 and continuing until the filing of this Complaint, the exact dates being unknown to the plaintiff, the defendants, and each of them, jointly and severally, have published, distributed and disseminated electronic advertising brochures and other advertising statements which include false and/or misleading representations and disparaging accusations regarding Plaintiff's product.

291.    Defendants' association of its YouTube/YouTube TV products with the phrases "YouTube," "Broadcast Yourself," or with statements indicating YouTube/YouTube TV product websites are an "alternative to mainstream media and movie corporations," constitutes a false or misleading representation of fact regarding the actual affiliation, association and business relationships Defendant YouTube/YouTube TV has with mainstream media and movie corporations.

292.    Defendants' use of false or misleading representations of fact in commercial advertising or promotion misrepresents the nature, characteristics, or qualities of Defendants' goods.

293.    Defendants' use of false or misleading representations of fact has the tendency to deceive a substantial portion of the target consumer audience, or actually deceives the target consumers.

294.    Defendants' false or misleading representations of fact are material because they are likely to influence the operating and/or purchasing decision of the target consumers.

295.    The Defendants, and each of them, jointly and severally, falsely or

misleadingly represented products that are advertised, promoted, sold and distributed in interstate commerce.

296.    Plaintiff has been and continues to be injured by Defendants' false or misleading representations of fact through the diversion of sales or loss of goodwill.

297.    The Defendants, and each of them, jointly and severally, knows that its representations of fact are false or misleading.

298.    Defendants' false or misleading representations of fact were done with bad faith and malice or reckless indifference to Plaintiff's and consumers' interests.

299.    Defendants' bad faith false or misleading representations of fact regarding the actual affiliation, association and business relationships Defendant YouTube/YouTube TV has with mainstream media and movie corporations, makes this an exceptional case within the meaning of 15 U.S.C. § 1117.

300.    The Defendants, and each of them, jointly and severally, continues to make false or misleading representations of fact regarding the actual affiliation, association and business relationships Defendant YouTube/YouTube TV has with mainstream media and movie corporations, and will continue to do so unless enjoined by this Court as provided by 15 U.S.C. § 1116.

301.    Plaintiff is entitled to an award of Defendants' profits due to sales of the falsely or misleadingly represented product, any damages sustained by Plaintiff, and the costs of the action, pursuant to 15 U.S.C. § 1117.

302.    In addition, or alternatively, Plaintiff is entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.

## COUNT XIV: Breach of Contract

### (as to Defendants Bezos, Amazon, Brin, Schmidt, Page, Pichai and Defendants Alphabet, dba, Google, dba, YouTube/YouTube TV): Damages

303.  Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

304.  Plaintiff fully performed all the "Terms and Conditions," covenants and promises to be performed on the part of the Plaintiff under the YouTube/Blogger/Google AdSense Program.

305.  The Defendants, and each of them, jointly and severally, failed to make all payments and perform all obligations under the "Terms and Conditions," covenants and promises of the YouTube/Blogger/Google AdSense Program.

306.  The Defendants, and each of them, jointly and severally, breached the "Terms and Conditions," covenants and promises of the YouTube/Blogger/Google AdSense Program by failing to make timely payments and by failing to pay all outstanding amounts, accrued interest, and fees upon demand.

307.  Although Plaintiff has demanded that Defendants perform all obligations under the "Terms and Conditions," covenants and promises of the YouTube/Blogger/Google AdSense Program, Defendants, and each of them, jointly and severally, failed and refused, and continue to fail and refuse to take any steps necessary to fully and completely make timely payments; pay all outstanding amounts; accrued interest; or fees.

308.  As noted above, Defendant Alphabet, Inc., dba, Google, dba, YouTube,

LLC., is the alter-ego of Defendant Jeff Bezos, dba, Amazon, Inc.

309.  As a direct and proximate result of Defendants' continuous breaches, Plaintiff has suffered extreme financial losses in the form of lost profits. Plaintiff has been damaged in the minimum amount of $1 Billion dollars for each year, beginning in 2008, or in an amount to be proven at trial as a result of Defendants' breach of the "Terms and Conditions," covenants and promises of the YouTube/Blogger/Google AdSense Program.

310.  Plaintiff's damages are ongoing and increasing due to Defendants' breach of the "Terms and Conditions," covenants and promises of the YouTube/Blogger/Google AdSense Program.

## COUNT XV: Fraud

**(as to Defendants Bezos, Amazon, Brin, Schmidt, Page, Pichai and Defendants Alphabet, dba, Google, dba, YouTube/YouTube TV)**

303.  Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

311.  The Defendants, and each of them, jointly and severally, misrepresented to Plaintiff that YouTube was a video advertising platform being marketed as an alternative to mainstream media and movie outlets, when in fact, as early as 2007, Defendants were in fact entering into multi-billion dollar contracts to host videos, movies, and televisions shows on behalf of mainstream media stations and movie outlets.

312. The Defendants knew they were hosting videos, movies, and televisions shows on behalf of mainstream media and movie outlets, rather than operating as an

alternative to mainstream media and movie outlets. The Defendants, and each of them, jointly and severally, perpetrated this fraud and misrepresentation by utilizing content creators/Blogger™ designers not affiliated with mainstream media and movie outlets, like Plaintiff, to build and market YouTube as an alternative to mainstream media and movie outlets.

313.   Defendants' misrepresentations were material. Plaintiff would not have spent ten (10) years creating two (2) YouTube channels (The Attorney Depot™ and The Harry Williby) if Plaintiff had known Defendants were actually under multi-billion dollar contract with mainstream media and movie outlets (for the entire ten (10) year period).

314.   The Defendants intended to induce Plaintiff to rely on its misrepresentations. The Defendants, and each of them, jointly and severally, knew that stating they were an alternative to mainstream media and movie outlets, Plaintiff would build and market YouTube as an alternative to mainstream media and movie outlets. The Defendants, and each of them, jointly and severally, had reason to expect that Plaintiff would rely on the misrepresentations that it made to Plaintiff because of the continuous contractual relationship between Plaintiff and Defendants.

315.   Plaintiff reasonably relied upon the representations Defendants made over the course of ten (10) years, while designing Blogger™ pages and YouTube channels.

316.   Plaintiff was justified in relying upon Defendants' representations that they were an alternative to mainstream media and movie outlets, because Defendants continued to use and advertise the phrases "YouTube," "Broadcast Yourself," and "YouTube [Content] Creator," and the Defendants never once, during the period of 2008

through 2018, advertise, announce, or inform Plaintiff that they were in fact, under multi-billion dollar contractual relations with every mainstream media and movie outlet in the country.

317.   Plaintiff has been substantially harmed by Defendants' misrepresentations, because Plaintiff spent ten (10) years designing Blogger™ pages and YouTube channels, for the multi-trillion dollar profit of the Defendants and mainstream media and movie outlets, while netting negative profits, or earnings.

WHEREFORE, Plaintiff prays for relief as set forth below.

**COUNT XVI: Negligent Misrepresentation**

**(as to Defendants Bezos, Amazon, Brin, Schmidt, Page, Pichai and Defendants**

**Alphabet, dba, Google, dba, YouTube/YouTube TV)**

318.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

319.   The Defendants misrepresented to Plaintiff that YouTube was an alternative to mainstream media and movie outlets, when in fact Defendants were signing multi-billion dollar contracts with mainstream media and movie outlets. The Defendants made such misrepresentations by electronic advertising, which Plaintiff relied upon for a period of ten (10) years.

320.   The Defendants had no reasonable grounds to believe that these misrepresentations were true. Plaintiff joined YouTube as a content creator in October 2008. As early as 2007, the Defendants had in fact entered into a multi-million dollar agreement to host videos and shows produced and owned by mainstream media outlet,

NBC.

321.    The Defendants intended to induce Plaintiff to rely on its misrepresentations. The Defendants knew that because of its representation that YouTube was an alternative to mainstream media and movie outlets, Plaintiff would build and market YouTube as an alternative to mainstream media and movie outlets.  The Defendants knew that Plaintiff would rely on the misrepresentations made to him, because YouTube/Google Adsense used unique, confidential content creator identification numbers, when allowing creators to upload/host videos and/or when paying through the Google Adsense program.

322.    Plaintiff was justified in relying upon Defendants' representations that they were an alternative to mainstream media and movie outlets, because Defendants continued to use and advertise the phrases "YouTube," "Broadcast Yourself," and "YouTube [Content] Creator," and the Defendants never once, during the period of 2008 through 2018, advertise, announce, or inform Plaintiff that they were in fact, under multi-billion dollar contractual relations with every mainstream media and movie outlet in the country.

323.    Plaintiff has been substantially harmed by Defendants' misrepresentations, because Plaintiff spent ten (10) years designing Blogger™ pages and YouTube channels, for the multi-trillion dollar profit of the Defendants and mainstream media and movie outlets, while netting negative profits, or earnings.

WHEREFORE, Plaintiff prays for relief as set forth below.

**COUNT XVII: Breach Of Implied-In-Fact-Contract**

**(as to Defendants Bezos, Amazon, Brin, Schmidt, Page, Pichai and Defendants**

**Alphabet, dba, Google, dba, YouTube/YouTube TV)**

324. Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

325. By their actions, the Defendants, and each of them, jointly and severally, entered into a contract with Plaintiff, whereby Plaintiff would create content and Defendants would provide advertisement on said content, and pay Plaintiff based upon consumer access to said advertisements.

326. Because Defendants required Plaintiff and mainstream media and movie outlets to use unique, confidential content creator identification numbers, when allowing creators to upload/host videos and/or when paying through the Google Adsense program, the Defendants knew, or had reason to know that they were required to accurately advertise, announce, or inform Plaintiff that they were in fact, under multi-billion dollar contractual relations with every mainstream media and movie outlet in the country.

327. When allowing the uploading/hosting of videos and/or when seeking payment through the Google Adsense program, Defendants did use the unique, confidential content creator identification numbers. The Defendants then reaped and shared billions of dollars ($2.2 Trillion Dollars to date) in advertising revenue, with mainstream media/movie outlets, each year beginning in 2008 and continuing to present date, through the Google Adsense program.

328. The Defendants breached the implied-in-fact contract with Plaintiff through its fraudulent conduct in which they identified as an independent entity, when in fact they were under multi-billion dollar contractual relations with every mainstream media and

movie outlet in the country. Additional breaches occurred when the Defendants allowed the mainstream media and movie outlets in the country to file and prevail upon frivolous copyright claims against Plaintiff.

329.   Plaintiff has been harmed by Defendants' breach. Based upon Defendants' conduct, Plaintiff was led to believe that he was uploading/hosting videos on behalf of an independent video streaming service; and that Plaintiff would receive the appropriate negotiated payment for those videos through the Google Adsense program. Plaintiff was instead deceived into uploading/hosting videos on behalf of Defendants and mainstream media/movie outlets.

WHEREFORE, Plaintiff prays for relief as set forth below.

**COUNT XVIII: Breach of Implied Covenant of Good Faith & Fair Dealing**

**(as to Defendants Bezos, Amazon, Brin, Schmidt, Page, Pichai and Defendants**

**Alphabet, dba, Google, dba, YouTube/YouTube TV)**

330.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

331.   Plaintiff and Defendants entered into contracts whereby Plaintiff created Blogger™ pages and YouTube channels. In fulfilling their duty to act in good faith (a higher standard amongst merchants) the Defendants must accurately advertise, announce, and/or inform Plaintiff that they were in fact, under multi-billion dollar contractual relations with every mainstream media and movie outlet in the country, giving Plaintiff a basis to make an informed decision, and negotiate adequate compensation.

332.   The Defendants knew, or had reason to know that they were required to

accurately identify for whom they were actually under contractual relationships with.

333. The Defendants knew, or had reason to know that the advertisement revenue they were generating was directly dependent upon the Blogger™ pages and YouTube channels created by Plaintiff.

334. When allowing the uploading/hosting of videos and/or when seeking payment through the Google Adsense program, Defendants did use the unique, confidential content creator identification numbers. Plaintiff duly performed his duties under the contract.

335. The Defendants breached the covenant of good faith and fair dealing governing every contract with Plaintiff by identifying as an independent entity, when in fact they were under multi-billion dollar contractual relations with every mainstream media and movie outlet in the country, reaping massive and ill-gotten profits.

336. The Defendants breached the covenant of good faith and fair dealing governing every contract with Plaintiff, because the facts and evidence indicates the Defendants had no intention of operating as an alternative to mainstream media, or movie outlets. The Defendants in fact began secret multi-million contract negotiations with mainstream media and movie outlets beginning in 2006. Plaintiff, based upon Defendants' intentional and malicious breach of covenant of good faith and fair dealings, joined YouTube and Blogger™ in 2008.

337. Plaintiff has been harmed by Defendants' breach. Had the Defendants informed Plaintiff that they were in fact, under multi-billion dollar contractual relations with every mainstream media and movie outlet in the country, Plaintiff would have had a

basis to make an informed decision, and negotiate adequate compensation.

WHEREFORE, Plaintiff prays for relief as set forth below.

### COUNT XIX: Unfair Competition, Cal. Bus. & Prof. Code §17200

### (as to all Defendants)

338. Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

339. The Defendants are engaged in the business practice of representing themselves as an independent entity, hosting online, digital advertisements on Blogger™ pages, websites and YouTube channels, utilizing the Android OS and the Google AdSpend/Adsense payment program, when in fact they are under multi-billion dollar contractual relations with every mainstream media and movie outlet in the country.

340. The Defendants' practice is unfair because it is unethical, oppressive and unscrupulous. The Defendants falsely represented themselves as an alternative to mainstream media/movie outlets and an independent entity, to take advantage of the unpaid labor, marketing and video editing/production skill sets of Plaintiff as a content creator and blog/website designer. Instead of acting as an alternative to mainstream media/movie outlets and an independent entity, Defendants were in fact, under multi-billion dollar contractual relations with every mainstream media and movie outlet in the country. Upon information and belief, the Defendants profited by representing themselves as an alternative to mainstream media/movie outlets and an independent entity, taking advantage of the unpaid labor, marketing and video editing/production skill sets of Plaintiff as a content creator and blog/website designer, thereby converting

Plaintiffs' profits for their own use.

341.   Defendants further damaged Plaintiff by terminating and demonetizing Plaintiff's Blogger pages and YouTube channels. This wilful and egregious behavior damages Plaintiff's reputation and the trust Plaintiff and his channels, Blogger pages and websites have earned over a ten (10) year period.

WHEREFORE, Plaintiff prays for relief as set forth below.

## COUNT XX: Conversion

### (as to all Defendants)

342.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

343.   The Defendants willfully interfered with Plaintiff's rights to its personal property. The Defendants, through, wilful misrepresentations and a fraudulent schemes of artifice, induced Plaintiff to develop of Blogger™ pages, websites and YouTube channels purportedly on behalf of Plaintiff and Defendants, but with full knowledge that Plaintiff was in fact developing Blogger™ pages, websites and YouTube channels on behalf of Defendants and mainstream media and movie outlets.

344.   Defendants' intentional and deceitful acts enabled them to dispose of the property in a manner inconsistent with Plaintiff's property rights. These property rights include the sale of digital advertisement at a designated price.

345.   Defendants' unauthorized transfer of Plaintiff's property caused substantial damages to Plaintiff.

WHEREFORE, Plaintiff prays for relief as set forth below.

**COUNT XXI: Quantum Meruit**

**Restitution**

**(as to all Defendants)**

346.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

347.    Defendants, in operating YouTube and enacting the Google Adsense Online Terms of Service, intended to benefit Host Websites and YouTube channels owners by establishing standards and procedures for hosting videos, content and payment decisions. The Policies are supposed to limit subjective decision-making and are designed to protect the interests and investments of Host Websites and YouTube channels owners like Plaintiff.

348.    Indeed, there can be no doubt that the operation of YouTube and enacting the Google Adsense Online Terms of Service were enacted for the benefit of Plaintiff. The Google Adsense Online Terms of Service were promulgated after the Defendants purchased Applied Semantics in 2003 and YouTube in 2006. Now, 18 years after their enactment, the Defendants have turned their back both on the purpose of the Google Adsense Online Terms of Service and Plaintiff.

349.    The Google Adsense Online Terms of Service holds: "*As used in these Terms of Service, "you" or "publisher" means the individual or entity using the Services (and/or any individual, agent, employee, representative, network, parent, subsidiary, affiliate, successor, related entities, assigns, or all other individuals or entities acting on your behalf, at your direction, under your control, or under the direction or control of the*

*same individual or entity who controls you). "We," "us" or "Google" means Google LLC, and the "parties" means you and Google."*

350.    The Defendants have long held that their Google Adsense contract with publishers/content creators could be terminated at any time. Such contracts are too unfair to be enforceable. During the past 10 years, Plaintiff has invested over a million dollars to attract, retain and support YouTube channels and Blogger™ and Facebook pages, all spent in reliance on the Google Adsense Online Terms of Service and the obligations of Defendants under those Policies.

Plaintiff made those investments with the express understanding between Plaintiff and the Defendants that: **(a)** Defendants would comply with the Google Adsense Online Terms of Service; **(b)** Defendants would support Plaintiff as the Host of YouTube channels and Blogger™ pages, and **(c)** Plaintiff would recoup his investments in the YouTube channels and Blogger™ and Facebook pages through the revenues generated by the Google Adsense program. The Defendants and all their subsidiaries benefited tremendously from Plaintiff's investment in the YouTube channels and Blogger™ pages.

351.    Neither Plaintiff nor Defendants believed that Plaintiff's investment in the YouTube channels and Blogger™ and Facebook pages was gratuitous, or that the Google Adsense Online Terms of Service somehow did not apply to Plaintiff or the Defendants. In fact, the Google Adsense Online Terms of Service continues, holding: "*Unless expressly authorized in writing by Google, you may not enter into any type of arrangement with a third party where that third party receives payments made to you under the AdSense Terms or other financial benefit in relation to the Services.*"

352.   By virtue of allowing mainstream media/movie outlets to earn Adsense revenue, in blatant violation of the Google Adsense Online Terms of Service, Defendants have deprived Plaintiff of the revenues necessary to recoup his investment in the YouTube channels and Blogger™ and Facebook pages. Defendants have made no effort to reimburse Plaintiff for the investments it made in the YouTube channels and Blogger™ pages, or otherwise compensate Plaintiff for the unlawful shadow banning, demonetization and termination of Plaintiff's YouTube channels and Blogger™ and Facebook pages.

353.   Defendants are estopped from denying the obligatory nature of the Google Adsense Online Terms of Service. The Defendants adopted the Terms specifically to provide a process and standards to reign in subjective decision-making in the hope of avoiding further antitrust liability. Defendants, through their legal representatives, have admitted that the Google Adsense Online Terms of Service imposes obligations on the Defendants, and that the Terms must be satisfied for a Google Adsense payment to be approved. Given the history of the Google Adsense Online Terms of Service – and the Defendants' position regarding the Terms' role in the payment process – Plaintiff relied on the Google Adsense Online Terms of Service in structuring his relationship with the Defendants. Plaintiff's reliance caused Plaintiff to lose his significant investment in the YouTube channels and Blogger™ and Facebook pages, therefore allowing Defendants to reverse course and reject the Google Adsense Online Terms of Service – while enriching themselves – would be unjust.

354.   As a direct and proximate result of Defendants' actions, Plaintiff lost, and

has been deprived of, his investment in the YouTube channels and Blogger™ and Facebook pages.

355.   Accordingly, Plaintiff is entitled to restitution in the amount of all sums invested by Plaintiff in the YouTube channels and Blogger™ and Facebook pages, in an amount to be determined at trial.

## COUNT XXII: Unjust Enrichment Under California Law

### Damages/Disgorgement

### (as to all Defendants)

356.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

357.   As a result of their unlawful and inequitable conduct described above, Defendants have and will continue to benefit and be unjustly enriched as a direct result of their collusive actions to the detriment of Plaintiff.

358.   Plaintiff is entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct, and are entitled to reimbursement of all ill-gotten gains.

359.   The economic benefit Defendants derived is a direct and proximate result of Defendants' unlawful practices.

360.   The financial benefits Defendants derived rightfully belong to Plaintiff. Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiff. Defendants were enriched by their illegal activities at the expense of Plaintiff and thus Defendants should be ordered to make

restitution for the benefit of Plaintiff because it would be unjust to allow Defendants to retain the benefits.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## X.   PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Harry J. Williby respectfully requests that the Court enter judgment against Defendants and grant the following relief:

1.    On Count One of the Complaint, judgment in favor of Plaintiff and against Defendants, jointly and severally, in a minimum amount of $10 Billion Dollars ($1BN for each year 2008-2018) or an amount to be determined at trial and trebled pursuant to 15 U.S.C. § 15, and/or disgorgement in an amount to be determined at trial;

2.    On Count Two of the Complaint, judgment in favor of Plaintiff and against Defendants, jointly and severally, in a minimum amount of $10 Billion Dollars ($1BN for each year 2008-2018) or an amount to be determined at trial and trebled pursuant to 15 U.S.C. § 15, and/or disgorgement in an amount to be determined at trial;

3.    On Count Three of the Complaint, judgment in favor of Plaintiff and against Defendants, jointly and severally, in a minimum amount of $10 Billion Dollars ($1BN for each year 2008-2018) or an amount to be determined at trial and trebled pursuant to 15 U.S.C. § 15, and/or disgorgement in an amount to be determined at trial;

4.    On Count Four of the Complaint, judgment in favor of Plaintiff and against Defendants, jointly and severally, in a minimum amount of $10 Billion Dollars ($1BN for each year 2008-2018) or an amount to be determined at trial and trebled pursuant to 15 U.S.C. § 15, and/or disgorgement in an amount to be determined at trial;

5.    On Count Five of the Complaint, That the Court adjudge and decree as follows:

a.    That Defendants' conduct in requiring OEMs to license and distribute the

Android operating system, or any other software product as a condition of licensing any Android operating system product violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; and

b. That Defendants' agreements with OEMs restricting their right to modify the screens and functions of the Android operating system, or to add non-Google Internet browser software or other software products during the boot-up sequence, or to substitute non-Google Internet browser software or other software products for Google Internet browser software or other software products, violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

6. On Count Six of the Complaint, That the Court adjudge and decree as follows:

a. That Defendants' conduct in requiring persons to license and distribute its Internet browser software or any other software product as a condition of receiving placement in or access to any Android operating system product, including any screen or function thereof, violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; and

b. That Defendants' conduct in requiring or inducing persons to agree not to license, distribute, or promote any non-Google Internet browser, or to license, distribute, or promote such browser only on terms or under conditions that materially disadvantage it, violates

Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

7.     On Count Seven of the Complaint, That the Court adjudge and decree as follows:

      a.  That the Horizontal Market Agreement constitutes an illegal restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act and issue an injunction requiring rescission of the Horizontal Market Agreement and that the Defendants' use of the AdSpend/AdSense Pay-Per-Click program be enjoined;

      b.  that the Defendants, their officers, directors, agents, employees and successors and all other persons acting or claiming to act on their behalf be enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining, or renewing the Horizontal Market Agreement, or from engaging in any other combination, conspiracy, contract, agreement, understanding or concert of action having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

      c.  that the Defendants, their officers, directors, agents, employees and successors and all other persons acting or claiming to act on their behalf be enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining, or renewing the shadow ban, demonetization, or termination of Plaintiff's website(s) or video

channels, or removal of any content thereof on said website(s) or video channels, without order of this Court;

d. that the Plaintiff have such other relief as the Court may deem just and proper to redress, and prevent recurrence of, the alleged violation and to dissipate the anticompetitive effects of the Defendants' past violation(s); and

e. that the Plaintiff recover the costs of this action.

8. On Count Eight of the Complaint, an Order of the Court declaring that Defendants': (i) funding, employment and service in the Obama and Biden Administrations (ii) shadow ban, demonetization, and termination of Plaintiff's website(s) or video channels and refusal to comply with their own Google Adsense Online Terms of Service, and (iii) redistribution of the resulting ill-gotten supra-competitive gains through artificially set digital advertising fees to all mainstream media/movie outlets as a quid pro quo for breaching the terms of those Google Adsense Online Terms of Service, amount to government agency and an unreasonable restraint on trade and interstate commerce and a violation of the antitrust laws.

9. On Count Nine of the Complaint, That the Court adjudge and decree as follows:

a. That the Defendants, and each of them, jointly and severally, have attempted to monopolize, through government agency and political financial contributions, the market for Internet browsers, mobile browsers, operating systems, online news feeds, digital advertising,

Apps and online sales franchise platforms in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

10.     On Count ten of the Complaint, That the Court adjudge and decree as follows:

    a. That the Defendants, and each of them, jointly and severally, have willfully maintained its monopoly in the market for Internet browsers, mobile browsers, operating systems, online news feeds, digital advertising, Apps and online sales franchise platforms in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and

    b. That the Defendants, and each of them, jointly and severally, have engaged in and/or are currently engaged in government agency and extraordinary political campaign funding to willfully maintain and fund its monopoly in the market for Internet browsers, mobile browsers, operating systems, online news feeds, digital advertising, Apps and online sales franchise platforms in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

(i)     That Google, Facebook and Amazon, and all persons acting on their behalf or under their direction or control, and all successors thereto, be preliminarily and permanently enjoined from:

    a. Donating any further computing, data service, or data access to political parties, or persons affiliated, or acting on behalf of a political party in the United States;

    b. Donating any further monies, currencies (whether U.S., or foriegn) or items

of monetary, or financial value to political parties, or persons affiliated, or acting on behalf of a political party in the United States;

c. Enforcing Copyright takedown notices without full compliance with the Digital Millennium Copyright Act (17 U.S.C. §§ 512, 1201–1205, 1301–1332; 28 U.S.C. § 4001) and full compliance with 17 U.S. Code § 107 - Limitations on exclusive rights: Fair use;

d. Enforcing Copyright takedown notices on behalf of mainstream media and/or movie companies Defendants have entered into monetary contracts with and specifically those entities named herein said complaint;

e. Utilizing Pay-Per-Click in the selling of digital advertisements;

f. Utilizing Pay-Per-Click as the payment methodology for Content Creators, Website Owners, or YouTube Channel Owners;

g. Removing any content from, shadow banning, or demonetizing Plaintiff's competing website, wilabee.com, without direct, written approval of the Court;

h. Requiring any person to license or distribute Google's Internet browser software or any other software product or service as a condition of licensing or distributing any Android operating system product;

i. Requiring or inducing any person to agree not to license, distribute, or promote any non-Google Internet browser software or other software product, or to do so on any disadvantageous, restrictive or exclusionary terms;

j.  Taking or threatening any action adverse to any person in whole or in part as a direct or indirect consequence of such person's failure to license or distribute Google's Internet browser software or other software product, of such person's licensing or distributing any non-Google Internet browser or other software product, or of such person's cooperation with Plaintiff, or the United States;

k.  Restricting the right of any person to modify the screens, boot-up sequence or functions of any Android operating system product which such person has licensed so as automatically or otherwise to add non-Google Internet browser software or other software products, including but not limited to alternative user interfaces, or automatically or otherwise to substitute such non-Google Internet browser software or other software product for Google's Internet browser software or other software product, so long as such addition or substitution does not materially impair the performance of such Google/Android operating system product;

l.  Effecting assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (a) through (l).

(ii)     That the Court enter such other preliminary and permanent relief as is necessary and appropriate to restore competitive conditions in the markets affected by Defendants' unlawful conduct.

11.     On Count eleven of the Complaint, For judgment that Defendants, and each

Original Complaint

of them, jointly and severally, have:

(i)

    **a.**    have violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); And

    b.    Finding this to be an exceptional case pursuant to 15 U.S.C. § 1117;

(ii)    That an injunction be issued enjoining and restraining Defendants, and each of them, jointly and severally, and each of their officers, agents, servants, employees, and attorneys, and all those in active concert or participation with it from:

    a.  Using the Wilabee™/The Attorney Depot™/Corrupt Justice™ Trademark or any other reproduction, counterfeit, copy or colorable imitation of the Wilabee™/The Attorney Depot™/Corrupt Justice™ Trademark on or in connection with any goods or services;

    b.  Engaging in any course of conduct likely to cause confusion, deception or mistake, or to injure Plaintiff's business reputation or dilute the distinctive quality of the Wilabee™/The Attorney Depot™/Corrupt Justice™ Trademark, including through the continued importation, distribution, sale or offering for sale of counterfeit Wilabee™/The Attorney Depot™/Corrupt Justice™ products;

    c.  Using any simulation, reproduction, counterfeit, copy, or colorable imitation of the Wilabee™/The Attorney Depot™/Corrupt Justice™ Trademark in connection with the promotion, advertisement, display, sale, offer for sale, manufacture, production, importation, circulation, or distribution of any

products;

d. Making any statement or representation whatsoever, or using any false designation of origin or false description, or performing any act, which can or is likely to lead the trade or public, or individual members thereof, to believe that any products manufactured, distributed, or sold by Defendants are in any manner associated or connected with Wilabee™/The Attorney Depot™/Corrupt Justice™, or are sold, manufactured, licensed, sponsored, approved, or authorized by Wilabee™/The Attorney Depot™/Corrupt Justice™;

e. Destroying, altering, removing, or otherwise dealing with the unauthorized products or any books or records which contain any information relating to the importation, manufacture, production, distribution, circulation, sale, marketing, offer for sale, advertising, promotion, rental or display of all unauthorized products which infringe or dilute the Wilabee™/The Attorney Depot™/Corrupt Justice™ Trademark; and

f. Effecting assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (a) through (f).

(iii)    For an assessment of: (a) damages suffered by Plaintiff, trebled, pursuant to 15 U.S.C. § 1117(b); or, in the alternative, (b) all illicit profits that Defendants derived while using counterfeits and/or infringements of the Wilabee™/The Attorney Depot™/Corrupt Justice™ Trademark, trebled, pursuant to 15 U.S.C. § 1117(b); or, in

the alternative, (c) statutory damages, awarded to Plaintiff pursuant to 15 U.S.C. § 1117(c), of up to $2,000,000 for each trademark that Defendants have counterfeited and/or infringed; (d) plaintiff be awarded a 10% market profit share of YouTube/YouTube TV; and (e) an award of Plaintiff's costs and attorneys' fees to the full extent provided for by Section 35 of the Lanham Act, 15 U.S.C. § 1117; and

(iv)    For costs of suit, and for such other and further relief as the Court shall deem appropriate.

12.    On Count twelve of the Complaint, For judgment that Defendants, and each of them, jointly and severally, have:

(i)

a.    have violated Subdivision 43(a)(1)(b) of the Lanham Act, 15 U.S.C. § 1125(a); and

b.    A Finding this to be an exceptional case pursuant to 15 U.S.C. § 1117.

(ii)    That an injunction be issued enjoining and restraining Defendants, and each of them, jointly and severally, and each of their officers, agents, servants, employees, and attorneys, and all those in active concert or participation with it from:

a.    Making any statement or representation whatsoever, or using any false designation of origin or false description, or performing any act, which can or is likely to lead the trade or public, or individual members thereof, to believe that any Google, Facebook, or Amazon pay-per-click digital advertising products manufactured, distributed, or sold by Defendants results in payment of $0.25 per click;

Original Complaint

b. Destroying, altering, removing, or otherwise, dealing with the Google, Facebook, or Amazon pay-per-click digital advertising products, or any books or records which contain any information relating to the importation, manufacture, production, distribution, circulation, sale, marketing, offer for sale, advertising, promotion, rental or display of all Google Adsense digital advertising products; and

c. Effecting assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (a) through (c).

(iii)    For an assessment of: (a) damages suffered by Plaintiff, trebled, pursuant to 15 U.S.C. § 1117(a); or, in the alternative, (b) all illicit profits that Defendants derived while using false advertisements, misrepresentations, or misleading statements, trebled, pursuant to 15 U.S.C. § 1117(a); (c) plaintiff be awarded a 10% market profit share of YouTube/YouTube TV; and (d) an award of Plaintiff's costs and attorneys' fees to the full extent provided for by Section 35 of the Lanham Act, 15 U.S.C. § 1117; and

(iv)    For costs of suit, and for such other and further relief as the Court shall deem appropriate.

13.    On Count thirteen of the Complaint, For judgment that Defendants, and each of them, jointly and severally, have:

(i)

a. have violated Subdivision 43(a)(1)(b) of the Lanham Act, 15 U.S.C. § 1125(a); and

b. A Finding this to be an exceptional case pursuant to 15 U.S.C. § 1117.

(ii)     That an injunction be issued enjoining and restraining Defendants, and each of them, jointly and severally, and each of their officers, agents, servants, employees, and attorneys, and all those in active concert or participation with it from:

a. Making any statement or representation whatsoever, or using any false designation of origin or false description, or performing any act, which can or is likely to lead the trade or public, or individual members thereof, to believe that Alphabet, dba, Google, dba YouTube/YouTube TV is a separate entity, independent of mainstream media corporations, or box office movie outlets;

b. Destroying, altering, removing, or otherwise, any books or records which contain any information relating to the importation, manufacture, production, distribution, circulation, sale, marketing, offer for sale, advertising, promotion, rental or display of all Alphabet, dba, Google, dba YouTube/YouTube TV advertising products; and

c. Effecting assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (a) through (c).

(iii)     For an assessment of: (a) damages suffered by Plaintiff, trebled, pursuant to 15 U.S.C. § 1117(a); or, in the alternative, (b) all illicit profits that Defendants derived while using false advertisements, misrepresentations, or misleading statements, trebled, pursuant to 15 U.S.C. § 1117(a); (c) plaintiff be awarded a 10% market profit share of

YouTube/YouTube TV; and (d)  an award of Plaintiff's costs and attorneys' fees to the full extent provided for by Section 35 of the Lanham Act, 15 U.S.C. § 1117; and

(iv)    For costs of suit, and for such other and further relief as the Court shall deem appropriate.

14.    On Count Fourteen of the Complaint, a judgment in favor of Plaintiff and against Defendants, jointly and severally, in amount to be determined at trial;

15.    On Count Fifteen of the Complaint, a judgment in favor of Plaintiff and against Defendants, jointly and severally, in amount to be determined at trial;

16.    On Count Sixteen of the Complaint, a judgment in favor of Plaintiff and against Defendants, jointly and severally, in amount to be determined at trial;

17.    On Count Seventeen of the Complaint, a judgment in favor of Plaintiff and against Defendants, jointly and severally, in amount to be determined at trial;

18.    On Count Eighteen of the Complaint, a judgment in favor of Plaintiff and against Defendants, jointly and severally, in amount to be determined at trial;

19.    On Count Nineteen of the Complaint, a judgment in favor of Plaintiff and against Defendants, jointly and severally, in amount to be determined at trial;

20.    On Count Twenty of the Complaint, a judgment in favor of Plaintiff and against Defendants, jointly and severally, in amount to be determined at trial;

21.    On Count Twenty-one of the Complaint, a judgment in favor of Plaintiff and against Defendants, jointly and severally, in amount to be determined at trial;

22.    On Count Twenty-two of the Complaint, a judgment in favor of Plaintiff and against Defendants, jointly and severally, in amount to be determined at trial;

23.     An award to Plaintiff of its costs, including reasonable attorneys' fees, in prosecuting this action; and

24.     Any other relief to which Plaintiff may be entitled as a matter of law or equity, or which the Court determines to be just and proper.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

Original Complaint

## XI. Demand For Jury Trial

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a jury trial on all issues so triable.

Dated this **25th** day of **February, 2021**

Harry J. Williby
Bar #: In Pro Se
Address: P.O. Box 990755
City/State/Zip: Redding, CA
Phone: 000-000-0000
Email: wilabee@protonmail.com

Original Complaint