Harry J. Williby
P.O. Box 990755
Redding,CA 96099-0755
Phone: (000) 000-0000 (cell phone users can be tracked by defendants' Android OS)
E-mail: wilabee@protonmail.com
Attorney for: In Pro Se

FILED

APR 04 2022

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA –SAN FRANCISCO**

| | |
|---|---|
| **Harry J. Williby,** | Case No.: **C-22-01271-VC** |
| **Plaintiff,** | |
| vs. | |
| **Sergey Brin,** | **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR DEFAULT FINAL JUDGMENT** |
| **Larry Page,** | |
| **Pichai Sundararajan, a.k.a.,** | |
| **Sundar Pichai, his predecessor,** | |
| **Eric Schmidt, dba, Alphabet, Inc.,** | |
| **Google, LLC., and YouTube, LLC., dba, Blogger, dba, Google AdSense (Pay-Per-Click)** | **ORIGINAL** |
| **Mark Zuckerberg, dba, Facebook, Inc.,** | |
| **Jeff Bezos, dba, Amazon.com, Inc., and Doe(s)/Roe(s) 1-10, Defendant(s).** | |

The Clerk having entered default against the defendants, the Plaintiff hereby submits this Memorandum of Law in support of its Motion for Default Final Judgment, Monetary Damages and Entry of Final Judgment against the above named defendants, and each of them, jointly and severally.

## I.   Factual Background

The plaintiff spent a period of ten (10) years marketing Google, Blogger (Google Suite Products) Facebook and YouTube, as a content-creator. Plaintiff attracted millions of viewers/readers for the Defendants' platforms. Plaintiff did so based upon assertions by the Defendants Facebook and Google, that he Plaintiff, would share in online generated advertising revenue. Plaintiff's marketing spanned the globe and generated millions of viewers/readers and billions of dollars for the Defendants, jointly and severally. Plaintiff undertook this endeavor beginning in October of 2008 and concluded, only after being banned/blocked from the marketing platforms in 2018, by defendant Google and Facebook. Prior to October 2018, the Defendants paid Plaintiff approximately $2500.00 in online generated advertising revenue, most of which was confiscated by the Defendant. Upon further investigation in 2018, Plaintiff determined that Defendants, Google, Facebook and Amazon had in fact generated $2.2 trillion dollars in online generated advertising revenue, between 2008 and 2018. The defendants achieved this using Google's Pay-Per-Click horizontal market advertising scheme. Further investigation determined that during this same period, the Defendants, jointly and severally, purchased all online advertising companies; and entered into multi-billion dollar online advertising contracts with virtually every major movie and media outlet in the country.   As a consequence of his investigation, the plaintiff discovered that the defendants, jointly and severally, are operating in violation Section 1 of the Sherman Act, 15 U.S.C. § 1; and 15 U.S.C. § 2, the Lanham Act; and other Unfair Business Practices under both State and Federal statute.

Plaintiff filed a Complaint against the defendants on February 28, 2022, in the United States District Court for the Northern District of California, San Francisco Division. The Complaint alleges, in multiple counts, certain anticompetitive practices by the defendants in violation of Section 1 and 2 of the Sherman Act. On March 1, 2022, the Clerk of this Court issued a Summons in a Civil Action, notifying defendants that they must, within twenty-one days after service of the Summons, file with the Clerk of Court, and serve upon the Plaintiff, an Answer to (or rule 12b motion to dismiss) the Complaint.

The Defendants, and each of them, jointly and severally, through their respective representatives, received service of the Complaint and Summons on March 11, 2022. A process server acting on behalf of the Plaintiff, caused the United States Postmaster General's representative, to personally serve upon the Defendants, and each of them, jointly and severally, a true copy of the Summons and Complaint, at their principal place of business in Menlo Park, CA, Mountain View, CA and  Seattle, WA, or at the United States Postal Office, on March 11, 2022. A Pro Se litigant's pleadings and papers are deemed served, upon delivery of said papers and pleadings to the PostMaster General, or his designated representative. [Citations omitted.]

By the expiration of the twenty-one day period specified on the Summons, the defendants had not filed an Answer to (or rule 12b motion to dismiss) the Complaint with the Clerk of this Court, nor had it served a copy of the Answer to (or rule 12b motion to dismiss) the Complaint upon the Plaintiff. To date, the defendant has not responded to the Complaint, nor otherwise appeared in this action. On April 1, 2022, the

Plaintiff attempted to contact each defendant's attorney (General Counsel) by phone to inform them that Plaintiff intended to petition the court for a judgment by default. The Plaintiff received no response from either Defendant, nor any other agent or representative of Defendants, to this phone call.

## II.    The Defendant Has Failed to Answer the Complaint or Otherwise Defend This Action and the Plaintiff is Entitled to a Judgment By Default

Rule 12(a)(1)(A) of the Federal Rules of Civil Procedure provides that a defendant shall serve its answer to a complaint within twenty days of service of the latter. As noted above, the Complaint in this case was filed on February 28, 2022, and personally served upon the defendants, through their employed representatives, on March 11, 2022. The Summons, issued by the Court on March 1, 2022 and served upon the defendants together with the Complaint, notified the defendants of their obligation to file an answer with the Clerk of Court, and to serve a copy of the Answer upon the Plaintiff, within twenty-one days from the date of service. Twenty-one days, from March 11, 2022, service date was April 1, 2022. As of April 1, 2022, defendants had not filed an answer with the Clerk, had not served an answer upon the Plaintiff, had made no entry of appearance in this matter, and had not otherwise responded to the civil action instituted against it by the Plaintiff. To this date, the defendants have undertaken no defense in this matter. On April 4, 2022, the Plaintiff served and filed with the Clerk of the Court, a request for entry of default. The "entry of default by the clerk is a prerequisite to an entry of default judgment." Vongrabe v. Sprint PCS, 312 F. Supp. 2d 1313, 1318 (S.D. Cal. 2004).

The Plaintiff recognizes that entry of a default judgment against a defendant is a severe remedy. Moreover, the Ninth Circuit has opined "judgment by default is a drastic step appropriate only in extreme circumstances; a case should, whenever possible, be decided on the merits." Falk v. Allen, 739 F.2d 461, 463 (9th Cir. 1984). Where, as here, however, a party does not respond to a properly served Complaint and ignores a duly issued and properly served Summons of a Court, a default judgment, though drastic, is the appropriate and, indeed, only recourse. The Ninth Circuit has held that "a defendant's conduct is culpable if he has received actual or constructive notice of the filing of the action and intentionally failed to answer." TCI Group Life Ins. Plan, 244 F.3d at 697. The concept of "intentionally" in this context refers to conduct that is willful, deliberate, or that evidences bad faith. Id. TCI Group explicitly holds at 699, n.6 [...] On the contrary, courts "tend[] to consider the defaulting party's general familiarity with legal processes . . . as pertinent to the determination whether the party's conduct in failing to respond to legal process was deliberate, willful or in bad faith." Id.

There is a general presumption to try cases on their merits, and the instant case does [...] warrant a departure from this presumption.  See In re Hammer, 940 F.2d 524, 525 (9th Cir. 1991). The Plaintiff would prefer that this case be decided upon its merits and has every confidence he would prevail at a trial. Since the defendants do not appear disposed to defend this action, however, this Court has as the only avenue available to conclude this matter, the entry of a default judgment against the defendants, and each of them, jointly and severally. When the Court determines that a defendant is in default, the factual allegations of the complaint are taken as true, and this rule applies whether the

complaint seeks legal or, as in this case, equitable relief. [Citation].

The Plaintiff is submitting to the Court, together with this Motion, a Default Final Judgment. For the benefit of this Court in determining the damages to apply in this case, should the Court agree to enter a judgment by default against the defendants, the Plaintiff offers the following summary of what it expects its evidence would have shown at a trial of this matter.

III.    **Plaintiff Waives Preliminary Injunction/Declaratory Relief and Seeks Default Judgment & Monetary Damages Awarded by the Court**

A.    **Defendants Remain Engaged in Anti-competitive Practices**

Since the inception of this action, presently pending before this court, 36 states and Washington, D.C., have filed major antitrust cases challenging the Defendants Facebook, Amazon and Google's control over their respective Android app stores. Google also faces a suit that the Justice Department and 14 states filed in October (2020), focused on Google's efforts to dominate the mobile search market; one from 38 states and territories filed in December (2020), also focused on search; and a third suit by 15 states and territories related to Google's power over the advertising technology. The Federal Trade Commission and 48 states sued Facebook in December 2020, alleging that Facebook grew its market power by buying up, or bullying potential rivals. The FTC also alleges that Facebook ``eliminated the possibility that rivals might harness the power of the mobile internet to challenge Facebook's dominance.'' The FTC further alleges that in addition to acquiring smaller rivals, such as Instagram, Facebook kneecapped potential competitors by restricting third-party developers who built software that connected to

Facebook's platform. The FTC and the States are seeking remedies that could include a sell off of Facebook's Instagram and WhatsApp divisions. Plaintiff leaves it to the FTC and the States to seek injunctive/declaratory relief against the Defendants.

However, in furtherance of the Defendants' conspiracy to engage in anti-competitive practices, On September 1, 2021, Yahoo! (with a 20% stake in the foreign-owned, online Advertising Giant, Alibaba) was sold to Private equity firm Apollo Global Management. The firm announced that it has completed its acquisition of Yahoo! (formerly known as Verizon Media Group, itself formerly known as Oath) from Verizon. The deal is worth $5 billion, with $4.25 billion in cash, plus preferred interests of $750 million. Verizon has retained a 10% stake in Yahoo!. Verizon has agreed to preinstall Android OS on all phones and tablets they manufactured. Verizon also provides free YouTube TV subscription services to New Verizon Phone customers. In addition, Yahoo!, a competitor of Defendant Alphabet, dba, Google, dba, YouTube, continually hosts Google Adsense, digital advertisements (which include Facebook, Amazon and Google Advertisements), ... all across the Yahoo! Platform.

On March 17, 2022, Defendant Bezos, dba, Amazon closed its $8.5 billion dollar acquisition of MGM studios. MGM previously worked with a number of Amazon's competitors: "The Handmaid's Tale" streams on Hulu, "Fargo" is a key FX property and "Vikings: Valhalla" is currently in Netflix's Top 10. MGM adds a mini-major film studio to Defendant Bezos, dba, Amazon acquisitions. MGM gives Defendant Bezos, dba, Amazon a TV studio that produced nearly 1,000 episodes of television in 2019. Second, it adds valuable intellectual property (IP) such as James Bond and Rocky. Amazon Prime

Video customers can now access the MGM channel for an extra $4.99 per month. All content can be accessed directly through the Amazon Prime Video Channels, effectively boosting the available movies on offer by a considerable degree.

Digital Advertising has become a massive business for Amazon. This is in large part because of the fees Amazon charges sellers for sponsored listings on Amazon.com. The MGM acquisition has a bigger impact on Amazon's $31 billion dollar advertising business. The MGM studio owns 4,000 films and 17,000 TV show episodes. Amazon's video service said that it was now streaming ads to 120 million viewers a month in 2021. IMDb TV has been a key part of Amazon's video ad strategy. Amazon provides IMDb TV as a free service. Instead of providing a cheaper tier to customers willing to watch ads, Amazon simply presents IMDb TV as a free add-on. This allows the company to stream content to and make money from people who don't pay for Prime. In India, Amazon has been streaming ad-supported video with a service called miniTV. The miniTV service is available through the company's mobile Android shopping app. Amazon applied for a U.S. trademark for miniTV in October (2021).

Most notably, MGM studios can be accessed at YouTube.com via https://www.youtube.com/c/MGMStudios/videos . On April 16, 2012, YouTube said it had signed a deal with Metro-Goldwyn-Mayer (MGM) to start adding some 600 titles, including classics like Rain Man and Rocky to the online video site, as well as its Google Play store. Immediately users in the U.S. and Canada got access to some MGM classic content. The MGM deal meant YouTube and Google Play now have for rent (and digital advertising) movie/video content from five of the six major studios--MGM,

Paramount, Universal, Sony Pictures, Warner Bros. and Disney--as well as more than 10 independent movie studios, including Lionsgate, and The Weinstein Company. In early April, 2021, Google signed a deal with Paramount that brought 500 new titles to YouTube and its Google Play store.

In November of 2008, YouTube agreed to show free films and television programmes from Hollywood studio Metro-Goldwyn-Mayer (MGM). The videos were free to watch, with ads running alongside them. At the end of October 2008, Google revealed that it was launching a new agency incentive programme to push advertising on YouTube. On October 18, 2008, CBS (Paramount) began streaming content on the Google' video site. The network began showing a random smattering of shows that include "MacGyver," "Star Trek," the original "Beverly Hills 90210," and current episodes. In 2008, YouTube accounted for 44.1 percent of online video views in the U.S. At all times mentioned herein (and since 1998), Defendant Jeff Bezos, dba, Amazon has been a major financial investor in Alphabet, dba, Google, dba YouTube/YouTube TV (dba, Twitter). As of 2022, Defendant YouTube generates $15 billion dollars annually in digital advertising revenue. This amounts to roughly 10 percent of all Google revenue.

Amazon's purchase of Metro Goldwyn Mayer (Movie Studios) is the company Amazon's 108th online/media acquisition. Amazon owns more than 90% market share in 5 product categories. In 2020, Google accounted for nearly 29 percent of the total digital advertising revenue generated in the United States and was the largest digital ad publisher in the country. Facebook and Amazon followed, with 25 and 10 percent, respectively.

As a direct and proximate result of the Defendants' conspiracy to engage in anti-competitive practices, Plaintiff spent a period of ten (10) years marketing Google, Blogger (Google Suite Products) Facebook and YouTube, as a content-creator, under knowingly false assertions by the Defendants, and each of them, jointly and severally. Plaintiff unknowingly attracted millions of viewers/readers for the Defendants' platforms, through marketing that spanned the globe and generated billions of dollars for each of the Defendants, jointly and severally. Plaintiff would not have knowingly, willingly, or intentionally created such an apparatus had he known it was solely for the benefits of the Defendants, and each of them, jointly and severally.

**B.    The "Obama Phone," the Android OS and Google Adsense Pay-Per-Click Advertisement Represents a Horizontal Market Agreement that has Generated billions of dollars (in online digital Ad) Revenue for Facebook, Amazon And Google.**

The UMX U686CL is a cell phone subsidized by the US government for low-income users. The UMX U686CL is often referred to as the "Obama Phone" by the general public. Then-President Obama expanded subsidized cell phone distribution and phone services for millions of Americans in 2008. The UMX U686CL runs on the Android OS, which is owned by Google and operated by Facebook and Amazon. The UMX device comes with hidden apps installed. The first app, "Android/Trojan.Dropper.Agent.UMX," is heavily obfuscated malware that installs adware and other unwanted apps without the knowledge or permission of the user. Secondly, the app contains an encoded string. When this string is decoded, it contains a

hidden library named: "com.android.google.bridge.Libgmp ." This encoded string aggressively displays ads. Once the library is loaded into memory, it installs software Malwarebytes calls "Android/Trojan.HiddenAds." The malware that installs these programs is hidden in the phone's settings app. This makes it virtually impossible to uninstall. The Computer Fraud and Abuse Act (CFAA), 18 U.S.C. 1030, outlaws conduct that victimizes computer systems. This cyber security law protects federal computers, bank computers, and computers connected to the Internet. The federal government criminalizes the distribution of malicious software in 18 U.S. Code Section 1030. Section 5(A) specifically prohibits you from knowingly causing information, code, commands or programs to be transmitted to a computer without authorization .

The UMX U686CL (operating  on the Android OS with pre-installed  malware), the Defendants' respective Android OS platforms and Defendant's "Google AdSense," "pay-per-click,"   (and  "Google  AdSpend")  programs  are  all  tied  together. "Pay-per-click" means that advertisers (digital ad customers) pay "only when" a person clicks on an ad, even if the click is accidental . As of 2022, Android is the most popular operating system in the world. Android controls 72.72% of the Mobile Operating System Market Share, Worldwide, as of May 2021. There are over 2.5 billion active users spanning over 190 countries. Thus, when 2.5 billion Android devices are activated by the consumer, the defendants, and each of them, jointly and severally, immediately began downloading digital ads to the device, without the knowledge, or permission of the consumer. Not only does "pay-per-click" advertising constitute free advertising, accidental clicks net the three Defendants approximately $1 billion dollars per day in

digital ad revenue. This conduct by the Defendants, and each of them, jointly and severally, has put Plaintiff out of the digital advertising business, … and completely out of the industry. Plaintiff has and continues to suffer exorbitant losses and damages as a direct and proximate result of the Defendants' wilful, malicious, intentional   and tortious conduct, as described in the complaint.

Due to its massive user base, Defendant Facebook makes a lot of money from serving online, digital ads. Most Facebook ads are "pay-per-click." Again, this means that advertisers pay Facebook "only when" a person clicks on an ad. Even though each click may not cost that much, it quickly adds up to billions of clicks and billions of dollars. Facebook currently makes 98.5% of its money from digital advertising. According to Defendant Facebook, "there are now 8 million businesses globally that use their advertising platform."

In 2020, Defendant Amazon's online (pay-per-click) digital ad revenues in the United States are projected to amount to $12.75 billion U.S. dollars with growth declining to a still impressive 23.5 percent year-over-year. In 2019, Amazon's annual online (pay-per-click) digital ad revenue grew by 39.4 percent. Defendant Alphabet's search engine [Google] AdSense ad sales, are the second largest source of revenue for Alphabet.

Defendant Alphabet, dba, Google and Defendant Facebook remain the dominant digital advertising companies. They controlled a combined 58 percent of the $111 billion market, in 2018. This is down from 59 percent in 2017 (Google 38.6% and Facebook 19.9%). Defendant Amazon, Inc., generated $4.61 billion in U.S. digital ad

sales in 2018. This represents 4.2 percent of the total digital ad market.As the United States Court of Appeals for the Second Circuit has recognized, such industry-wide agreements tend to "stiffen the spines" of otherwise competing interests. U.S. v. Apple, 791 F.3d 290, 305 (2d Cir. 2015).

## C.   Barack Obama, Facebook, Amazons and Google Illegal Kickbacks

In furtherance of the Defendants' conspiracy to engage in anti-competitive practices, contracts between the federal government and Amazon, Google, Facebook, and Twitter have exploded in number. As of September 2021, Google has netted $16 million in contracts with the Pentagon, another $2 million with DHS, and nearly $4 million with the Department of Justice (the majority of that with the FBI). Facebook has just over $167,000 in contracts with the Pentagon and $363,600 with the Department of Homeland Security. Twitter, meanwhile, secured a $255,000 contract with DHS. Since 2004, five U.S. government agencies have spent at least $44.7 billion on services from Facebook, Amazon, Google, Twitter (owned by Google/Bezos) and Microsoft. From 2007 to 2019, Amazon saw a 400 percent increase in all federal contracts.

In November of 2021, the CIA awarded its C2E contract, potentially worth tens of billions of dollars, to five companies: Amazon, Google, Microsoft, Oracle and IBM. The companies will compete for specific task orders for certain intelligence needs. In 2021 (Biden), the National Security Agency awarded a secret cloud computing contract worth up to $10 billion to Amazon Web Services. The contract's code name is "WildandStormy." In 2020 (Biden), Amazon secured at least a portion of the CIA's multibillion-follow-on C2E contract. Amazon first inked a $600 million cloud contract

with the CIA called C2S in 2013 (Obama). Amazon provided cloud services to the CIA and sister intelligence agencies, including the NSA. On November 21, 2021, Defendant Bezos, dba, Amazon announced a $100 Million dollar donation to Barack Obama's Private Foundation. The $100 million donation was arranged by Jay Carney, Bezos' political liaison and the former Obama press secretary. Carney was the point man for Bezos, and Obama eventually spoke directly with the Amazon C.E.O. earlier this year. The donation is the largest individual contribution the Obama foundation has received to date. In addition, virtually every book written by Obama is sold through Amazon.

Amazon paid no taxes under Obama. Amazon has never paid any taxes no matter who was in office. Amazon actually owed money to the federal government in 2019. After two straight years of paying $0 in U.S. federal income tax, Amazon was on the hook for a $162 million bill in 2019. $162 million is still just a fraction of the $13.9 billion in pre-tax income Amazon reported for 2019 (roughly 1.2%, in fact). The federal corporate tax rate is 21%. However, as in the past, Amazon employed various tax credits and deductions to reduce its federal tax bill. Amazon also reported $280.5 billion in total revenue in 2019. In 2018, Amazon posted income of more than $11 billion, but the company paid $0 in federal taxes. In fact, thanks to tax credits and deductions, Amazon actually received a federal tax refund of $129 million. That was a year after Amazon received a $137 million refund from the federal government for 2017 .

In furtherance of the Defendants' conspiracy to engage in anti-competitive practices, the Defendants, and each of them, jointly and severally, provided the sitting (and now former) President with services of monetary value. In the 2020 election cycle,

the Defendants, jointly and severally, donated over \$430 million dollars to Democrat candidates. In 2012, Facebook allowed then-President Obama to hack Facebook's API system to access voters and to raise campaign donations in the 2012 elections. Between 2008 and 2012 and 2020-to-present, the Defendants, and each of them, jointly and severally, provided Obama with millions in election funding, millions in private funding and private company platform support. The Defendants, and each of them, jointly and severally, were rewarded with positions within the Obama-Biden administrations ... that allowed Defendants, unchecked, to engage in anti-competitive practices. In fact, Defendants' product bears Obama's name, to wit: "Obama Phone." 11 CFR § 9012.5 (Kickbacks and illegal payments) holds: **(a)** It shall be unlawful for any person knowingly and willfully to give or accept any kickback or any illegal payment in connection with any qualified campaign expenses of any eligible candidate or his or her authorized committee(s). Subdivision **(b)** holds: It shall be unlawful for the national committee of a major or minor party knowingly and willfully to give or accept any kickback or any illegal payment in connection with any expense incurred by such committee with respect to a Presidential nominating convention.

There exists a prima facie showing that Obama has received enormous monetary illegal kickbacks from the Defendants, and each of them, jointly and severally. Obama took virtually no steps to prevent Defendants fromengaing in unlawful, anti-competitive practices. It is now Obama who receives millions of dollars in annual revenue from Facebook, Amazon and Google. Obama's post-Whitehouse, personal wealth now exceeds \$475 million dollars. The entire sum of \$475 million dollars was received by Obama,

from the Defendants, and each of them, jointly and severally ($575, including recent $100 million from Defendant Bezos). On the other hand, after ten (10) years of marketing, developing content, and promoting advertisements on Defendants' platforms, … Plaintiff walked away with $0.00 dollars.

## D.    Description of the Defendants

Defendant Alphabet Holding Corporation (hereafter "Alphabet") was created by Law as a private legal entity, for profit, and with "general corporate powers," under the Delaware General Corporation Law (where Alphabet is incorporated). Alphabet is an American multinational conglomerate headquartered in Mountain View, California 94043, at 1600 Amphitheatre Parkway (County of Santa Clara). Alphabet, Inc. was created through a corporate restructuring of Google on October 2, 2015. On January 16, 2020, Alphabet became the fourth US company to reach a US$1 trillion dollar market value. At all times mentioned herein, Defendants Brin, Page, Schmidt and Pichai, owned and operated the company.

Defendant Facebook, Inc. is a California corporation that was founded in 2004, by Defendant Mark Zuckerberg. Defendant Facebook's Headquarters is located at 1 Hacker Way, Menlo Park, California 94025. As of June 2021 Facebook has a market cap of $961.30 B. This makes Facebook the world's 6th most valuable company.

Amazon, owned by Defendant Jeff Bezos, is a Delaware corporation with its principal place of business in Seattle. Amazon has a principal place of business at 1200 12 th. Ave. South, Suite 1200, Seattle, WA 98144. The Amazon organizational structure favors a vertical hierarchical approach with global, function-based groups and geographic

divisions. This gives the company extensive top-down control over global operations, allowing it to increase market share and maintain market leadership status. Amazon's net worth as of November 11, 2020, is more US$1.7 trillion dollars, making it the second-most valuable company in the U.S., trailing only Apple.

## E.   Anti-Competitive Business Practices

The first cause of action alleged in the Complaint is that the defendants violated Section 1 of the Sherman Act by shadow banning Plaintiff's websites. The Complaint alleges [that] [s]ince 2003, Defendants have tightly limited the supply and territorial markets of online advertisement in the United States and around the world, through its Google "AdSense (Pay-Per-Click)" program. The Complaint alleges that as a direct consequence of the actions of the defendants, and each of them, jointly and severally, and specifically the purchasing of all online ad companies, in combination with the shadow banning, and demonization of Plaintiff's websites, said conduct prohibited Plaintiff from generating online ad revenue.

The Complaint further alleges that the defendants, by their actions, encouraged and, as a combination of price-fixing (pay-per-click) shadow banning, demonetizing and terminating Plaintiff's YouTube channels, in addition to purchasing of all online ad companies, under Section 1 of the Sherman Act, participated in a group boycott to refuse to deal with Plaintiff as a seller of seller, creator and hosting agent of online ads to the public through the Internet and to eliminate price competition in the sale of online sales of goods, services, and specifically digital advertising. Advertising is YouTube's central mechanism for gaining revenue. The group boycott as described in the Complaint

constituted a violation of Section 1 of the Sherman Act and had the effect of unreasonably restraining trade and commerce in the sale of online sales of goods, services, and specifically digital advertising.

## F.    The Android OS Malware Supported Monopoly

The second cause of action alleged in the Complaint is that the defendants violated Section 1 of the Sherman Act by demonetizing Plaintiff's YouTube Channels and websites. The defendants, jointly and severally, are the world's largest providers of the Android OS, Google Apps, Google Search browser, Internet advertising, online sales, and online news feeds. There are over 2.5 billion active Android devices. Android is provided to consumers at no cost. All three defendants function on the Android OS and exercise complete platform control. Defendant Google's Android is used daily by 1.17 billion people worldwide, while 1.35 billion people use Defendant Facebook's Apps daily. Defendant Amazon has 300 million active users on its Android platform. Nearly two-thirds of Americans have bought something from Amazon. This represents more than 90% of US online shoppers. As the Plaintiff alleges in the complaint, the Defendants, jointly and severally, accomplish demonetization of websites, through absolute control of the Android OS. The pre-installed (digital advertising) malware on Android devices forecloses any competition is digital advertising by Plaintiff, or any other business.

## G.    False Advertising of YouTube's True Corporate Persona

Before being purchased by Google in 2006, YouTube declared that its business model was advertisement-based, making $15 million dollars per month. Advertising

remains YouTube's central mechanism for gaining revenue. Defendant Alphabet advertised YouTube as an alternative to mainstream media beginning in 2006. However, at the time of purchase in 2006, YouTube had in fact already entered into multiple contracts, with multiple mainstream movie and media outlets. In 2008, when Plaintiff joined YouTube, the Defendants had roughly 65 million unique visitors per month. After a decade of Plaintiff marketing YouTube, YouTube is a global media property that reaches every corner of this planet. Approximately 5 billion videos are watched on Youtube every single day. Every single video viewed on YouTube, displays digital advertisements. Defendant Google's false advertisement of YouTube as an alternative to mainstream media added up to a total of $17 billion of revenue in 2019. Defendant Google's hardware businesses (phones/tablets, etc.) are lumped together with subscription services like YouTube Premium and YouTube Music Premium in Defendant Google's "Other" category. Through this false advertisement and bundling of services, the Defendants (during the operative times of the complaint) have shared, or will share, more than $1.4 Trillion in online, digital advertising revenue. Plaintiff, in reliance on these false assertions and hidden persona of Defendant YouTube, netted $0.00 dollars after a ten (10) year marketing and content creating campaign.

## H.    Illegal Agreements

To protect its valuable Android monopoly against such potential competitive threats, and to extend its operating system monopoly into other software markets, The Defendants, jointly and severally, have engaged in a series of anticompetitive activities. The Defendants' conduct includes agreements tying other software products to the

Android operating system; exclusionary agreements precluding companies from distributing, promoting, buying, or using products of Android's software competitors or potential competitors; and exclusionary agreements restricting the right of companies to provide services or resources to Android's software competitors or potential competitors. The Defendants have entered into anticompetitive agreements with virtually all of the nation's largest and most popular ISPs, including particularly Online Service Providers ("OLSs"), firms which provide the communications link between a subscriber's PC, Cell Phone and the Internet and sometimes related services and content as well.

These agreements extend to group boycotting website owners, content creators, and bloggers such as Plaintiff. Complaint alleges that the defendants, by their actions, encouraged and participated in a group boycott of Plaintiff's websites. The group boycott as described in the Complaint constituted a violation of Section 1 of the Sherman Act and had the effect of unreasonably restraining trade and commerce in the sale of online, digital advertisement. Said conduct as described above, prohibited Plaintiff from generating online ad revenue. For a period of ten (10) years, and continues to prohibit Plaintiff from generating online ad revenue.

I.     **The Complaint States Claims on Which Relief May Be Granted**

Section 1 of the Sherman Act proscribes every "contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states[.]" Group boycotts, or concerted refusals to deal, fall within the class of restraints prohibited by the Sherman Act. See, e.g., Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 212, 211 (1959). A classic group boycott involves, as does the boycott by defendant

in this case, concerted action by competitors with "'a purpose either to exclude a person or group from the market, or to accomplish some other anti-competitive object, or both.'" [Citation]. See Brantly v. NBC Universal, Inc., 675 F.3d 1192, 1197 (9th Cir. 2012); Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1047 (9th Cir. 2008).

The Ninth Circuit held in Sicor, Ltd. v. Cetus Corp., 51 F.3d 848, 854 (9th Cir. 1995) (emphasis in original) (citations omitted). In general, a "plaintiff [also] must allege both that a 'relevant market' exists and that the defendant has power within that market." Newcal Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1044 (9th Cir. 2008); see also In re Wellpoint, Inc. Out-of-Network "UCR" Rates Litig., 865 F. Supp. 2d 1002, 1029 (C.D. Cal. 2011). The Complaint in this case alleges, in multiple counts, that the defendants, and each of them, jointly and severally, agreed to undertake concerted efforts to exclude, and thus eliminate, competitors from the digital advertisement, Operating Systems, Search Engine, and online sales market. An association such as the defendants Facebook, Alphabet and Amazon is a group of competitors, and an agreement among members of an association unreasonably to restrain interstate trade violates the Sherman Act. Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1007 (3d Cir. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1691 (1995). Concerted action by dealers to protect themselves from the price competition posed by discounters, as the complaint in this case alleges, constitutes a form of horizontal price fixing, and is a per se violation of the Sherman Act. Denny's Marina, Inc. v. Renfro Productions, Inc., 8 F.3d 1217, 1221 (7th Cir. 1993).

**J.     Explanation of the Default Final Judgment**

The Plaintiff believes that the Default Final Judgment provides adequate remedy and damages for the alleged violations. The Default Final Judgment is intended to insure that defendants do not continue to exclude Plaintiff, and thus eliminate competitors from acquiring such online companies for marketing and sale. It prohibits the defendants from engaging in a variety of means and methods of conduct designed to deprive content creators/website owners from gaining access to sources of supply, advertising space, advertiser lists, or other resources useful in the marketing or selling of digital advertisement. The Default Final Judgment does not prevent the Defendants from unilaterally declining to deal with any content creators/website owner, so long as its reasons for doing so are bona fide. Furthermore, the Default Final Judgment compensates Plaintiff for Defendants Facebook, Amazon and Google concerted attempts to maintain its monopoly in operating systems, Internet search browsers and digital advertising to achieve dominance in other markets, not by innovation and other competition on the merits, but by tie-ins, exclusive dealing contracts, and other anti competitive agreements that deter innovation, exclude competition, and rob customers of their right to choose among competing alternatives.

## IV.   CONCLUSION

Based upon the knowledge it has acquired through its investigation of the defendants and defendants' conduct, the Plaintiff believes that the Default Final Judgment will effectively compensate Plaintiff and place defendants on notice regarding future violations of Section 1 of the Sherman Act by defendants, without imposing any onerous burdens on the Defendants' ability to function as competing businesses that are

dedicated to serving the legitimate needs and interests of its consumers. For the foregoing reasons, the Plaintiff respectfully requests that the Court enter a judgment by default against defendants and each of them, jointly and severally, and award monetary damages to Plaintiff, as set forth in the complaint.

Respectfully submitted,

Dated this **1st** day of **April, 2022**

*Harry J. Williby (CGS)*
Harry J. Williby
Bar #: In Pro Se
Address: P.O. Box 990755
City/State/Zip: Redding, CA
Phone: 000-000-0000
Email: wilabee@protonmail.com